1  THIMESCH LAW OFFICES
   TIMOTHY S. THIMESCH, Esq. (No. 148213)
2  158 Hilltop Crescent
   Walnut Creek, CA 94576-3452
3  Direct: (925) 588-0401
   Facsimile: (888) 210-8868
4  tim@thimeschlaw.com

5  Attorneys for Plaintiff
   HOLLYNN D'LIL

6

7

8                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
9

10 HOLLYNN D'LIL,                          CASE NO. 2:11-CV-02230-WBS-AC
                                           Civil Rights
11         Plaintiff,

12 v.

13 RIVERBOAT DELTA KING, INC.;            **Hearing**
   CITY OF SACRAMENTO; OLD SACRAMENTO     Date:    September 22, 2014
14 BUSINESS ASSOCIATION, INC.; and DOES 1  Time:    2 PM
   through 50, Inclusive,                  Place:   Courtroom 5
15                                         Judge:   Hon. William B. Shubb
           Defendants.
16

17 _____/

18        **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**

19             **IN OPPOSITION TO DELTA KING'S**

20   **MOTION FOR SUMMARY ADJUDICATION OR ALTERNATIVE STAY**

21

22

23

24

25

26

27

28

**Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication:**
**Case No. 2:11-CV-02230-WBS-AC**

1

## <u>TABLE OF CONTENTS</u>

2
TABLE OF AUTHORITIES ....................................................................................iv

3
REQUEST FOR SUA SPONTE CROSS-GRANT.................................................1

4
INTRODUCTION ...................................................................................................1

5
ARGUMENT

6
I.    SHAM & CONCLUSORY AFFIDAVITS SHOULD BE STRUCK ............2

7
II.   <u>ISSUE 1</u>: UNNOTICED ISSUE RE "PLAINTIFF'S BURDEN".................

8
        A.    OBJECTION.................................................................................

9
        B.    DELTA KING HAS BURDEN ON DEPARTURES AND SHBC ISSUE.........

10
III.  BOOTLEGGED CONSTRUCTION AND SELF- GRANTED HARDSHIP .............14

11
IV.   THE DELTA KING IS NOW A "LAND-BASED" STRUCTURE ...........................15

12
V.    ISSUE 2: ACCESS INFRASTRUCTURE REGULATED AS "RAMPS"

13
        A.    The Access Infrastructure Was Required to Comply .......................................18

14
        B.    Delta King Fails to Address the Governmental Bases of Liability .................19

15
        C.    Delta King's Affidavits Are By Those Not Involved......................................20

16
        D.    The Presence of a "Hull" Simply Presented another Enforcement Duty .........20

17
        E.    Part 2 Regulated the Aft Service Ramp ........................................................22

18
        F.    Part 2 Regulated Both Ramps, Not an Either-Or............................................24

19
        G.    Delta King's Position about the Applicability of Part 2 is Inconsistent...........24

20
        H.    Exemptions Involving New Construction Required Appeals Ratification.......25

21
        I.     Access Infrastructure not Part of a Recreational Boating Facility ..................25

22
        J.     Codes Differentiate Facilities in Scoping .......................................................26

23
        K.    Section 504 and Readily Achievable Cover Elements of the Aft Ramp .**Readily**

24
VI.   <u>ISSUE 3</u>: ACCESS TO FOURTH AND FIFTH DECKS IS REQUIRED

25
        A.    Summary of Argument Regarding Non-Existence of Elevator Exception.......27

26
        B.    The Building Department Clearly Misunderstood its Enforcement Duties......27

27
        C.    The Structure and Job Determine Which Parts of the Code to Apply.............28

28
        D.    There was No Unbridled Discretion or Basis for Estoppel .............................28

**Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication:
Case No. 2:11-CV-02230-WBS-AC**

E.   Delta King Pursues a Theoretical "See-What-Sticks" Approach .................... 37

F.   Equivalent Facilitation is not a form of Exception ............................................ 38

G.   Section 19958 is a Statutory Mandate and Not Suggestive of Discretion ........ 38

H.   H&S Section 18954 Provides No Unbridled Discretion ................................... 39

I.   Reliance on Section H&S 19957 Requires Following Procedures for UHE .... 41

J.   "Modifications" under UBC Section 106 are Not Authorized ........................ 43

K.   Defendants Exceed the Maximum Square Feet for an Exemption .................... 43

L.   Unilateral Posting of a Warning Sign was Not a Form of Exception .............. 53

M.   Hearsay Otherwise Cannot Establish "Exemptions" ....................................... 44

N.   Service at the Base of a Staircase is never "Equivalent Facilitation" .............. 46

O.   2008 Remodel and Other Work Re-Triggered Vertical Access Obligations ... 50

VII.   ISSUE 4: COMPLAINT DOES NOT DEMAND COMPLETE LEVELING

A.   Common Mitigations Are Available ................................................................. 51

B.   We Know No Records are Missing on this Point ............................................. 53

C.   The Unilateral Placement of Mats Demonstrates No Historical Concern ........ 53

D.   Delta King May Not Rely Upon Hearsay or Mashed Together Exceptions ..... 53

VIII.   ISSUE 5: A STAY WOULD NOT BE PROPER

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK, CA 945976
(925) 588-0401

1

# <u>TABLE OF AUTHORITIES</u>

2

3

**[To be supplied]**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK, CA 945976
(925) 588-0401

1

## REQUEST FOR CONSIDERATION OF A *SUA SPONTE* CROSS-GRANT

Plaintiff apologizes for seeking an extension of time to file a dispositive motion, and then not filing.  While preparing this filing, plaintiff's access consultant Barry Atwood, who had been responsible for the essential and large supporting affidavit with proofs respecting the multiple barrier claims, became unexpectedly hospitalized on July 8, and was release only last week.  Nevertheless, plaintiff hopes that the Court will consider exercising discretion to cross-grant summary adjudication where appropriate.  "Even when there has been no cross-motion for summary judgment, a district court may enter summary judgment *sua sponte* against a moving party if the losing party has had a 'full and fair opportunity to ventilate the issues involved in the matter.'" [1]

## INTRODUCTION

The witnesses have been heavily deposed and cross-examined about the alleged "exceptions" they received from the building department to depart from Title 24's code requirements.  But to read the declarations, it's as if the depositions never happened.  Testifying through only broad legal conclusions, the Coynes, Sullivan and Wisham attempt to take it all back.

As will be demonstrated, the code requirements were extremely precise.  All witnesses agreed that procedures for all forms of possible exceptions, exemptions and alternatives, the required procedures were not followed.  For example, they all agree cost data was not provided in connection with requests, findings were not recorded other than through the allowances made within the blueprints themselves, and no appeals ratification procedures were pursued.  Because of these deficiencies, Delta King cannot come close to qualifying for code departures, and no amount of broad conclusory legal statement about "balancing codes" can change this outcome.  The procedures were mandatory.  The building department simply did not have

---

[1]  *Gospel Missions of America v. City of Los Angeles* 328 F3d 548, 553 (9th Cir. 2003), quoting, *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 312 (9th Cir.1982).

1   discretion to grant departures under any basis it desired.

2         The access infrastructure must also comply.  The only declarations come from

3   witnesses who were not involved with its design and construction, and Delta King does not

4   qualify as a "recreational boating facility" in order to access new departures allowed by ADAS.

5         Last, there is no basis for allowing a stay.  There are no "pending proceedings" to

6   qualify under the rule, and Delta King and City have not shown diligence in searching the

7   available documents that it admits it already has.  Indeed, they earlier sought time to conduct

8   this search, and without explanation abandoned it.  They cannot be allowed to take advantage

9   of their own purposeful "loss" of records.

10

11                                 **ARGUMENT**

12   **I.       THE SHAM AND CONCLUSORY AFFIDAVITS SHOULD BE STRUCK**

13         **A.       RULE APPLIES TO HEARSAY, CONTRADICTION AND CONCLUSION**

14         All three Coyne brothers, as well as Sullivan and Wisham have submitted sham

15   affidavits with the intent to shroud their prior testimony.  "A sham affidavit is a contradictory

16   affidavit that indicates only that the affiant cannot maintain a consistent story."[2]  Under the

17   sham evidence rule, "the concern... is that a party will first admit no knowledge of a fact but

18   will later come up with a specific recollection that would override the earlier admission."[3]

19   A district court may "disregard 'sham' affidavits that contradict deposition testimony submitted

20   solely to generate [an] issue of fact for summary judgment purposes," or in this case, to mislead

21   the Court that there exists is an issue of "undisputed fact."[4]  This is referred to as a "reverse

22   sham-affidavit."

23              Just as a party who has been examined at length on deposition cannot raise an
              issue of fact simply by submitting an affidavit contradicting his own prior

24

25   **2**   *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 254 (3d Cir. 2007).

26   3   *Buckner v. Sam's Club, Inc.*, 75 F.3d 292-293 (7th Cir. 1996).

27   **4**   *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir. 1997), citing *Kennedy v.
        Allied Mutual Ins. Co.*, 952 F.2d 262, 266-267 (9th Cir. 1991).

28

testimony, so also we think it clear that a party moving for summary judgment cannot extinguish a genuine issue of material fact simply by filing an errata sheet and affidavit to counteract the effect of previous deposition testimony.[5]

"If a party who has been examined at length on deposition could raise an issue of fact [or undisputed fact] simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."[6]   The "sham affidavit" rule is not limited to depositions, and includes other prior statements under oath, such as interrogatory responses.[7]   Before disregarding such disingenuous affidavits, "courts must first make a factual determination that the contradiction was actually a 'sham.'"[8]   An affidavit is a "sham" if the court finds that the party submitting the affidavit or declaration fails to "provide[] a sufficient explanation for the contradiction."[9]

Courts may also reject declarations containing only conclusory allegations on the ultimate legal issue are not sufficient to defeat summary judgment.[10]   For instance, the Tenth Circuit rejected as conclusory an expert's declaration that an air bag system constituted a "defect in design," particularly since there was no mention of how a frontal air bag would have aided in a side-impact collision.[11]

Also subject to being struck are affidavits containing hearsay (statements by others) generally fail Rule 56(c)(4) standards, above: "hearsay evidence in Rule 56 affidavits is entitled

---

[5]   *A.C. ex rel. J.C. v. Shelby County Bd. of Educ*., 711 F.3d 687, 702-703 (6th Cir. 2013).

[6]   *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir. 1975).

[7]   *School District No. 1J, Multnomah County, Oregon v. ACandS, Inc*., 5 F.3d 1255, 1264 (9th Cir.1993).

[8]   *Kennedy*, 952 F.3d at 267.

[9]   *Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1242 (N.D. Cal. 2004).

[10]   *Sitrick v. Dreamworks, LLC*, 516 F3d 993, 1001 (Fed. Cir. 2008); *see M & M Med. Supplies & Service, Inc. v. Pleasant Valley Hosp., Inc*., 981 F2d 160, 164 (4th Cir. 1993); *In re Segerstrom*, 247 F3d 218, 227 (5th Cir. 2001); *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F3d 290, 311 (2nd Cir. 2008).

[11]   *Evers v. General Motors Corp.* (11th Cir. 1985) 770 F2d 984, 986.

---

1  to no weight."[12]/  Finally, affiants are required to have personal knowledge.  For instance, many

2  affidavits contain statements to the effect, "I have personal knowledge of each and every fact

3  stated herein and am competent to testify thereto if called as a witness at trial."  However, such

4  statements alone are *not sufficient* to establish personal knowledge and competency.  That must

5  be shown by the facts stated: i.e., they must be matters known to the declarant personally, as

6  distinguished from matters of opinion or hearsay.[13]/

7          One exception to these rules are "admissions in the opposing party's pleadings (even if

8  unverified) are admissible evidence (FRE 801(d)(2)) and therefore can serve as the basis for

9  summary judgment or opposition."[14]/

10

11          **B.     DELTA KING'S ENTIRE CHANGE OF POSITION IS A SHAM**

12          Delta King started this case arguing that public accommodations law (i.e., Health &

13  Safety Code 19955-19959 as enforced through Title 24) did not apply to Delta King.  Indeed,

14  Delta King's Answer stated this explicitly at affirmative defenses 28 and 29, then failed to

15  allege a single affirmative defense supporting right to seek a code departure, and it quickly

16  became evident Delta King was not at all certain Title 24 had even been enacted during the

17  conversion period, and that this was the reason it believed formal exceptions under Title 24

18  were not required.  Finally, it was clear Delta King thought that its plans were sufficient

19  evidence standing by themselves to constitute "formal approval" by the building department.

20  The combination of these positions carried forward into the earliest deposition of Ed Coyne,

21

22  [12] *Scosche Industries, Inc. v. Visor Gear Inc.*, 121 F3d 675, 681 (9th Cir. 1997) (internal quotes
       omitted); *Harris ex rel. Harris v. Pontotoc County School Dist.*, 635 F3d 685, 692 (5th Cir.
23     2011) (**hearsay** evidence in defamation case inadmissible); *Brintley v. St. Mary Mercy Hosp.*
       904 F.Supp.2d 699, 731] (ED MI 2012).

24
25  [13] *Bank Melli Iran v. Pahlavi* 58 F3d 1406, 1412 (9th Cir. 1995) (declarations "on information
       and belief" entitled to no weight where declarant lacks personal knowledge); and *Argo v.
26     Blue Cross & Blue Shield of Kansas, Inc.*, 452 F3d 1193, 1200 (10th Cir. 2006) (striking
       portion of affidavit as to which affiant clearly had no personal knowledge).

27  [14] *Lockwood v. Wolf Corp.* (9th Cir. 1980) 629 F2d 603, 611; Cal. Prac. Guide Fed. Civ. Pro.
       Before Trial Ch. 14-E.
28

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

where the following interchange took place:

    Q. MR. THIMESCH: Did you make any formal applications for hardship exception during the renovation period to the Building Department, any formal application to the Building Department for hardship exception?

    MR. POST: **It assumes facts not in evidence, applicable law not yet enacted**, and calls for a legal conclusion.  Answer to the best you can.  (Emphasis added.)

    THE WITNESS: I'm not familiar with the term "hardship exclusion."

    Q. MR. THIMESCH: Okay. Maybe I don't need to ask you this question because I just understood you to say that blueprints are the only paperwork you ever saw submitted to the Building Department or coming back from the Building Department.

    A. Well, aside from the applications that go with the blueprints.

    Q. You're referring to a permit application?

    A. Permit applications, yes.

(E.Coyne Depo at Pltf's Exh 92, pp. 99:10 thru 100:7.)  This "plans approval" position played out in the depositions of Timothy Sullivan, Solon Wisham, Charlie Coyne, and Joanna Stevens. It was only by the time of the final Delta King deposition of Mike Coyne, who testified dead last, that Delta King apparently had come around to rethinking its over reliance on the "plans-approval" position, and sought to establish that "unreasonable hardship" paperwork actually existed.  However, as will be shown, Mike Coyne basically states his recollection of this paperwork was confined to correspondence that he saw on Delta King letterhead, which he later expands in his thinking to include hardship forms, but which he can't describe at all, or even relate any of details as to the information contained in those letters or forms.  Thus, with Mike Coyne's testimony and now the Sham Affidavits, it is now clear that Delta King has now come full circle from its earlier position that public accommodations law did not apply, and that plans-approval was by itself sufficient.  Now they rely directly upon public accommodations law as a means of arguing exception.

    Delta King and the Coynes are bound by the theory of non-applicability of public accommodations law that they disclosed in their pleadings.  They cannot now reinvent their case for the purpose of proposing a motion for summary judgment.  ("[T]he necessary factual

1   averments are required with respect to each material element of the underlying legal theory . . .

2   "Simply put, summary judgment is not a procedural second chance to flesh out inadequate

3   pleadings."[15/]

4

5        **C.    WISHAM'S DECLARATION IS AN UNSUPPORTED SHAM**

6        By far the more expansive of the two governmental declarations submitted by Delta

7   King on the issue of "formal approval" comes from Assistant City Manager Solon Wisham.

8   However of the two city witnesses, he is by far the least qualified to testify.  He simply has no

9   personal knowledge.  He admitted he had no jurisdiction over building code enforcement, that

10  he lacked sufficient technical expertise regarding such codes and Title 24, that he did not

11  participate in any determinations, that he never saw a formal exception being granted, and that

12  he only "listened in" on a series of conversations.  Nevertheless, without explaining this prior

13  testimony, he now sees fit to make bold and broad legal conclusions about the City having

14  made "determinations," "balancing the codes," "providing as much access as possible," etc.

15       Unfortunately, because all such broad and meaningless conclusions lack foundation,

16  serve to contradict his earlier testimony, and purport to rely only on pure unrecorded hearsay,

17  plaintiff moves to strike.  Wisham's testimony is just another version of the same "over-the-

18  counter-discussions" rejected in Donald v. Café Royale.  Moreover, it is clear from Wisham's

19  testimony that both the Delta King and the City relied upon the perception that they had

20  unlimited "discretion" to determine how to apply the building code while bypassing Title 24's

21  formal proscriptives for departures, i.e., "unreasonable hardship exceptions" (UHE) and "legal

22  and physical constraints" (LPC) (exceptions Wisham has never heard of).  In other words,

23

24     **15** *Wasco Products, Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)

25     *Pickern v. Pier 1 Imports, Inc.,* 457 F.3d 963, 968 (9th Cir. 2006) (plaintiffs were required to
   provide notice of factual allegations in their pleadings; refusing to allow new theories to be

26     presented for first time in opposition to motion for summary judgment); *Britz Fertilizers v.*
   *Bayer Corp.*, 2009 WL 3365851 *11 (E.D. Cal. October 16, 2009) ("Britz's failure to allege

27     this theory of indemnity liability and its effort to raise this theory for the first time at
   summary judgment is fatal.").

28

1   Wisham and Sullivan believed they had authority to grant departures on any criteria they

2   desired.

3          The problems with Wisham's declaration are manifold.  To begin, he lacks all personal

4   knowledge.  He admits that during the conversions at his office, he didn't know what "codes"

5   were being enforced, and incorrectly refers to a "city code" (there was none in relation to

6   building regulations).  (Wisham Depo at Pltf's Exh 89, p. 59:13024.)   Wisham then admits that

7   he had no technical expertise, authority, or legislative mandate over building code enforcement.

8   (Id. at pp. 59:25 thru 60:24; 70:12 thru 71:6; 75:13 thru 76:19; 77:2-17; 91:3 thru 92:16

9   (including discussion between counsel about plaintiff's counsel "beating a dead horse" on

10  Wisham's rather limited involvement.)

11          No meetings involving Wisham took place on the Delta King during the construction

12  phase. (Id. at p. 79:12-14.)  Wisham admits that while he attended approximately five meetings

13  at his office at City Hall dealing with a multitude of issues from fire, ingress, egress, building

14  codes that relate to electrical and plumbing, etc., but that he only listened and did not weigh in.

15  He knows of no notes, documents or other recordings of the contents of those meetings, and

16  there's no list of attendance.  (Id. at pp. 79:21 thru 81:20; 18-23.)  He recalls the attendance of

17  fire marshal Dennis Smith and Tim Sullivan, but he does not remember anyone else.  (Id. at pp.

18  78:13 thru 79:6.)  No one from a disabled advocacy group or a state governmental entity

19  attended the meetings, and Wisham is not aware of the City Council ever convening regarding

20  exceptions or variances to Title 24's handicap access requirements.  Wisham also says there

21  was no "appeals board," at that time, and that he would know from his role as City Manager.

22  (Id. at p. 104:21-105:21.)

23          Wisham then admits he never saw any formally approved exception.  He testified that

24  as to access to the fourth floor bar and guestrooms, he only "knew" that "the design was

25  approved by without access…via elevator," but **admits that he did <u>not</u> know if an "exception**

26  **of any type was granted formally approving the [interior elevator] design," nor whether**

27  **an exception was granted formally approving the design to "get on or off the boat,"** i.e.,

28  the access infrastructure.  (Id. at pp. 66:20 thru 67:24.)  More broadly, Wisham admits he had

1   never seen any "written formal exceptions of any nature relating to handicap access and

2   departures from Title 24 building regulations." (Id. at p. 84, lines 8-12 and 20-24.) Wisham

3   also never saw any historical preservation reports related to the Delta King. (Id. at p. 72:4-8.)

4       Furthering his lack of personal knowledge, Wisham then admits he has no idea what a

5   formal exception from the building department looks like as he's never seen one. (Id. at p.

6   68:7-13.) Wisham bandies about arguing that he saw some "reports," but says the only reports

7   he saw dealt with the exterior elevator barge, but not the interior elevator. (Id. at pp. 68:13 thru

8   69:13.)

9       Wisham admits no serious alternatives were considered for interior access to the upper

10  floors. For instance, he was never shown a proposed design for the elevator that penetrated the

11  top floor, nor was he told how much it would have penetrated in terms of feet. He never saw a

12  design for the elevator that reached only the fourth floor, and Wisham never suggested any

13  alternatives. The only discussion was an elevator that pierced the roof line of the fifth deck.

14  (Id. at pp. 71:7-12 and lines 16-18; 86:2 thru 87:7.)

15      The excepting procedures under Title 24 for UHE and LPC are extremely specific in

16  terms of the criteria and recordation of findings, and for the LPC, taking the further step of

17  gaining appeals ratification. Both Sullivan and Wisham were fairly deposed.[16] However,

18  Wisham's deposition established these processes were ignored.  It was all back room. Thus,

19  there is no basis for Wisham to now testify as to the alleged "proper balancing" of the codes.

20  ////

21

22

23  _____

    [16] Plaintiff videotaped Sullivan's deposition and can provide same to the Court if necessary in

24  connection with the Court's analysis of this issue. Of note, Sullivan and Wisham's attorney,
    Kathleen Rogan, was present for the entirety of both depositions. She has not submitted a

25  declaration stating that she thought these witnesses were confused or misled by the
    questioning. Rogan raised almost no objections during the depositions and has not done so

26  now. Rogan asked no follow up questions of the two witnesses at the deposition. Very few
    corrections were subsequently served. Few objection was raised to the manner of plaintiff

27  counsel's questions at the time, and in fact, as the transcript makes clear, the questioning was
    polite and measured in pace.

28

**Thimesch Law Offices**
158 HILLTOP CRESCENT
WALNUT CREEK,

**Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.
2:11-CV-02230-WBS-AC**                                                          — 8 —

1          **D.      SULLIVAN'S DECLARATION IS AN UNSUPPORTED SHAM**

2          Sullivan's declaration dedicates itself to trying to escape the admission made at

3   deposition.  Foremost is that approval of Title 24 departures was communicated only by

4   "placing a note on the plans" (i.e., such as that Delta King cites on page A-10 of the "Mike

5   Coyne Set), and also the admission that Sullivan was unaware of the specific requirements of

6   the historical code, which he only "considered."  Sullivan attempts his escape through a series

7   of expansive and conclusory statements.  For instance, his declaration now argues codes were

8   applied "to the maximum extent possible," that there was an "extensive period of discussion

9   and deliberation," that "conflicting objectives of preserving historical fabric" were balanced,

10  and that analysis was done on an "item by item basis."  (– the last using a blanket statement to

11  describe item-by-item consideration.)  All of these statements are as baldly contradictory with

12  Sullivan's deposition testimony as they are conclusory, and must be disregarded.

13          Of the two governmental witnesses, Sullivan was the person with jurisdiction to

14  actually apply code.  However, his declaration is not anywhere as near as aggressive as

15  Wisham's.  Instead, he now says Wisham "was more involved" than he, which is as extremely

16  bizarre as it is odd, since this was *his* project and *he* was the building official.  He is now

17  relying on another person to tell him what exceptions were granted.  Further, Sullivan now

18  states *he* was not the one who granted the exception to allow a cocktail seating area at the base

19  of the stairs.  Instead, it is some unidentified official at the building department who did so.

20          Sullivan testified that the procedure his office employed in 1984 for handicap hardship

21  exceptions involved a "review of the plans, a determination of what would be involved to gain

22  full compliance, how that could affect the structure probably from a historical standpoint,

23  review of the accommodations that were offered on an accessible level, a decision then would

24  been made to that was a reasonable accommodation or not."  (Sullivan Depo, p.75:7-15.)  This

25  decision was communicated to the applicant by placing a note on the plans, and Sullivan does

26  **<u>not</u>** believe it was communicated in "any other way."  (Sullivan Depo, pp.75:20-76:2.)

27  Sullivan does not recall how the note was placed on the plan, i.e., whether it was dictated or

28  not.  (Sullivan Depo, p.76:3-5.) This procedure describes the process for granting hardship

**Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.   — 9 —
2:11-CV-02230-WBS-AC**

1    exceptions, and Sullivan was applying Title 24's handicap access requirements.  (Sullivan

2    Depo, p.76:6-18.)

3          As to historical fabric Sullivan was "not aware" that all decisions regarding historical

4    fabric were made by Ed Coyne and Walter Harvey.  (pp.77:20-78:2.)  When quizzed about the

5    history of the Delta King, he can't accurately specify when it was built.  (p. 78:3-7.)  Sullivan

6    didn't research the history of the Delta King, but relies on his childhood memories from having

7    grown up in Sacramento.  (p.78:8-16, 79:2-6.)  He didn't rely upon Ed Coyne and Walter

8    Harvey for historical information, and has "no recollection of discussing historic fabric with the

9    owners at all."  (Sullivan Depo, pp.78:17-79:1.)  Sullivan can't state what the Historic Building

10   Code said with regard to floors and levels during the renovation period, Sullivan responds, "I

11   don't recall that clearly in order to answer your question specifically."  (Sullivan Depo, pp.

12   80:15-81:7.)  When asked whether the unreasonable hardship exception Sullivan referred to

13   earlier was under Title 24 and not the State Historical Building Code, Sullivan says "I can't say

14   we excluded the State Historical Building Code."  Sullivan thinks they were affected by that

15   code.  (Sullivan Depo, p.81:8-13.)  When asked what Sullivan considered about the State

16   Historic Building Code, Sullivan says the railing was lower than the current building code, and

17   to raise it would have affected the appearance of the structure, so they deferred that item to the

18   State Building Standards Commission, and they granted a variance of three inches on the height

19   of the railing, and it was his understanding that this was based on this being a historically

20   designated structure.  (Sullivan Depo, p.82:24-83:8)  Sullivan also answers "we would have

21   considered how an interior ramp would have affected this structure if one were to attempt to

22   ramp from the third level to the fourth level or constructing a new elevator within the existing

23   structure to gain access."  (Sullivan Depo, pp. 82:20-83:13.)  Sullivan then admits Sullivan's

24   not sure whether the elevator was an "existing" elevator, and Sullivan's never seen as-builts of

25   the boat to tell him whether it was existing.  Sullivan agrees the "as-builts are really important

26   in a case of this type because you'd want to know whether that elevator was new or existing in

27   applying these requirements."  (Sullivan Depo, p.83:14-84:12.)  When asked if as-builts are

28   important to every aspect of the DK in determining handicap access requirements for every

1   level and room, Sullivan answers only that "it's an advantage to have as-builts."  Sullivan

2   agrees that they tell him whether there's been an alteration or not and an obligation triggered.

3   (Sullivan Depo, pp. 84:18-85:18.)

4        No article 15 lift was ever suggested, designed or costed for his consideration to provide

5   vertical access between the third and fourth decks.  (pp.109:10-20.)  In fact in implementing

6   Title 24 during the conversion, Sullivan does not recall Title 24 UHE being very specific.

7   When asked again with the exact language of the UHE regulation, he again confirms he does

8   not recall the procedures being specific enough to require recordation of findings in agency

9   files as to costs, the cost of all construction contemplated, the impact of improvements on

10  financial feasibility, the nature of accessibility which will be gained or lost, the nature of the

11  use of the facility under construction and its availability to handicap person.  He thought the

12  regulations were "vague and forever changing."  (p. 110:7-111:3.)  When asked about

13  unreasonable hardship exceptions under the code (as his office interpreted them) and whether

14  the building official had only limited (not unlimited) discretion when following a precise

15  procedure, Sullivan agrees the building official had discretion, but he doesn't recall the

16  "procedure that was precise."  (p. 67:10-22.)  He recalls under the code there being an

17  "unreasonable hardship exception," but he didn't recall specifically what it said.  ((Sullivan

18  Depo, pp.67:23-68:8.)

19

20        **E.      ED COYNE'S DECLARATION IS AN UNSUPPORTED SHAM**

21        Ed Coyne likewise makes a long series of statement in his declaration about the

22  building department having carefully balanced codes.  However, he simply lacks the personal

23  knowledge, as he was not involved in the paperwork, has no code expertise, and admits that he

24  had never heard of the term "unreasonable hardship.  Finally, he admits that all exceptions were

25  recorded only on the face of the plans.  (Ed Coyne Depo, pp. 96:15-97:15; 99:21-100:4;

26  102:24-103:6;103:18-23; 107:3-5; 132:12-133:18.)

27

28

**Thimesch Law Offices**
158 HILLTOP CRESCENT
WALNUT CREEK,

**F.      PORTIONS OF THE C.COYNE DECLARATION SHOULD BE STRUCK**

"I understand and believe that the determination as to what portions of the Delta King would be available to an accessible path of travel and the extent of the accessibility was made by the City of Sacramento Building Department when the Delta King was rehabilitated in the 1980's.  I understand that the Sacramento Building Department directed the Delta King to post warning and notice placards at all entrance points and access points throughout the vessel…" (C.Coyne Decl. at pp. 4:27 thru 5:4.)  Plaintiff objects that there was no foundation laid as to how he reached this "understanding," and it obviously comes from the double and triple hearsay related by Coyne's brothers.  In fact, Charlie Coyne admits he had no involvement in the construction or interaction with building officials.  (C.Coyne Depo at Pltf's Exh 91, pp. 23:19 thru 24:16.)

Plaintiff objects under FRCP Rule 26(a)(2)  to Charlie Coyne's declaration at ¶s 11 and 12.  Not only does Charlie Coyne fail to set forth his qualifications for his opinions about collecting and assessing river height and resulting ramp slopes, Delta King failed to disclose him as expert.  Thus, there has been no opportunity for discovery to cross-examine weaknesses in his analysis.  And according to the professional opinion of Plaintiff's Marine Architect, who was properly disclosed and provided a report regarding river height ranges and resulting slopes, it's clear that Charlie Coyne relies upon totally inaccurate river height data to support his allegedly "simple geometry" calculations.  Unfortunately, his data is off by some four fee in either direction.

**II.     ISSUE 1: UNNOTICED ISSUE RE "PLAINTIFF'S BURDEN"**

**A.      OBJECTION**

This issue, encaptioned "Issue No. 1: Plaintiff's Burden," appears in the Defense Brief at pp. 26-28.  It appears set forth not a separate issue for summary adjudication, but only a summary of the different bases of liability under federal law.

However, to the extent something more was intended, plaintiff objects that it was not listed in the Notice of Motion, and the issue otherwise fails to point to any particular part of the

record that supports the inference that plaintiff cannot prove a particular element of her case.  In the absence of notice and citation, Delta King may not shift the burden to plaintiff on summary adjudication.[17/]

### B.   DELTA KING HAS BURDEN ON DEPARTURES

The alleged right to rely upon a code departure, or an exception, is an affirmative defense. Thus, the burden of proof on such issues is on the defense.[18/]

### C.   DELTA KING HAS BURDEN RE HISTORIC FABRIC ISSUES

A Defendant claiming that a particular barrier removal is "not readily achievable," or that a construction obligation is impeded by historic fabric concerns, pleads an affirmative defense and has the burden of proof of production as well as persuasion.  This is particularly true when the defendant alleges that "historic fabric" acts as an impediment to literal compliance.[19/]

---

[17] Fed.R.Civ.P. 56(c)(1); *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation)* (9th Cir.2010) 627 F.3d 376, 387 ("The moving party initially bears the burden of proving the absence of a genuine issue of material fact") (*citing Celotex v. Catrett* (1986) 477 U.S. 317, 323 [106 S.Ct. 2548, 91 L.Ed.2d 265]); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* (1986) 475 U.S. 574, 585 –86 [106 S.Ct. 1348, 89 L.Ed.2d 538]; *Oracle Corp.,* 627 F.3d at 387 (where the moving party meets its burden, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial"); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1105 (9th Cir. 2000) (a blanket argument that "plaintiff cannot prove its claim" is not sufficient.)

[18] See *N.L.R.B. v. Ky. River Comty Care, Inc.*, 532 U.S. 706, 711 (2001) (discussing "the general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits.").  Cited with approval in proving *Rodriguez v. Barrita, Inc.*, 48 NDLR P 115, 2014 WL 31739 (N.D. Cal. Jan. 3, 2014) *reconsideration denied,* C 09-04057 RS, 2014 WL 282655 (N.D. Cal. Jan. 24, 2014) (ADA and Title 24 matter).

[19] See *Molski v. Foley Estates Vineyard and Winery, LLC,* 531 F.3d 1043, 1048 (9th Cir. 2009).  Note, the rule in *Foley* was extended to non-historic situations in *Rodriguez v. Barrita, Inc.,* C 09-04057 RS, 2012 WL 3538014 (N.D. Cal. Mar. 1, 2012) on reconsideration in part, C 09-04057 RS, 2012 WL 2308069 (N.D. Cal. June 18, 2012) (holding, defendants must bear the initial burden of production as well as the ultimate

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.
2:11-CV-02230-WBS-AC                    — 13 —

III.     **BOOTLEGGED CONSTRUCTION AND SELF- GRANTED HARDSHIP**

We now know that – in addition to a vast amount of structural bootlegged work – Delta King also located and bootlegged its interior elevator – all prior to obtaining its initial construction permit on December 24, 1986.  (See collected evidence at PSUF 146, citing Atwood Decl. at page 4, ¶s 13 thru 15, citing PSUF 114; Pltf's Exhibits 19, 43, 55, 56, 93, 175, 180, 181, 182, 184, 187, 196; Depo Exh. 46, pp. DK_2486-20 thru DK_2486-261 (not a SJ Exh due to size); Blackseth Depo at Pltf's Exh 198, p. 56:17 thru 57:11; and Mike Coyne Depo at Pltf's Exh 95, pp. 43:1 thru 48:4 )

However, like a swift boat, Delta King's tries to cover this up.  It submits the blanket statement at DSUF 14 that "[a]pplicable permits for the Rehabilitation were obtained from the City of Sacramento between 1984-1989," thus obscuring all the bootlegged work that occurred for a 2-year plus period between September of 1984 and up to Christmas Eve in 1986.  To cite to 1984, Delta King relies on its demolition and fence permits.  However for the next two years, Delta King had no construction permit or approved plans whatsoever.

Since the owners now admit all work was "substantially complete" before the end of 1986 (see Blackseth Report at Pltf's Exh 175, p. 1, and Blackseth Depo at Pltf's Exh 198, p. 56:17 thru 57:11), this means that substantially all work had been conducted without a permit, including the non-complying elevator terminating at the third floor.  Thus, by locating the elevator in a location that could not penetrate the fifth deck without impeding egress at the fifth deck, Delta King not only created their own hardship, they self-granted it.  Indeed, Sullivan admits that by the time he arrived on the scene, he believed the elevator to be existing, and evaluated vertical access requirements on that basis.  (Sullivan Depo at Pltf's Exh 93, p.83:14-84:12.)  Delta King thus cannot claim their work was "approved" since they failed to supply critical information.[20]/

---

burden of persuasion in establishing that remediation is not readily achievable. Further, defendants must carry their burden with respect to each identified barrier to access in the facility.").

[20]  Cf. *Rodriguez v. Barrita, Inc.*, C 09-04057 RS, 2014 WL 282655 (N.D. Cal. Jan. 24, 2014),

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1    The question then becomes what the Building Department considered after-the-fact in

2    applying Title 24's requirements.  The answer is very little.  Delta King failed to submit "as-

3    built drawings" with the permit, and thus building officials never had notice of the pre-

4    construction condition or the requirements that had been thereby triggered.  In the building

5    trades, this is called a "fly-by" tactic.  As explained by Atwood:

6        …because [Delta King's] plans submitted to the Building Department make no
         distinction whatsoever between what is proposed and what is existing, it is
7        impossible to tell what the owners claimed preexisted their renovation work.
         Clearly they relied upon over-the-counter representations in this regard, which were
8        accepted by the building department, who was rendered helpless by the absence of
         "as-builts." *This is a common "fly-by" tactic in the construction trade.  Building*
9        *department personnel, who are pressed for time, are often forced to accept such*
         *representations.*  (See Atwood Decl. at p. 6, at ¶i (emphasis added).)
10

11

12   **IV.    THE DELTA KING IS NOW A "LAND-BASED" STRUCTURE**

13   Title 1 of the United States Code, which provides rules of construction for the United

14   States Code, defines "vessel" as including: "every description of watercraft or other artificial

15   contrivance used, or capable of being used, as a means of transportation on water." (1 U.S.C. §3.)

16   In support of Issue's 2, 3 and 4, Delta King argues as a defense that it is a "boat," or

17   "floating structure," not a building.  (Def. Brf. At p. 29, and DSUF 8.)  Delta King's position in

18   this regard is not recent.  In filing its Answer to the Complaint, Delta King denied that it has

19   been converted to a "land-based facility," and its affirmative defenses argued it was only a

20   "boat" not subject to public accommodation law, but subject to only the Coast Guard's

21   Jurisdiction under maritime law.  (See PSUF 111 to 114.)  It later withdrew the Coast Guard

22   defense, but continues to argue it is not a "public accommodation."  (PSUF 115.)  This appears

23   to be part of Delta King's position that it is not subject to the requirements of the Title 24 as a

24   public accommodation, or the Uniform Building Code as a "structure."  If so, Delta King has

25   failed to lay a legal foundation.

26   The question is jurisdictional:  Whether the Delta King at the start of the conversion in

27   _____

28       finding hardship exception improvidently granted by the City where application provided
         inaccurate information.

1    1984 and moving forward constituted a "navigable vessel" subject to the Coast Guard's

2    jurisdiction to regulate "seaworthiness," or whether it was a primarily "land-based structure"

3    subject to the state's jurisdiction over design to ensure "health and safety" of occupants?  The

4    answer is the latter.

5           Pursuant to the Tenth Amendment, all health and safety concerns fall on state and local

6    government.  The Tenth Amendment provides: "The powers not delegated to the United States

7    by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or

8    to the people."  (U.S. Const. amend X.)  On the other hand, the legislative powers of Congress

9    are enumerated in Article I, section 8 of the United States Constitution, but do not include any

10   general police power.  (*See* U.S. Const. art. I, § 8.)  The power of the Coast Guard to regulate

11   seaworthiness emanates from Commerce Clause (Article 1, Section 8), which gives the federal

12   government extensive authority to regulate interstate commerce, and that this authority has

13   been extended by precedent and statute to the licensing and construction of "navigable vessels."

14          In this instance, it cannot be argued that at the time of conversion the Delta King was

15   seaworthy or subject to the Coast Guard's jurisdiction.  It had been "undocumented" as a vessel

16   for many decades, and had been derelict and without an engine or rudder since approximately

17   the mid-1940s, and has no plans to convert back to a passenger vessel.  Under the current

18   ownership, it has never meet any of the basic requirements, i.e., a captain, minimum manning

19   requirements, life vests, musters, stevedore, etc.  (PSUF 116, 141 and 144.)  Indeed, because

20   the conversion used standard commercial construction materials, replacing the former clap-

21   board construction of the upper decks, and did not maintain proper ballast measures, it is now

22   so top-heavy that it could not be made seaworthy without rather significant reconstruction and

23   expense.  (PSUF 142.)

24          Instead and as planned, the Delta King was converted to operate as a land-based

25   structure.  It has a permanent postal address, is situated at a permanently lease site, receives all

26   of its utilities from shore, it relies upon heating and cooling systems housed in the hull of the

27   adjacent landing barge, and since 1987 has been permanently moored at the current site through

28   a series of "O-Rings" welded to the side of the boat and attached around adjacent piles.  (PSUF

1   135, 137, 138, and 143; and see photo of O-Ring at Pltf's Exh 193.)  It pays local assessment,

2   sales, and hotel occupancy taxes, and has county health inspection over both the restaurant and

3   separate grill upstairs.  (See Pltf's disputation at DSUF 8, and PSUF 139 thru 140.)

4           Most telling that the conversion's jurisdiction belonged to the building department is

5   that the Coast Guard wasn't involved – at all.  (PSUF 117.)  Both the owners and the building

6   department knew it wasn't going to be, and that addressing health and safety concerns for Delta

7   King's "land-based" customers and occupants was strictly within the building department's

8   jurisdiction.  (PSUF 120 thru 121, and 130.)  In this regard, the initial lease agreement between

9   the City and Delta King specified that the Delta King would "obtain all permits" required by

10  the building department.  (PSUF 122 thru 123.)  The Delta King then contemporaneously

11  obtained a demolition permit from the building department, and 2 years later obtained a

12  construction permit.  (PSUF 124 and 125.)

13          The building department determined that the Delta King was a "structure" regulated by

14  the building code.  (PSUF 131.)  The construction permit rated the structure according to its

15  UBC hourly fire rating and the various UBC occupancy codes applicable to the mixed-use of

16  businesses to be created.  (PSUF 126 through 128.)  Sullivan states he knew how to apply

17  building regulations to these "standard occupancies," and that under that under the enforcement

18  policies at the time, Title 24 required strict enforcement of handicap access enforcement for

19  areas of new construction and improvements.

20          Per the opinion of Plaintiff's maritime expert, Commander David E. Cole (USCG Ret.),

21  the withdrawal of USCG jurisdiction automatically reverted health and safety concerns to the

22  local building agency.  If this had not occurred, the Delta King would have been in violation of

23  federal law and subject to a daily fine.  (PSUF 118 and 119.)

24          Numerous maritime decisions have resolved conflicts between maritime and local state

25  jurisdiction, for instance in resolving when to apply the Jones Act over local worker's

26  ////

27

28

1   compensation.[21]/   But the critical distinction is whether the former vessel is "seaworthy" or

2   "navigable" versus whether it has achieved a new status as a permanently moored and land-

3   based structure.  A case that is similar on all fours to Delta King's permanent mooring status is

4   *The Matter of Treasure Bay Corp.,* where the court dealt with a permanently moored casino

5   vessel called the "Treasure Bay Biloxi."  There the court determined that the Biloxi was no

6   longer a "vessel" subject to a maritime lean.  It reached this conclusion after noting the Biloxi's

7   extensive connections to utilities, non-navigational abilities, and its permanent mooring status,

8   holding:

9           Application of these three attributes to the casinos in question clearly
10          demonstrates that they have all three common attributes of nonvessels: (1) neither
            structure was constructed to be used primarily as anything other than a gambling
11          casino; (2) both structures were moored or otherwise secured at all relevant times at
            their permanent locations; and (3) they were not capable of movement and never
12          moved across navigable waters in the course of normal operations. There was no
            transportation function that could be incidental to the primary purpose of the two
13          structures—the operation of gambling casinos.[22]/

14

15   **V.     ISSUE 2: THE AFT SERVICE RAMP MUST COMPLY AS A "RAMP"**

16          **A.      The Access Infrastructure was required to Comply**

17          Delta King's motion proceeds on the theory that since the Title 24 in effect at the time

18   of construction omitted the term "gangway," it therefore regulated no portion of the access

19   infrastructure's design and construction.  Delta King argues hypothetically, that if the access

20   infrastructure were being built today, it would now "comply" with the 2010 ADAS and the

21   2013-Title 24, which do use the term "gangway."

22          Plaintiff responds as follows:

23          1.      Title 24 reached the access infrastructure as it adequately regulated "public

24

25   [21]  See, e.g., consolidated Jones Act cases discussed at *Pavone v. Mississippi Riverboat
26        Amusement Corp.,* 52 F.3d 560 (5th Cir.1995).

27   [22]  *Matter of Treasure Bay Corp.*, 205 B.R. 490, 496, 1997 A.M.C. 2878, 30 Bankr. Ct. Dec.
28        483, 1997 WL 75823 (Bankr. S.D. Miss. 1997)

**Thimesch Law Offices**
158 HILLTOP CRESCENT
WALNUT CREEK,

Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.
2:11-CV-02230-WBS-AC                                                                    — 18 —

1  accommodations," "improvements," "site development," "sidewalks," "walks," "accessible

2  routes," "normal paths," "main entrances," and most importantly, "ramps."

3      2.    We know the City was not confused about whether its infrastructure was

4  regulated by Title 24 because Delta King argues a "unreasonable hardship exception" was

5  obtained, which was obviously unnecessary if Title 24 did not apply.

6      3.    The City also could not claim to have been confused when it required other,

7  earlier-built private marina developments (like the L-Street Landing Barge, Crawdad's, and

8  Catfish Café) to provide disabled accessible gangway access at all river levels.

9      4.    Delta King lacks proof to suggest the City was confused about the reach of

10 Title 24 since Delta King presents only the affidavits of those not involved with design and

11 construction.

12     5.    The City could not escape the Best Evidence Rule, nor rely upon the Doctrine of

13 Lost and Destroyed Documents as a means of presenting hearsay, as it has not shown diligence

14 in locating the relevant records among its large stash of uncategorized microfiche documents.

15     6.    If built today, the Delta King would <u>not</u> comply with the new ADAAG and

16 Title 24 regulations because it is not a "recreational boating facility."

17     7.    In 1987, there were multiple designs that would have provided full and equal

18 access along all normal paths of travel.  Delta King now admits it does not know if the City

19 considered those.

20

21     **B.    Delta King Fails to Address the Governmental Bases of Liability**

22     On this issue of the access infrastructure Delta King moves by itself and <u>without the</u>

23 <u>City's joinder or support</u>.  Because Delta King is only the lessee of the access infrastructure, its

24 liability is subservient and derivative liability to that of the City, who in 1987 was the owner-

25 builder and remains so today.  Thus, for Delta King to escape its co-defendant liability, its

26 burden relates not just to the private causes of action, but to all causes of action, including those

27 related to governmental liability.  In addition to the causes of action under Health & Safety

28 Code and Title III, Delta King's burden was to disprove the City's liability under Government

1  Code Section 4450-4456, Title II, and Section 504 of the Rehabilitation Act.  Meeting burden

2  was not attempted.  The company discusses only Title 24 and ADAAG regulations from a

3  private liability perspective, but does not address the greater scope of liability imposed by

4  underlying remedial statutes related to governmental liability, nor the separate import of the

5  1984 Uniform Accessibility Guidelines (UFAS), which were applicable under Section 504.[23]/

6

7  ### C.   Delta King's Affidavits are by Those Not Involved

8  Delta King's principal justification for non-accessibility is that the wharf presented a

9  "challenging environment" that required provision of a single accessible route versus two.

10  Critically missing in support of these arguments are the affidavits of those who actually built

11  and considered the design, including Leo Goto, architect Ted Leonard, Kip Skidmore and

12  Loren Moore.  Instead Delta King presents only the affidavits of those not involved.  In fact,

13  the Coynes all testified carefully as to their clean hands on the design, as did Sullivan and

14  Wisham.  (See C.Coyne Depo at Pltf's Exh 91, pp. 23:19 thru 24:16; Sullivan Depo at Pltf's

15  Exh 93, p. 158:7-15; E.Coyne Depo at Pltf's Exh 92, p. 6-24; M.Coyne Depo, Vol. 1, Pltf's

16  Exh 95, p. 149:14-22; and Wisham at Footnote.)[24]/

17

18  ### D.   The Structure's "Hull" Simply Presented another Enforcement Duty

19  Not all buildings are the same.  Some are built over water, or within marshes, or on top

20

21

22

---

[23]  *Disabled in Action of Pennsylvania v. Pierce*, 606 F. Supp. 310, 311-12 (E.D. Pa. 1985)
(denying motion to dismiss in action under Section 504 seeking UFAS enforcement against,
inter alia, entrance built with federal funds without a compliant ramp)

[24]  As to the access infrastructure, Wisham does not know the name of the company that built it.
(Id. at p. 136:10-12.)  **The access infrastructure was not part of the five discussions in
the City Manager's office.**  (Id. at p. 138:8-20.)  After inspecting photos, Wisham can't
even identify the aft ramp as that which existed in 1989, or if such a ramp existed in 1989.
(Id. at pp. 143:5-12, 144:15-17.)  Wisham could not relate any personal knowledge as to the
permit and enforcement process over the aft ramp.  (Id. at pp. 147:20 thru 184:1.)

**Thimesch Law Offices**
158 HILLTOP CRESCENT
WALNUT CREEK,

Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.
2:11-CV-02230-WBS-AC                                                      — 20 —

1  of sand, or within earthquake zones, etc. **25/**  Delta King, however, places great reliance on their

2  structure having a "hull," and that this somehow justifies finding the Delta King fell outside the

3  building code.  However, they're not anywhere near the first floating structure, nor the last.

4        The City's Riverbank Marina on Garden Highway

5  is a prime example, which originally had two floating

6  restaurants, but now has just the one, Crawdad's (at right). 

7  Its developer Kip Skidmore and the architect Loren Moore

8  each testified how they took out building permits with the

9  City and managed to engineer disabled access to the

10  restaurants and marina at all river heights.  (PSUF 145.)  Another example is the City's L-Street

11  Ramp structure (at the opposite end of the head pier from the Delta King), who's ramp system

12  also floats on a barge and is accessible at all river heights.  Thus, Delta King's needs were not

13  all that unique.

14  ////

15

16

17

18

19

20

21

22

23

24

25  **25** See for example the factual situation in *Liquidating Tr. Ester Du Val of KI Liquidation, Inc.*

26  *v. United States*, 116 Fed. Cl. 338, 346, 2014 WL 2619539 (Fed. Cl. 2014), in which the
    particular contract refers to modern version of the UBC and specifies that for the particular

27  job site at issue "*the soils are very sensitive to moisture and require special foundation sub-
    grade preparation…[which] [f]or heavier structures, **piles** may be required.*"  (Emphasis

28  added.)

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1   And the code certainly empowered the building department to adapt.  The 1982 UBC at

2   §302(b) required the applicant to submit "plans, engineering calculations, diagrams and other

3   data… [and the] building official may require plans, computations and specifications to be

4   prepared and designed by an engineer or architect

5   licensed by the state to practice as such."  Clearly in this

6   case, §302(b) meant only that the Delta King needed to

7   retain competent marine engineers and naval architects

8   to deal with issues related to the hull.  For the Delta

9   King's interior facilities, on the other hand, such as

10   guestrooms, which Delta King freely admits they

11   configured using standard framed construction

12   techniques without the aid of their marine architect (see

13   pic at right), far less so, if not at all.  But the point is,

14   owners of unique facilities adapt to the UBC and

15   Title 24 design requirements, not the other way around.



16

17   **E.      Part 2 Regulated the Aft Service Ramp**

18   Title 24 reached the access infrastructure as it adequately regulated "public

19   accommodations," "improvements," "site development," "sidewalks," "walks," "accessibility,"

20   "normal paths," "primary entrances," and most importantly, "pedestrian ramp."  These are all

21   classic definitions regulating paths to classic public accommodation types of a hotel, restaurant,

22   convention center, etc.  (See Tile 24 at Sections 2-105(b)11B(1); 2-149(d); 2-402(a); 2-407(a);

23   2-417(d)-(e); 2-420(f); 2-424(a); 2-7101.)

24   Although the 1984 version of Title 24 did not use the term "gangways," we know that

25   such version, indeed all versions of Title 24, contemplated floating structures as that which

26   must be engineered to be accessible, because it expressly requires that "boat docks, fishing

27   piers, etc., shall be accessible."  (See §2-1107(a)(4); Decl. of Barry Atwood at ¶16 (listing all

28   sections from the Title 24 codes from 1982 thru 2011 that regulated "fishing piers and boat

1    docks.").)

2        There are two precedents demonstrating the broad remedial purpose of Title 24 and how

3    the regulations are applied expansively to meet the particular need of the public

4    accommodation being created.  In the 1975 Attorney General opinion (CV75-1) attached at

5    Pltf's Exh 206, the attorney general reasoned that although the Government Code at that time

6    was restricted to "sidewalks," his analysis found the definition of a "walk for pedestrian use,"

7    expansive enough to cover a curved pedestrian overcrossing, i.e., even though it did not run

8    along the side of the street.  (Id. at 515.)  Similarly, in *Donald v. Sacramento Valley Bank*, the

9    defendant bank claimed it was exempt from ASA requirements (which proceeded Title 24)

10   because such regulations did not provide scoping requirements for ATMs.  The court of appeals

11   disagreed finding that although at the time of ASA's enactment, ATMs were only a "gleam in

12   some banker's eye," the regulations were sufficient to require access because they required

13   access to "walks."[26/]  One last case related to the ADA is perhaps helpful.  In *Caruso v.*

14   *Blockbuster-Sony Music Entm't Ctr. at Waterfront,* the Third Circuit confronted the

15   entertainment venue's attempt to restrict wheelchair seating access to a front row area, but

16   while denying access to seating on the lawn.  The venue claimed this was allowed because it

17   "higher quality (i.e. closer) seats in the pavilion."  The Third Circuit relied upon the DOJ

18   commentary to find this was not allowed:

19           As the DOJ explains in its commentary:

20           Taken together, [the statutory and regulatory provisions concerning separate
         benefits and integrated settings] are intended to prohibit exclusion and segregation
21       of individuals with disabilities and the denial of equal opportunities enjoyed by
         others, based on, among other things, presumptions, patronizing attitudes, fears,
22       and stereotypes about individuals with disabilities. Consistent with these standards,
         public accommodations are required to make decisions based on facts applicable to
23       individuals and not on the basis of presumptions as to what a class of individuals
         with disabilities can or cannot do.... Separate, special, or different programs that are
24       designed to provide a benefit to persons with disabilities cannot be used to restrict
         the participation of persons with disabilities in general, integrated activities. 28

25

26

27   _____

     [26] *Donald v. Sacramento Valley Bank*, 209 Cal. App. 3d 1183, 1193, 260 Cal. Rptr. 49, 1989
28       WL 64261 (Ct. App. 1989)

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.   — 23 —
2:11-CV-02230-WBS-AC

C.F.R. Part 36, App. B., at 622.**27/**

The Third Circuit found the venue's justification for "exclusion" to be precisely the type of

justification that "the DOJ commentary found so repugnant."  (Id.)

### F.     Part 2 Regulated Both Ramps, Not an Either-Or

A major flaw in Delta King's analysis, and that of the Declaration of Charlie Coyne, is

it presumes the obligation to provide access is an either-or situation, i.e., depending upon the

river height, either the aft ramp or the elevator-barge ramp.  However, Title 24 required access

to "normal pats of travel."  (Title 24, §2-7101.)

### G.     Delta King's Position about the Applicability of Part 2 is Inconsistent

As a demonstration of the inability of the witnesses to get their stories straight as a

group, Sullivan first testified he had no jurisdiction over the access infrastructure, which he

opined was built by either Public Works or the SHRA (Sullivan Depo at Pltf's Exh 93, p.

158:7-15), but earlier had already testified, perhaps in his demonstrated zeal to be helpful to

Delta King, that he granted an "unreasonable hardship exception" as to "ramps at various

stage[s] of the river level would be in noncompliance due to the fluctuation of the river."  (pp.

68:9-69:1.)  This position was reiterated by Michael Coyne.  (M.Coyne Depo at Exh 95, Vol. I,

pp. 64:7 thru 65:4.)  Delta King's brief also site to an exception at page 41 of its brief.  (Citing

Title 24, §2-7101(b).)

The position is inconsistent.  Either Delta King believe the ramps were regulated despite

they're being gangways, or they believed they were regulated and needed an exception.

Plaintiff believes this is yet one more example of alternative pleading.

---

**27** *Caruso v. Blockbuster-Sony Music Entm't Ctr. at Waterfront*, 193 F.3d 730, 739, 9 A.D.
Cases 1600, 9 A.D. Cases 1601, 16 NDLR P 172, 1999 WL 1024037 (3d Cir. 1999), citing
*See* 42 U.S.C. § 12182(b)(1)(A)(iii) (discriminatory to provide a separate benefit unless
necessary to provide equal benefit); id. at (b)(1)(B) (benefits of a public accommodation
must be provided in the most integrated setting appropriate to the needs of the individual).

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

This confusion played out in the deposition of Delta King's access expert Kim Blackseth, who when asked to explain the inconsistency, is forced to explain that he believes the gangways were "regulated," but just that there's no code section.[28]

### H.      As an Area of New Construction, Exception Required Appeals Ratification

In the absence of an LPC exemption proceeding through the appeals ratification process, the <u>newly constructed</u> access infrastructure did not qualify for an exception.  This point was made in *Rodriguez v. Barrita, Inc.,* which pointed to the 1986 Interpretive Manual put out by the State Architect, which warned: "Do not forget, the exemption applies only to the path of travel of [sic] restrooms, drinking fountains and public phones serving the area, *the area of remodel is not exempted by this section*. [sic]"  Based on this language, Barrita concluded, "Therefore, according to then-application regulations, a building department could not issue an unreasonable hardship exception for the actual area of alteration."**[29]**

### I.      The Aft Ramp is not Part of a Recreational Boating Facility

Delta King spends no time analyzing whether it qualifies for the gangway standards applicable to "recreational boating facility" under the new regulations at ADAS, CBW and 2013-Title 24.  However, the Delta King is not a recreational boat, which is defined as "any vessel manufactured or used primarily for noncommercial use; or leased, rented, or chartered to another for the latter's noncommercial use. It does not include a vessel engaged in the carrying of six or fewer passengers."  (Cal. Code Regs. tit. 14, § 6565.2 (Regulations governing the department of boating and waterways.)  On the other hand, the Delta King, as a former passenger and cargo vessel, is 285 feet long, 58 feet wide, and 1847 tons, with a total area of

---

[28]  See Depo of Blackseth, Pltf's Exh 186, pp. 220:24 thru 221:16.

[29]  *Rodriguez v. Barrita, Inc.*, C 09-04057 RS, 2014 WL 282655 (N.D. Cal. Jan. 24, 2014), citing to Disabled Access Regulations: Title 24 Interpretive Manual (August 16, 1984), *available at* ECF No. 232–3.

1   43,000 square feet.  (PSUF 108.)

2

3   **J.      The Code's Scoping Provisions Discriminate against Facility Types**

4           The Delta King is not a recreational boating facility, but a public accommodation.  The

5   codes do discriminate against different facility types.  For instance the new ADAS and Title 24

6   Standards do not exempt the slope of ramps leading to fishing piers, even when longer than 80

7   feet.[30]  And since there are no "place holders" or other indications from the DOJ that it intends

8   to issue further regulations for gangways for other public accommodation types, we may

9   properly assume that ordinary slope requirements apply.  Conversely, under Delta King's

10  analysis, which would require scoping of gangways for all facility types, it still would be

11  exempt, as would existing public accommodations that already comply, like Crawdad's and the

12  L-Street landing barge.

13  **K.      Section 504 and Readily Achievable Cover Elements of the Aft Ramp**

14          Although the ramps have not been modified since 1990, both defendants have liability

15  under federal law, and irrespective of the 1987 installation.  The City's liability to provide a

16  compliant ramp also arises under Section 504 and UFAS (in effect since 1984), and Delta

17  King's liability to replace minor elements arises under the readily achievable standard.  As to

18  the latter, and example is the absence of handrails and extensions, which are modifiable to

19  adjusting river heights as demonstrated in the below drawing.

20

21

22

23

24

25

26

27  _____

28  [30]  ADAS § 1005.1.

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1    VI.    **ISSUE 3**: ACCESS TO FOURTH AND FIFTH DECKS IS REQUIRED

2            A.    **Summary of Argument Regarding Non-Existence of Elevator Exception**

3            As will be discussed, the Delta King could not have qualified for an exception from

4    vertical access requirements for the following reasons:

5            (1)    Both the UBC and Title 24 required newly created hotel and restaurant

6    occupancies of Delta King's particular size to be served by elevators.  Because of the

7    bootlegged construction, the building department did not have notice these requirements

8    applied to Delta King.

9            (2)    Bar and restaurant occupancies are required to have an accessible main entrance.

10           (3)    Section 19958 did not provide discretion because that code section supplies only

11   the legislative mandate for enforcement by building officials.

12           (4)    Section 8-1306 does not apply for a large variety reasons, but mostly because

13   Delta King disavows reliance on its procedures, and because Sullivan admits he only

14   "considered" the SHBC instead of following its rather precise proscriptive procedures and

15   limited range of alternatives.

16           (5)    UBC Section 106 does not apply because Part 2 did not adopt this section.

17           (6)    H&S Section 19957 allows exceptions only when following the gatekeeping

18   proscriptives of Part 2's underlying regulations for unreasonable hardship exceptions (**UHE**)

19   and legal and physical constraints (**LPC**), which are forms of departure that both Sullivan and

20   the Coynes admit were not pursued.

21           (7)    As already discussed, supra, the "formal approval" analysis of *Donald v. Café*

22   *Royale* provides no basis for exception because it is only dicta, because this language was

23   limited to analyzing damage recovery under §54.3, not injunctive relief claims, and because

24   only the Office of the State Architect (**OSA**) has the legislate mandate to define how an

25   applicant obtains "formal approval" for departures.

26

27           B.    **The Bldg. Dept. Clearly Misunderstood its Enforcement Duties**

28           The declarations of Sullivan and Wisham are rife with statements that have nothing to

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.
2:11-CV-02230-WBS-AC                                                                — 27 —

1    do with code requirements – but instead reveal the unlimited discretion these gentlemen

2    believed they had.  Statements such as "balancing code requirements," "maximum extent

3    feasible," etc., have nothing to do with departures under the UHE, LPC or SHBC alternatives.

4

5    **C.    The Structure and Job Determine Which Parts of the Code to Apply**

6    Defendants make much of the fact their structure lacks a "traditional foundation."

7    Citing this single example, they contend the building officials used their "discretion" to

8    determine which parts of the building code applied.  However, the error in this logic is

9    immediately apparent.  It is the nature of the structure that <u>determines</u> what parts of the

10   building code applied.  Many structures are built over water, including local Joe's Crab Shack

11   (on piers), and Crawdad's, and the former Catfish Café, on Garden Highway (which were both

12   built upon barges), as well as the City's L Street Landing Barge.

13

14   **D.    There was No Unbridled Discretion or Basis for Estoppel**

15   At the bottom Delta King's position is that the building department had some form of

16   unlimited discretion "to determine" how to apply Part 2 and on a selective basis, or to

17   "balance" its requirements against other concerns.  Delta King argues that this discretion was

18   "exclusive" to the building department, and that it judicially and administratively estops

19   plaintiff.[31]/  However, the alleged "discretion" to apply part 2 *selectively* is never explained.[32]/

20   Delta King instead relies upon mashing together a large variety of codes (including the non-

21

22   [31] See Delta King's Verified Responses to Plaintiff's First Set of Interrogatories at Pltf's
23   Exh 11, p. 15, lines 2-4, stating "Responding Party is also informed and believes that the
     exercise of discretion by building authorities constitutes a form of judicial and administrative
24   estoppel barring some or all of plaintiff's claims."

25   [32] See Defense Brief at p. 42.  The other citation to this issue is found at Def. Brf. p. 58.
     However, it is unsupported.  At heading No. 1 on p. 58, defendants encaptioned their
26   argument as "*The Sacramento Building Department has exclusive Jurisdiction to Determine
     which Provisions of the CBC apply to any construction, including novel projects such as the*
27   *Delta King.*"  However, the incorporated-reference back to "section D(1)" leads to no such
     argument.
28

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1   applicable §106 of the UBC), but none of which suggest the local agency has unbridled

2   discretion, or that a plaintiff is ever estopped from claiming a violation.

3     The building department had the <u>duty</u> to enforce Title 24 that was preeminent to general

4   UBC requirements.  (See Atty. Gen. Opinion at Footnote 33.)  Indeed, Title 24 has protective

5   procedures for limiting exceptions to limited and defined situations and by requiring that

6   justifications be recorded and permanently maintained.  The Building Department had no

7   authority to controvert these requirements.  The power of a local jurisdiction to make police

8   regulations is derived from the California Constitution, Article XI, section 11, which states

9   "Any county, city, town or township, may make and enforce within its limits all such local,

10   police, sanitary and other regulations as are **not in conflict with general laws**."  (Emphasis

11   added.)  However, when it comes to building regulations, Title 24 demands "state-wide

12   uniformity."  (See Authorities and Atty Gen. Opinion at Footnote 33.)

13     A building department may not grant departures on any criteria it wants.  "Building

14   departments and other administrative agencies are not lawmaking bodies and have no power to

15   disregard or amend the ordinances which define their authority."[34]  "An administrative

16   agency... must act within the powers conferred upon it by law and may not validly act in excess

17   of such powers. Accordingly, it is well settled that when an administrative agency acts in

18   excess of, or in violation of, the powers conferred upon it, its action thus taken is void."[35]

19   These rules apply equally well to UHE and other code departures that have been improvidently

20

21   ―――――――――――――――――

22   [33]  *California Apartment Ass'n v. City of Fremont*, 97 Cal.App.4th 693, 694 [118 Cal.Rptr.2d
      603] (2002); and *Opinion of the Attorney General, 90-305*, 74 Cal. Op. Atty Gen. 1, 1991

23   WL 495444 (1991) (re preeminence of Title 24 over UBC and other model codes).  Note
      that Sullivan agreed with this point, i.e., that under his office's polices beginning in 1982

24   forward, he applied Title 24 regulations over any conflicts with the UBC.  Sullivan agrees he
      was required to do so by the Government Code and the Health & Safety Code, and he did so.

25   (Sullivan Depo, Pltf's Exh 93, p.46:11-22.)

26   [34]  *See Moeller v. Taco Bell Corp.*, 2007 WL 2301778 (N.D.Cal.2007)(citation, quotation
      marks, and alterations omitted).

27

28   [35]  *City & County of San Francisco v. Padilla*, 23 Cal.App.3d 388, 400 (Ct.App.1972).

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.
2:11-CV-02230-WBS-AC   — 29 —

1  granted.[36]

2      Another reason a building permit never operates to estop a civil rights is that private

3  plaintiff's standing to enforce is separate and apart from that of the local jurisdiction.  Long

4  ago, the court in *City & Cnty. of San Francisco v. Grant Co.*, held that due to the important

5  public policies underlying access regulation, a party not involved in a building permit's

6  issuance can never be estopped from enforcing handicap access requirements.[37]

7      As another District Court has noted, "Essentially, this [estoppel] argument attempts to

8  equate a building permit with a declaratory judgment that the subject property adheres to all

9  applicable laws.  None of the cases cited by Defendants, or any others found by this Court,

10  indicate that the issuance of a building permit compels any conclusion in the context of

11  litigation between the property owner and a private party suing under state and federal

12  accessibility laws."[38]   If the issuance of a building permit had any estoppel effect, it would

13  only bind the permitting agency.  Plaintiff, who never asserted that construction was

14  appropriate, is not bound by the permit.

15      "The doctrine of equitable estoppel is founded on concepts of equity and fair
dealing.  It provides that a person may not deny the existence of a state of facts if
16  he intentionally led another to believe a particular circumstance to be true and to
rely upon such belief to his detriment." *City and County of San Francisco v. Grant*
17  *Co.*, 181 Cal.App.3d 1085, 1090-91(1986).  Assuming, *arguendo*, that the building
permit represents a misrepresentation at all, it is a misrepresentation made by the
18  government not by Plaintiff.  It cannot estop her from asserting her rights.

19

20      *Best Western* was correct to rely upon the analysis in *Grant*.  The latter involved the

21  San Francisco Department of Public Works, who brought a public nuisance action against a

22  restaurant that had no accessible path of travel to the restrooms or between the dining levels.

23

24  ---

**36** See *Rodriguez v. Barrita, Inc.*, supra, 2014 WL 282655, at p. *4 (finding UHE invalid).

25

26  **37** *City & Cnty. of San Francisco v. Grant Co.*, 181 Cal. App. 3d 1085, 1091, 227 Cal. Rptr.
154 (Ct. App. 1986)

27  **38** *D'Lil v. Best W. Encina Lodge*, CV 02-9506 DSF (VBKX), 2004 WL 3685756, *3 (C.D.
28  Cal. Dec. 13, 2004).

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.
2:11-CV-02230-WBS-AC                                                                                    — 30 —

The alterations that created the barriers had been performed with permits issued by the San Francisco Building Department.  The Attorney General intervened and argued the restaurant was in violation of the CDPA.[39]  The Court noted first the elements of estoppel under state law: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury . . .."  The court pointed out that the undisputed evidence showed that three of the four elements failed: "(1) the state was not apprised of the fact of the remodeling, (2) the state did nothing to induce [the restaurant's] reliance let alone intend to create such reliance, and (3) [the restaurant] therefore could not have been injured by such reliance. The absence of any one of those elements is fatal to the claim."[40]  It then concluded, "the state is not estopped and was empowered to bring the action on its own if need be."[41]

Similarly, plaintiff is empowered to bring this action on his own.  He is not estopped by the building department's action because he has no privity with the building department.[42]  She did not know that the department had issued the permit, she did not intend defendants rely upon the permit, and she did nothing to induce defendants to rely upon the permit.  As the _Best Western_ court concluded, "The _Grant_ court held that the state could not be estopped by a representation made by a city.  (Citation omitted.)  Given that holding, it is hard to conceive how a private party could be estopped by a representation made by a municipal body."[43]

_Donald v. Café Royale_ is not to the contrary.[44]  As another U.S. District Court has

---

[39]  _Id.,_ 1089-1090.

[40]  _Id._ at 1091.

[41]  _Id._ at 1092-1093.

[42]  _See Id._ at 1092.

[43]  _D'Lil, supra_, 2004 WL 3685756 at *3.

[44]  _Donald v. Café Royale, Inc._ (218 Cal.App.3d 168 (1990).

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

pointed out, "in *Donald v. Café Royale, Inc*. (218 Cal.App.3d 168 (1990)), the court imposed California's accessibility laws on a non-compliant restaurant, despite the fact that the restaurant obtained incorrect information regarding handicap access requirements from an employee of the city building department."[45/]

Although the *Donald* court did confirm the defendant's liability for the violation, reliance on government action was not the issue on appeal, <u>nor was the injunctive relief claim, which was found moot</u>.  The issue on appeal was only whether the CDPA had an intent element for purposes of awarding damages.  The *Donald* court concluded that it does not.[46/]  As part of its discussion of intent under the facts of that case, the *Donald* court stated the following dicta, which Delta King wrongly rely upon:

> Our interpretation that section 54.3 contains no intent element does not preclude the possibility that in some instances denial of access under the statute may be excused, e.g., *where the violator has been affirmatively directed, or given formal approval*, by an enforcing agency to construct premises in a certain way, or maintain a configuration, which does not comply with the code requirements. However, the evidence of the manner in which Café Royale proceeded in the instant case is simply not enough. An informal meeting over the counter with an unidentified building department employee does not suffice to excuse compliance.[47]

This dicta has no persuasive value.  It is not only unnecessary to the holding and unsupported by any analysis, it also directly conflicts with the *Donald* court's own conclusions about the purpose of California's legislative scheme protecting disabled rights.

In deciding the question before it whether the CDPA contained an intent element, the *Donald* court began with the purpose of the CDPA.  "Our primary task is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [¶] '[A] statute should be construed with reference to the entire statutory system of which it forms a part in such a way that harmony may be achieved among the parts.'"  *Id.* at 176-177 (cits. omitted.)  The *Donald*

---

[45] *D'Lil v. Ramada Ltd*., SACV 03-0589 CJC, 2004 WL 3674006 (C.D. Cal. Jan. 28, 2004).

[46] *Donald, supra,*, 218 Cal. App. 3d at 176.

[47] *Id.* at 180 (*italics* added).

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1   court determined that the purpose of the CDPA is "to reduce or eliminate the physical

2   impediments to participation in community life by the physically handicapped" and "to make

3   all public and private buildings accessible to physically handicapped persons." *Id*. at 177-178.

4          That strong statement of public purpose, not one throw-away sentence about reliance, is

5   the central pillar of *Donald*.  Reliance as a defense actually undermines the public purpose the

6   *Donald* court identified and other courts have adopted.  Referring to *Donald* and *Best W.*

7   *Encina Lodge*, the US District Court in *D'Lil v. Ramada Ltd*. concluded: "These cases, coupled

8   with the State's long-standing policy to permit the physically-disabled persons 'the same right

9   as the able-bodied to the full and free use of ... public facilities,' undercut defendants' argument

10  that the issuance of a building permit prevents application of State accessibility laws."[48]

11         Perhaps because the Donald court was not really considering the question of reliance, it

12  overlooked the implications of allowing owners and operators to shield themselves from

13  liability using only a building permit.  Such a conclusion would directly undermine the purpose

14  to "make all public and private buildings accessible."[49]  Allowing businesses to rely upon

15  building permits would lead to wholesale dismantling of the legislative scheme.  The building

16  department's stamp would suffice, whether issued improvidently, ignorantly or corruptly.

17         *Donald's* dicta also has a fault in that it potentially abridges the exclusive rule-making

18  authority of the Office of the State Architect to issue Title 24 regulations and determine how

19  departures are formally approved and documented.  Plaintiff does not believe *Donald*

20  understood that the actions constituting "formal approval" in this context had already been

21  addressed legislatively by the Office of the State Architect.

22         Congress has established a similar intent for enforcement of the ADA.  Congress stated,

23  "Civil rights laws depend heavily on private enforcement. . . . Attempts to weaken the remedies

24  available under the ADA are attacks on the ADA itself and their success would make the ADA

25

26

27  [48]  *D'Lil v. Ramada Ltd.*, SACV 03-0589 CJC, 2004 WL 3674006 (C.D. Cal. Jan. 28, 2004).

28  [49]  *Donald, supra*, 218 Cal.App.3d at 178.

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.   — 33 —
2:11-CV-02230-WBS-AC

1   an empty promise of equality."**50/**   It further stated, "[I]nclusion of penalties and damages is the

2   driving force that facilitates voluntary compliance" with the ADA.**51/**   The California legislature

3   has made plain its intent that state access laws be at least as protective as the ADA in Civil

4   Code Sections §§ 51(f) and 54(c).  Thus, its interest in enforcement must be at least as strong as

5   that of Congress.

6        Delta King's theory of judicial estoppel can only be found in select zoning cases, such

7   as those holding that a local jurisdiction cannot adversely change a site's zoning status after the

8   owner has commenced permitted-work.**52/**   However, for building code violations, no similar

9   "vesting" authority exists.  Indeed, UBC-1982 §303(c) goes in the opposite direction, holding

10  that permits and plans shall not excuse a violation of code:

11       (c) **Validity of Permit.** The issuance or granting of a permit or approval of
         plans and specifications shall not be construed to be a permit for, or an approval of,
12       any violation of any of the provisions of this code or of any other ordinance of the
         jurisdiction.  No permit presuming to give authority to violate or cancel the
13       provisions of this code shall be valid.  The issuance of a permit based upon plans,
         specifications and other data shall not prevent the building official from thereafter
14       requiring the correction of errors in said plans, specifications and other data, or
         from preventing building operations being carried on thereunder when in violation
15       of this code or of any other ordinances of this jurisdiction.

16

17  Sullivan testified he enforced this rule, and

18  indeed every page of Delta King's approved

19  set of plans have the following stamp

20  restating the rule that "The approval of this

21  plan and specification SHALL NOT BE

22  SAID TO PERMIT OR APPROVE THE



23  ───────────────────────

24  **50**   Committee Print, Vol. II, 101st Cong., 2d Sess., at 1481- 82 (1990), quoted in *Parr v. L & L*
         *Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1082 (D. Haw. 2000).

25  **51**   S.Rep. No. 101-116, at 15 (1989); quoted *Id*.

26  **52**   See, e.g., *Stubblefield Construction Co. v. City of San Bernardino*, 32 Cal.App.4th 687, 708,
         ftn. 11 [38 Cal.Rptr.2d 413] (1995) (zoning case); and *Monterey San Co. v. California*
27       *Coastal Commission* (1987) 191 Cal.App.3d 169, 177-178, 236 Cal.Rptr. 315 (permit for
         coastal use)

28

**Thimesch Law Offices**
158 HILLTOP CRESCENT
WALNUT CREEK,

**Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.**     — 34 —
**2:11-CV-02230-WBS-AC**

1    VIOLATION OF any City Ordinance or State law."[53]  Note that this stamp can be found on

2    every page of the approved set.  Delta King's architectural draftsperson Joanna Stevens

3    testified that the company understood that this was the way the UBC worked, and that this was

4    a "drafting 101" concept that was pretty clear back then.

5         Extension of the doctrine of vested use to building code violations would be improper,

6    as it would substitute the opinion or inaction of the local building official over state law.  Note

7    that heretofore, the doctrine has only operated to provide preemption of an existing permit over

8    belated changes in local law (i.e., zoning).  In contrast, this case involves state law, and "there

9    is a statewide interest in uniform building codes."  The state has "preempted" the entire field.[54]

10   Under this rule, a local authority may only formally enact building standards only were

11   stronger than the state's.[55]

12        State codes must remain preeminent.  One need not ponder long to realize the adverse

13   effects on health and safety if the doctrine of vested use (i.e., a faulty permit) were extended to

14   "grandfather" building violations under the access codes, as well as the codes for fire, seismic

15   safety, electrical, ventilation, etc.  By Delta King's analysis, with building departments having

16   unlimited jurisdiction to ignore code requirements by claiming to have "balanced" them as it

17   saw fit, such dangerous conditions would be placed wholly beyond the law's reach.  (In accord,

18   see *D'Lil v. Ramada Ltd.*, *supra* (holding equitable vesting rights "give way to issues of public

19   safety and health and for the public welfare").)

20        Such a rule would also run counter to the rule that "[a] governmental entity may not,

21   through contract or legislation, abdicate its police power."[56]

22

23   **53** See Delta King's approved plan set at **Pltf's Exh 195**.

24   **54** *California Apartment Ass'n*, supra, 97 Cal.App.4th at 694.

25   **55** See *Building Industry Ass'n v. City of Livermore*, 45 Cal.App.4th 719 [52 Cal.Rptr.2d 902]
     (1996) (City's legislation requiring fire extinguishing systems proper within police power).

26

27   **56** *Davidson v. County of San Diego* 49 Cal.App.4th 639, 648 [56 Cal.Rptr.2d 617]) (1996)
     (Holding that "crematorium's vested [zoning] rights may be impaired through subsequent
28   police power enactments necessary to protect public health or safety.

**Thimesch Law Offices**
158 HILLTOP CRESCENT
WALNUT CREEK,

1    Differentiating building code enforcement one step further, note that the doctrine of

2    vested use operates solely against "retrospective" changes in zoning.  Here, plaintiff seeks only

3    application of existing building codes, i.e., that existed at the time of construction.

4    Delta King next argues that <u>because</u> the State has allegedly delegated the responsibility

5    for enforcing the building code to the local building departments as a "first line of defense," the

6    State (and by extension plaintiff) are estopped by the building department's prior failure to

7    enforce the access codes.  There is no authority for this proposition, cited or otherwise.  More

8    fundamentally, such a ruling would eliminate all access enforcement and is inconsistent with

9    UBC Section 303(c), *supra* (permit does not excuse violation), and the <u>*Grant*</u> decision, supra,

10   which foreclosed the estoppel defense.  (<u>*Grant*</u>, supra, 181 Cal.App.3d at 1091 (no estoppel).)

11   Finally, the motion presumes far too much about the "conditions" of the Delta King's

12   permits.  Other than the broad and conclusory statements made by the three Coynes, Sullivan

13   and Wisham, e.g., for example, that requirements were "balanced," there is no document

14   evidence that the City considered disabled access requirements at or allowed departures by

15   following the specific excepting procedures specified by Title 24.  Raw permits and plains,

16   which provide no details as to the scope of consideration, approval or disapproval, afford no

17   presumption that exceptions were granted to handicap access requirements.  (See Title 24

18   (1982) Sect. 2-422[57/] (requiring written findings for exceptions to access requirements);

19

20   ───────────────

     **57**  Section 2-422 defines Unreasonable Hardship as follows:

21

22         An unreasonable hardship exists when the enforcing agency finds that
         compliance with the building standard would make the specific work of the project
23       affected by the building standard unfeasible, based upon an overall evaluation of
         the following factors:
24       1. The cost of providing access.
         2. The cost of all construction contemplated.
25       3. The impact of proposed improvements on financial feasibility of the project.
         4. The nature of the use of the facility under construction and its availability to
26       handicapped persons.

27         <u>The details of any finding of unreasonable hardship shall be recorded and
         entered in the files of the enforcing agency.</u> (Id., emphasis added.)

28

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

**Plaintiff's Memorandum In Opposition to Delta King's Motion for Summary Adjudication: Case No.**   — 36 —
**2:11-CV-02230-WBS-AC**

1   *Broadway, Laguna, Vallejo Ass'n v. Board of Permit Appeals*, 66 Cal.2d 767, 773 (1967) (no

2   presumption of correctness of official action where requirement of written findings not made).)

3   Further, there is no evidence that any of the subject Delta King facilities have an acceptable,

4   alternative means of access, i.e., "equivalent facilitation."  (Health & Safety Code Section

5   19957 (exceptions must still provide equivalent facilitation); Deukmejian v. CHE, Inc., supra

6   150 Cal.App.3d at 138 (same effect).)  Less access cannot constitute equivalent or greater

7   access.  (Id.)

8

9       **E.      Delta King Pursues a Theoretical "See-What-Sticks" Approach**

10          To justify departure from prevailing code requirements for vertical access between the

11  3rd thru 5th floors, the authorities Delta King relies upon mashing together the following codes:

12  (1) Health & Safety Code (**H&S**) §19956; (2) H&S §19958; (3) Title 24, §8-1306; (4) UBC

13  §106; (5) H&S §19957; and (6) dicta about "formal approval" from *Donald v. Café Royale*,

14  218 Cal. App. 3d 168, 180 (1990).  Def. Brf. pp. 36 thru 44.  Delta King also suggest that the

15  "City" granted an exception by only "considering" the requirements of certain codes, like the

16  historic building code.  (Def. Brief at p. 44.)

17          Thus, instead of trying to prove a specific type of "exception" was approved, Delta

18  King's purses a "see-what-sticks" approach, and that relies upon foundation of hearsay mashed

19  together from the various conflicting accounts and overbroad conclusory statements.  All of this

20  of course becomes necessary for Delta King as it seeks to evade the implications of bootlegged

21  construction and self-granted exceptions.

22          After it taking all in – along with latest offering of Sham Affidavits, it quickly becomes

23  apparent that Delta King isn't really describing what actually occurred, but what it believes

24  *could have happened* had it applied for an exception under one of the variety of exceptions it

25  now claims was available back then.  Since it can't point to any specific supporting

26  documentation or even describe their contents, it relies on broad statements of what was

27  "considered" and "determined."

28

1

**F.      Equivalent Facilitation is not a form of Exception**

2      On this rather tenuous footing, Delta King then skips conveniently forward to analyzing

3  whether drink service in an elevator lobby could have constituted a form of "reasonableness"

4  and "equivalent facilitation."  Skipping forward is a common mistake.  Under the structure of

5  Part 2, equivalent facilitation is not available as an after-the-fact as justification for evading

6  accessibility requirements.  Indeed, while Part 2 uses the concept of "equivalent facilitation" to

7  permit utilization of alternatives to provide equivalent access to a facility, this right does not

8  stand by itself, i.e., as a distinct and raw form of exception.  Rather, accessing the right to

9  consider "equivalent facilitation" as an alternative first requires qualifying for the UHE.  For

10  instance, considering the cost of strict compliance as well as the cost of alternative methods,

11  which in this instance was an Article 15 lift, etc.  (Moreover, as will be discussed, the UHE's

12  use is extremely restricted when dealing with the specific area of new construction and

13  alteration.)  Since Delta King admits it did not submit cost data or consider the Article 15 lift, it

14  cannot use equivalent facilitation as a method to evade vertical access requirements.

15

16      **G.      Section 19958 is a Statutory Mandate and Not Suggestive of Discretion**

17      H&S 19958 sets forth the local agency's general enforcement duty over Part 2

18  regulations.[58]  In stating the regulations "shall be enforced," this is suggestive of a non-bending

19  duty, not to a degree of discretion.  Indeed, we can discern the importance of this obligation in

20  19958 in that the legislature saw fit set it forth separately from the general duty to enforce the

21

22  _____

    [58] Health & Safety Code 19958 provides:

23

    The building department of every city, county, or city and county shall enforce
24    this part [i.e., 19955-19959] within the territorial area of its city, county, or city
    and county. The responsibility for enforcing Chapter 7 (commencing with
25    Section 4450) of Division 5 of Title 1 of the Government Code in its application
    under this part shall be by such building department within the territorial area of
26    its city, county, or city and county.

27    "Building department" means the department, bureau, or officer charged with
    the enforcement of laws or ordinances regulating the erection or construction, or
28    both the erection and construction, of buildings.

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1    building code set forth elsewhere in the Health & Safety Code.

2

3    **H.    H&S section 18954 Provides No Unbridled Discretion**

4         Delta King next relies upon H&S 18954 (of the State Historic Building Code) for the

5    proposition that it, along with 19958, supra, "vests" building officials with "authority to enforce

6    the CBC to the extent that the inspectors determined that the code could be applied…"  (Def.

7    Brief at p. 43 (emphasis added).)  This argument fails because 18954 merely requires

8    observance of the governing regulations (which are authorized by H&S 18959.5).  In turn,

9    those regulations set out at Part 8 strictly abridge any discretion.  For instance, 8-1304 requires

10   building officials to enforce the "prevailing provisions for access" (i.e. Part 2) unless and until

11   procedures are followed to justify and document the basis for a departure, which should include

12   the opinion and/or comments of a representative local group or disabled people.[59]  Once the

13   procedural basis is established, discretion is then further limited to following the priority list of

14   "alternatives" found in Table 13-2.  (Together, 8-1304 and Table 13-2 shall be referred to

15   _____

16   [59] Section 8-1304 of the 1985-SHBC (found at **Pltf's Exh 123**, at p. 8-50), provides:

17        **"8-1304 Application.**

18        "Prevailing provisions for access by the disabled shall be applied to qualified
         historical buildings unless it is determined that strict compliance with such
19        provisions will destroy the historical fabric or historical aspects of the structure
         or site. If the historical fabric or historical aspects are threatened, alternative
20        provisions for access may be applied pursuant to this chapter provided the
         following limitations are met:

21        "(a)  such alternative provisions shall be applied only on an item-by-item
22              or case-by-case basis. (See Table 8-13-1)

23        "(b)  the alternative standards are applied according to the priorities
              outlined in Table 13-2 whereby the alternative providing the most
24              access is listed first.

25        "(c)  the official charged with enforcement of the standards shall provide
              written documentation stating the reasons for the application of the
26              alternative standards. Such statement should include the opinion
              and/or comments of a representative local group or disabled people
27              and shall be available to the public on request.

28        "NOTE: Authority cited: 18950-18960 Health and Safety Code.  Reference
         Sections 18930-18960 Health and Safety Code."

1    herein as the '**SHBC Alternatives**.")  Finally, 8-1306 provides for an "exemption" procedure.

2    But this, too, requires following a procedure to justify and document the basis, which is even

3    more extensive than that for alternatives.[60]/  In this instance, the building official "must" engage

4    the opinions of representative local group of local disabled people.  (Herein, the procedure

5    specified by 8-1306 shall be referred to as the "**SHBC Exemption**.")  Thus, H&S 18954 is not

6    the open invitation that Delta King envisions.

7    　　　　Delta King's brief does not cite to SHBC Alternatives at §8-1304.  That is because

8    would not have qualified.  Through its work without a permit, they had already redesigned the

9    floor plan for well over 90% of the interior spaces, and the alternatives in Table 13-2 do not

10   provide alternatives to the "floors & levels" requirement when dealing with non-historic

11   interiors.  (Id.)

12

13   _____

14   [60] Section 8-1306 of the 1985-SHBC (found at **Pltf's Exh 123**, at pp. 8-50 thru 8-51), provides:

15   　　　**"8-1306. Exemptions.**

16   　　　"If the historical fabric or aspect would be destroyed by the application or
     alternative standards as provided by this chapter, an exemption from the literal

17   requirements for full and equal access or any alternative provisions may be
     provided only if the following conditions are met:

18
     　　　"(a)　　such exemption is considered only on an item by item or case by
19   　　　　　　　　case basis

20   　　　"(b)　　interpretive exhibits and/or equal services of the exempted
     　　　　　　　　significant historical aspects are provided for the public in a
21   　　　　　　　　location fully accessible and usable by the disabled, including
     　　　　　　　　people with hearing and sight impairment.
22

23   　　　"(c)　　Services must be provided in an accessible location equal to those
     　　　　　　　　provided in the exempted location.
24
     　　　"(d)　　the official charged with enforcement of the standards shall
25   　　　　　　　　provide written documentation stating the reasons for the
     　　　　　　　　consequent exemption.  Such statement shall include the opinion
26   　　　　　　　　and/or comments of a representative local group of local disabled
     　　　　　　　　people and shall be available to the public on request.
27

28   　　　"NOTE: Authority cited: 18950-18960 Health and Safety Code.
     　　　Reference Sections 18930-18960 Health and Safety Code."

1   Instead Delta King relies upon the SHBC Exemption under §8-1306.  (Def. Brief at

2   p. 40.)  Even if Delta King had applied for an exemption (they did not), we can immediately

3   discern that the company could not have qualified for an exemption because Sullivan failed, for

4   example, to seek the opinions or comments of a representative local group of persons with

5   disabilities.  (Sullivan Depo at Pltf's Exh 93, p.115:12-15)  And why would he have bothered.

6   He did not know that Delta King had lock in the elevator's design by bootlegging it without a

7   permit.  He would have known about this, and then asked the local group to approve what Delta

8   King had already decided for them.  Perhaps another reason Sullivan failed to consult a local

9   group is that he did not understand SHBC's requirements for granting access to the

10   alternatives/exemptions, but considered them "vague" and forever changing.  (p. 110:7-111:3.)

### I.    Reliance on Section H&S 19957 Requires Following Procedures for UHE

12   Delta King relies for its position that discretion was unconstrained is H&S Code

13   §19957, which grants the ability of building officials to grant exceptions from literal

14   requirements in cases of "practical difficulty, unnecessary hardship, or extreme differences."

15   (See Def. Brief at p 42.)  However, 19957 is limited by the gatekeeping proscriptives imposed

16   by Part 2, **UHE** and **LPC**.

17   H&S §19957 was part of the original 1969-enactment, and specified the foundational

18   right of building departments to grant exceptions:

> In cases of **practical difficulty, unnecessary hardship, or extreme differences,** a *building department responsible for the enforcement of this part* may grant exceptions from the literal requirements of the standards and specifications required by this part or permit the use of other methods or materials, but only when it is clearly evident that equivalent facilitation and protection are thereby secured.  (Emphasis added.)

24   The origin of Section 19957 and its particular choice of words came directly from the 1961-

25   ASA regulations at §1.2.[61]  Both the statute and ASA-regulation and statute specified the

---

[61] ASA Regulations at **Pltf's Exhibit 126**, §1.2, used language that is identical in every material respect to H&S §19957:

1    identical three excepting categories as "*practical difficulty, unnecessary hardship, or extreme*

2    *differences*."  Section 1.2 had in turn simply borrowed this phraseology from common law

3    applicable to zoning requirements.  (See, e.g., 68 A.L.R. 13 (Originally published in 1947)

4    "Difficulty or Construction and application of provisions for variations in application of zoning

5    regulations and special exceptions thereto.")  Within legal circles the three excepting-categories

6    often had a combined-meaning of simply "hardship exception."[62]   However, §1.2 failed to

7    define its three excepting-categories, the meaning of each was potentially limitless, particularly

8    that for "*practical difficulty,*" which was seen as an overt invitation to simply bypass

9    requirements altogether.  Also, §1.2 failed to specify any application procedures or finding

10   requirements, making after-the-fact justifications the potential rule.  Finally, §1.2 required clear

11   evidence of "*equivalent facilitation,*" it failed to specify the meaning of this term for any

12   particular barrier or situation, making the determination of equivalency potentially subjective

13   and *ad hoc*.

14        All of this confusion ended in 1981 with the enactment of the new Title 24 regulations

15   and their harsh curtailment of the hardship exception.  The new regulations sharply limited the

16   situations in which a hardship could be applied for, it specified procedures and criteria for

17   determining when a hardship is present, it required the building official to permanently record

18   his reasons for granting the exception, it limited the meaning of "equivalent facilitation" by

19   defining it for many key facilities and occupancy-types, and, it finally specified that in certain

20   types of hardships, i.e., such as the granting of the right to provide less than the code-specified

21   means of equivalent facilitation, or the granting an outright "exemption," the applicant would

22   have to take the additional step of having the building official's findings in this regard

---

In cases of **practical difficulty, unnecessary hardship, or extreme differences,** *administrative authorities* may grant exceptions from the literal requirements of this standard or permit the use of other methods or materials, but only when it is clearly evident that equivalent facilitation and protection are thereby secured. (Emphasis added.)

[62] *Cf.* 71 Cal. Op. Att'y Gen. 114, ft. 2 [1988 WL 385193] (1988) (referring to §19957 as the "hardship exception").

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1    "ratified" through the local appeals process.  The regulations limited the latter appeals-

2    exempting process to "legal and physical constraints."

3

4            **J.       "Modifications" under UBC Section 106 are Not Authorized**

5            Last, Delta King erroneously relies upon UBC §106 for authority that building officials

6    may make general "modifications" upon finding special reasons of "impracticality." [63]/  Delta

7    King argues it may rely upon §106 because it believes Part 2 adopted the entire 1979 UBC.

8    It did not.  Title 24 sets forth its own unique regulations and adopted only a few individual

9    UBC regulations.

10

11           **K.       Defendants Exceed the Maximum Square Feet for an Exemption**

12           Setting aside the occupancy considerations for elevator construction, and the main

13   entrance requirements for restaurants and bars, Delta King does not qualify under §19956

14   because its structure exceeds the "3-story" and "3000 square feet" limitations, and therefore

15   cannot access the "reasonable portion" part of the analysis.  Moreover, Title 24's regulations

16   further limit access to the elevator exemption to "existing privately funded public

17   accommodations."  (See Title 24, Section 2-105(b)11B(4).)  No part of the Delta King qualified

18   since all of its public accommodations were newly constructed in 1985 along with the new

19   elevator shaft.[64]

20

21   _____

22   [63] Section 106 of the 1979-UBC Section provides:

23           **Modifications.  Sec. 106.** Whenever there are practical difficulties involved in carrying
             out the provisions of this code, the building official may grant modifications for
24           individual cases, provided he shall first find that a special individual reason makes the
             strict letter of this code impractical and that the modification is in conformity with the
25           spirit and purpose of this code and that such modification does not lessen any fire
             protection requirements or any degree of structural integrity. The details of any action
26           granting modifications shall be recorded and entered in the files of the code
             enforcement agency.

27   [64] The distinction is critical in evaluating vertical access.  Under the UBC (at Table 33-A), a
     "new elevator" must serve all newly created occupancies, including hotels and dining and
28   drinking rooms and lounges.   (See UBC Table 33-A at Pltf's Exh 201.)

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK.

1

2    **L.    Delta King's Unilateral Posting of Warning Sign was Not a Form Exception**

3        The Coynes claim Sullivan directed them to post a sign warning customers that the

4    Delta King did not comply with all standard building requirements.  However, this is self-

5    serving testimony is unsupported by the government witnesses.  Sullivan denies he ever made

6    this order, and states he has no knowledge of anyone else at the building department doing so.

7    (Sullivan Depo at Pltf's Exh 93, pp. 86:17-87:2.)  In all events, the simple hanging of a sign

8    cannot possibly sweep away UHE and LPC procedures.

9

10   **M.    Hearsay Cannot Establish "Exemptions"**

11       Under the requirements of Rules 1002 (Best Evidence) and 1004-1005 (aka "Doctrine

12   of Lost and Destroyed Documents"), the owners may not rely upon hearsay about "exceptions

13   and exemptions" allegedly granted by the City, such as the "annotations and notes" within their

14   own personal and non-certified copy of plans (aka "Mike Coyne Set"), since this hearsay does

15   not satisfy UHE recording requirements, or LPC appeals ratification procedures.  Moreover,

16   defendants have failed to show diligence in conducting a search through existing City records

17   to recover the full set of alleged official records, which they state still "likely exist" in City

18   records.  They promised the Court they needed more time to do this search, and then

19   abandoned it without explanation back to the Court.  (See Stipulation at Pltf's Exh 54, p. 4,

20   lines 19-24; Klock-Johnson Depo at Pltf's Exh 97, pp. 25:8-23; 29:23 thru 30:2)  Thus,

21   defendants have not shown the diligence necessary to claim documents have been lost or

22   destroyed.  Having documents, but being unwilling to take the time to locate them, does not

23   establish good cause.

24

25   **N.    The Delta Bar & Grill Lacks a Main Entrance**

26       Setting aside the non-equivalency, the Delta Bar & Grill lacks the accessible main

27   entrance that the court in *People ex rel. Deukmejian v. CHE, Inc.* found essential under the

28   regulations to provide access.  (See Title 24 §2-611(d)(1).)  Creating a space at the bottom of

1   the stairs and calling it part of the bar does not allow persons with disabilities to enter the bar.[65]

2   Even the general manager, Mike Coyne, admits that a customer isn't really in the bar, and

3   hasn't reached its main entrance, until she ascends the staircase and reaches the bar area, which

4   he sees as entirely different and separate from than the restaurant and lobby.  (M.Coyne Depo

5   at Pltf's Exh 95, pp. 109:8 thru 110:11.)

6       Title 24 clearly sees full inclusion in bars and restaurant facilities as essential, since it

7   sets the bench mark of requiring that 100% all areas of service and activity must be accessible,

8   and only allowing this amount to be reduced to 75% in the cases of UHE.  (See Title 24, §2-

9   1752(a) and also Exemption 2.)  Since the setup of the Delta King seeks exemption from these

10  requirements, they would have needed more than an UHE, but an LPC with full appeals

11  ratification, a procedure they admit they did not utilize at all during the conversion.

12  ////

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27  [65] *People ex rel. Deukmejian v. CHE, Inc.*, 150 Cal. App. 3d 123, 135-36, 197 Cal. Rptr. 484
    (Cal. Ct. App. 1983) (italics and bolding added).

28

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

### O.      Service at the Base of a Staircase is never "Equivalent Facilitation"

The defense argues that by providing service at the base of the stairs it has provided "equivalent facilitation."  This argument demonstrates a misunderstanding of the law.  The alternate area does not qualify as an equivalent facilitation for two reasons: (1) it is not an alternative design or technology and (2) it does not result in equivalent or greater access. The defense has simply confused the "equivalent facilitation" provision of Title 24 with the "alternative methods" provision of the much later the ADA.[66]



In rejecting a restaurant's argument that the disabled should be required to enter through a kitchen rather than the primary entrance on a lower floor, the Court in *People ex rel. People ex rel. Deukmejian v. CHE, Inc.*, the Court held that H&S 19956 was inapplicable, and held:

> he prohibition against discrimination of the handicapped within Civil Code section 54 et seq., the enactment of Government Code section 4450 et seq. and section 19955 et seq., and the incorporation by reference of the phrase "primary entrance" within applicable specifications, reflect a legislative sensitivity to the hardships suffered by those afflicted with a wide range of physical disabilities. *They are part of an expanding legislative effort to attain "the commendable goal of total integration of handicapped persons into the mainstream of society ...." In re Marriage of Carney, supra*, 24 Cal.3d 725, 740.) *The Legislature has declared "[i]t is the policy of this state to encourage and enable disabled persons to participate **fully** in the social and economic life of the state ...."* (Gov. Code, §

---

[66]  Plaintiff suspects the origin and date of the annotation at page A-10 of the Mike Coyne Set simply because the nomenclature is all wrong.  Provision of "accommodations" is an ADA term that was not used back in the 80s, and thus it is an anachronism for it to be on the plans from that period.  Plaintiff thus suspects defendants added this annotation at a date both after the conversion and the ADA's changing of the general terminology about how to provide disabled access.

1    19230, subd. (a).) These legislative responses are designed to lessen their entire
     burden, by guaranteeing equal and full access to public buildings, facilities, and
2    accommodations, without jeopardizing their safety. We believe the law is intended
     to promote accommodation of the physically handicapped by insuring them access
3    to public restaurants without facing the unnecessary, *136 adverse psychological
     impact of being separated from regular customer traffic and shunted through
4    secondary entrances.[67]

5    Similarly, the Court in _Donald v. Cafe Royale, Inc._ cited to the policy statements in _CHE_, and

6    found Café Royale's separate and limited accommodations for dining at the base of a staircase

7    near the main entrance did not constitute equal access.[68]

8         Similar paternalistic attitudes were addressed on the ADA side in _Antoninetti v. Chipotle_

9    _Mexican Grill, Inc._, where Chipotle argued that although the height of a counter violated the

10   1991 Standards, the business was willing to accommodate the plaintiff by bringing the food to

11   him as an equivalent facilitation. The Ninth Circuit rejected the argument and held that such

12   offers of help, "do not constitute equivalent facilitation because they do not involve use of other

13   designs and technologies…"[69]   Defendant Chipotle fell prey to a common error, i.e., conflating

14   the "equivalent facilitation" provision with the "alternative methods" provision found at 42

15   U.S.C. §12182(b)(2)(A)(v).

16        In _Moeller v. Taco Bell Corp._, 816 F. Supp. 2d 831 (N.D. Cal. 2011), the queue line in a

17   number of Taco Bell restaurants did not comply with the access standards and Taco Bell argued

18   that "it provides equivalent facilitation for its narrow queue line because customers who use

19   wheelchairs can line up off to the side of the queue." _Id._ at 866. The _Moeller_ court rejected the

20   argument. First, it noted that some disabled customers found this separate line "inconvenient,

21   cumbersome, and embarrassing, as it required them to rely on others to place their orders." _Id._

22   at 866. Additionally, the court noted that it "violates the ADA's integration mandate" and

23

24   ─────────────────

25   [67] _People ex rel. Deukmejian v. CHE, Inc._, supra, 150 Cal. App. 3d at 135-36 (italics and
     bolding added).

26   [68] _Donald v. Cafe Royale, Inc._, supra , 218 Cal. App. 3d at 182.

27   [69] _Antoninetti v. Chipotle Mexican Grill, Inc._, 643 F.3d 1165, 1174 (9th Cir. 2010) cert. denied,
     131 S. Ct. 2113, 179 L. Ed. 2d 926 (U.S. 2011) (internal quotes omitted for readability).

28

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1 violates the ADA's prohibition on providing access to goods and services that are different or

2 separate from others.[70]/  The court also quoted the congressional legislative history: "Providing

3 services in the most integrated setting is a fundamental principle of the ADA."[71]

4       In the 1980s, Sullivan couldn't possibly have

5 known that his actions would lead to segregation.  He

6 simply wasn't provided the necessary information.

7 Not only did Delta King hide the fact that the 3-floor

8 elevator was new, and thus triggered full requirements

9 for all occupancies,[72]/ Sullivan was not provided the



10 necessary information about what the bar and grill

11 facility would entail, and how it was different than the Pilot

12 House Restaurant.[73]/  He didn't know, for example, how

13 many stools there would be around the bar, that there would

14 be a bartender, about booths and TVs, or coffee tables,

15 couches and over-stuffed chairs, what was to be on the

16 menu, or whether it was different than the Pilot House



17 ―――――――――――――

18 **70** *Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 866-67 (N.D. Cal. 2011).

19 **71** H.R. Rep. 101–485, pt. 2, at 102 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 385).

20 **72** Under Sullivan's enforcement of Title 24 as his office understood its requirements during

21 the renovation period, it required the floors and levels of a bar occupancy to be on the same
level or accessible by means of ramp, elevator, or lift.  (Sullivan Depo, Pltf's Exh 93, p.

22 129:5-10.)

23 **73** They are vastly different atmospheres.  Web Advertising for Delta King indicates the
availability "fine and casual dining."  (http://local.amazon.com/marin-

24 county/B00M8LR8R2?src=email&cid=em_dd_950_101_na_s1_&ref_=pe_628140_122269
520_sh_fd.) Indeed, one offers a pricier menu with tablecloths, the other a grill menu, which

25 is similar in some respects, but more like a grill in others, can be enjoyed from couches,
boothed seating or on a patio.  The wheelchair user, who has no patio dining ability, is

26 expected to enjoy casual dining of the bar just outside the fancier restaurant.  During this
litigation, Delta King has attempted to fancy up the lobby with a couch, and they now have

27 table service on the third floor patio, but in yet another area where the disabled can expect to
have to sit by themselves.

28

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1   Restaurant, that the Restaurant and Bar & Grill would each have different names and

2   atmosphere's, that there would be live entertainment, that the bar & grill's patio had regular

3   dining tables, cocktail tables, wicker furniture, a variety of furniture, or that activities would

4   take place in the bar (Sullivan Depo, pp. 126:6-127:9; 128:13-21, 129:23-130:2; 130:3-6.)

5   Sullivan did not secure any contract with Delta King obligating them to provide access to "all

6   activities," but relies upon the note on the drawings as the form of obligation.  (Sullivan Depo,

7   p.130:7-13.)  When asked which activities were obligated, Sullivan answers "All."  (Sullivan

8   Depo, p. 130:14-17.)  When asked again which ones, Sullivan says if you need an alcoholic

9   drink, you could get an alcoholic drink.  (Sullivan Depo, p.130:18-20.)  When asked if that's all

10  the activities available on the fourth deck, Sullivan answers "According to my recollection is,

11  yes."  (Sullivan Depo, p. 130:21-23.)  When asked if that's all they represented to him, Sullivan

12  dismisses that "It's a bar."  (Sullivan Depo, p.130:24-25.)

13          On its face, Delta King's provision of services at the base of the stairs segregates.

14  This isn't just harsh rhetoric.  The message sent by provision of a separate facility without the

15  full atmosphere of inclusion is both loud and clear.  Plaintiff is simply not invited to join the

16  party.  According to Sullivan, why would she want to?  It's just a bar.

17          These non-integration attitudes were analyzed by plaintiff's designated expert professor

18  Peter Blanck, Ph.D., a professor of research in disabilities studies at Syracuse University.  His

19  report and CV are located at Pltf's Exh 200.  He evaluated Delta King's separate service

20  facilities, and concludes that it is,

21          consistent with my and others' research and findings that the exclusion in society of
            persons with disabilities often leads to embarrassment and stigma, and to the
22          provision of separate and not equal services to disabled individuals. Research
            shows that this segregation leads to societal and individual harm, and it diminishes
23          individual self-worth by negatively impacting individual inclusion and participation
24          in society.

25  Blanck notes that exclusion often results from historical perceptions of:

26          public imaginings about what the inherent physical limitations must be; public
            solicitude about the safety to be achieved by keeping the disabled out of harm's
27          way; public feelings of protective care and custodial security; public doubts about
            why the disabled should want to be abroad anyway; and public aversion to the sight
28

1    of them and the conspicuous reminder of their plight.[74/]

2    Blanck concludes that the "experience of Ms. D'Lil in this matter (e.g.,..."equivalent" service at

3    the bottom of the stairs) personifies this statement, as also illuminated by my prior research and

4    the situation the ADA was intended to prevent: paternalism that results in unnecessary

5    exclusion and isolation."[75/]   Although Delta King has now tried to fancy up the lobby, and

6    claims to pipe in music,[76] they fail simply to grasp why their separate services are non-

7    integrated, and hence not equivalent.

8

9        **P.    2008 Remodel and Other Work Re-Triggered Vertical Access Obligations**

10        Defendants unpersuasively argue the 2008 remodel did not trigger access requirements

11   since it allegedly did not change the "functionality" of these facilities.  This is not the test.  In

12   addressing this type of argument in *Davis v. John S. Ciborowski Family Trust*, held:

13           Defendants' first argument is based on the premise that alterations are not
14       subject to Title III unless they actually affect the way the building is used. I reject
         this argument because the defendants' underlying premise is inconsistent with the
         plain language of Title III, its purpose, and the regulations and guidance developed
15       by the DOJ to implement Title III.

16           The plain language of Title III expressly covers not only changes that "affect"
17       usability, but also changes that "could affect" usability. **The only reasonable**
         **interpretation of this language is that it covers alterations that have the**
18       **potential to affect the usability of the facility if they are made differently.** The
         defendants' argument that the statute covers only alterations that will affect the
19       usability of the facility if they are made **as proposed** ignores the phrase "could

20

21   _____

22   [74] Blanck Decl. at ¶22, pp. 9:14 thru 10:1-9, *citing* in part Jacobus tenBroek, The Right to Live
     in the World, 54 California Law Review, 841, 842. The ADA Amendments Act of 2008 (H.R.
23   3195) finds "people with physical or mental impairments having the talent, skills, abilities,
     and desire to participate in society are frequently precluded from doing so because of
24   prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers."
     H.R. 3195, § 2(a)(3), available at http://thomas.loc.gov/home/gpoxmlc 110/h319_ih.xml.

25   [75] Id. at p. 10:6-9.

26   [76] This is disputed, as Mike Coyne denies the Irish Night music, for instance, is piped in.  He
27   states the "muzak system" is limited to a looped track.  (Depo of M.Coyne, Vol. 1, at Pltf's
     Exh 95, p. 263:9-21.)

28

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

1     affect."[77]/

2     Delta King's $300,000 remodeling project in 2008 qualifies under this test.[78]/  For example, the

3     two counters fail to provide the usable lowered section that was required if the work had been

4     done properly, and the guestroom shower work (while it occurred in the standard rooms)

5     triggered under the scoping requirements that the showers in the designated rooms be upgraded,

6     for example, by providing the missing grab bars.  These are all areas of primary function and

7     triggered the 20% rule for provision of path of travel requirements.

8

9     **VII.   <u>ISSUE 4</u>: COMPLAINT DOES NOT DEMAND COMPLETE LEVELING**

10          **A.      Common Mitigations Are Available**

11          A red herring is the defense argument that "*cambered decks, coamings and stairways*

12    *and doorway dimensions must be destroyed and replaced with decks, doorways and stairs that*

13    *comply with contemporary CBC standards is without merit*."  (Brief at 13.)  Of course, the

14    Complaint never made any such demands.  Plaintiff's much modest demands as to deck slopes

15    are only mitigations, particularly through the leveling of the public restroom floors (newly

16    created in 1985) and their 5% slopes by installing a raked sleeper underlayment.  Another

17    mitigation is the provision of leveling mats at public entrances.  For instance, Plaintiff's

18    consultant and Delta King's consultant both agree that thresholds can be made compliant

19    simply by installing such step-up mats, and that this won't affect historic fabric.  (See

20    Blackseth Report at Pltf's Exh 175, pp. 6-7 under title "Registration Lobby"; and Atwood

21    Rebuttal Report at Pltf's Exh 196, p. 2, ¶5.)  Delta King has already begun installing one such

22    mat at the main entrance to the hotel.  (See Photo at Pltf's Exh 134; and M.Coyne Depo at

23

24    _____

25    [77]  *Davis v. John S. Ciborowski Family Trust*, 2013 DNH 055, 2013 WL 1410007 (D.N.H. Apr. 8, 2013) (emphasis added).

26    [78]  Regarding the overall value of the 2008 Remodel, please see Sacramento Bee article
27          Pltf's Exh 169.  Note that Delta King disclosed the existence of the 2008 remodel only
           during the course of the Mike Coyne depositions, but failed to produce any documents in
28          response to a number of production and interrogatory requests.

*Thimesch Law Offices*
158 HILLTOP CRESCENT
WALNUT CREEK,

Pltf's Exh 95, pp. 206:5 thru 207:20.)[79/]  And for doorways, even if Delta King had bothered to qualify for its application by following the process for SHBC alternatives (which it did not), the company was still required to provide access through provision of automatic door openers, which is a common mitigation.[80/]  (Sullivan Depo, at Pltf's Exh 93, p. 121:9-15; DeVore Depo at Pltf's Exh 102, p. 78:4-24.)

It must be remembered that while it may often be unrealistic for a plaintiff to demand perfect access in an historical environment, it is also improper for the defense to attempt to use that inability as some type of defense.  This was a point made in *Roberts v. Royal Atl. Corp.* in dealing with the inability to achieve new construction requirements in mitigating the slope of a ramp under a readily achievable claim:

> There is evidence that application of this rule might overcome some of the objections voiced by the defendants and the district court. For example, it appears that the district court has not considered fully the independent architect's testimony that construction of a ramp in the north parking lot might be readily achievable if the *ADAAG requirements were relaxed to permit a steeper ramp and the placement of accessible spaces further from the general route of travel than the ADAAG would otherwise allow.*[81/]

---

[79] Albeit which is the wrong model as it still leaves vertical threshold in excess of ½ inch beveled.  (See Atwood Rebuttal Report at Pltf's Exh 196, p. 2, ¶5.)

[80] For instance, the 2007 State Historic Building Code (in affect at the time of the 2008 remodel) provides the following with regard to power assisted doors:

> See **8-603.2 Entry.** These alternatives do not allow exceptions for the requirement of level landings in front of doors, except as provided in Section 8-603.4.
>
> ….
>
> **8-603.3 Doors.** Alternatives listed in order of priority are:
>
> …
>
> **8-603.4 Power-assisted Doors.** Power-assisted door or doors may be considered an equivalent alternative to level landings, strikeside clearance and door-opening forces required by regular code.

[81] *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 378, 21 A.D. Cases 210, 37 NDLR P 234, 2008 WL 4249368 (2d Cir. 2008)

1        **B.      We Know No Records Are Missing on this Point**

2            We know no records are missing regarding Delta King's alleged efforts to comply with

3    the LPC exempting procedures, or the SHBC exempting procedures at §8-1306, because

4    Sullivan freely admits he did not consult any disabled advocacy groups whatsoever during the

5    inspection and approval process for the Delta King.  (Sullivan Depo at Pltf's Exh 93, p.115:12-

6    15.)  Sullivan also didn't consult the State Department of Rehabilitation (Id. at p. 116:1-6), or

7    the State Historic Preservation Officer (Id. at p.116:7-11), or take any matter on appeal for

8    ratification of is decisions.  (Id. at p. 116:12-15.)  In fact, any determinations that Sullivan

9    made with regard to historic fabric or handicap access were not adjudicated by any independent

10   body whatsoever.  (Id at p.116:16-20.)  Indeed, during the renovation period, there was no

11   "appeals board."  (Wisham at Pltf's Exh 89, at p. 105:10-21.)  Thus, there were is no possible

12   means for Delta King to claim to have achieved an exemption, and therefore there are no

13   underlying records to be found.

14

15       **C.      Unilateral Placement of Mats Demonstrates No Historical Concern**

16           Defendants may not claim the use of leveling mats outside doorways will destroy

17   historical fabric as they have already done so themselves, and unilaterally, i.e., without

18   consulting the state historic preservation officer.  (See Photo at Pltf's Exh 134; and M.Coyne

19   Depo at Pltf's Exh 95, pp. 206:5 thru 207:20.)  And all parties agree the mats merely cover, but

20   do not destroy, the allegedly "historic" raised thresholds.

21

22       **D.      Delta King May Not Rely Upon Hearsay or Mashed Together Exceptions**

23           Plaintiff incorporates her earlier arguments regarding the impropriety of Delta King

24   relying on hearsay and attempting to mash together a form of exception by through elements of

25   the UHE, Section 106 and merely "considering" the SHBC.  That argument demonstrated that

26   each form of exception under Title 24 and the SHBC is independent and must be satisfied, and

27   Section 106 is never available as a form of exception.

28

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,

**VIII.  ISSUE 5: A STAY WOULD BE IMPROPER**

The request for a stay is improper.  Delta King has not looked for the documents among those available, and already knows that any "findings" that it alleges was restricted to blueprints, and can't satisfy the requirements of the UHE and LPC.  And the City, which did not join in this motion, supplied no declarations that any such exceptions for the access infrastructure ever existed, let alone involve records that were lost.


Dated: 8/27/2014                        THIMESCH LAW OFFICES
                                        TIMOTHY S. THIMESCH



                                        _____
                                        Attorneys for Plaintiff
                                        HOLLYNN D'LIL

Thimesch Law Offices
158 HILLTOP CRESCENT
WALNUT CREEK,