UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| HOLLYNN D'LIL,<br><br>             Plaintiff,<br><br>    v.<br><br>RIVERBOAT DELTA KING, INC.;<br>CITY OF SACRAMENTO; OLD<br>SACRAMENTO BUSINESS<br>ASSOCIATION, INC.,; and DOES<br>1 through 50, Inclusive,<br><br>             Defendants. | CIV. NO. 2:11-2230 WBS AC<br><br><u>MEMORANDUM AND ORDER RE: MOTION</u><br><u>FOR SUMMARY JUDGMENT OR,</u><br><u>ALTERNATIVELY, FOR A STAY</u> |

----oo0oo----

Plaintiff Hollynn D'Lil, a paraplegic, brought this action under the Americans with Disabilities Act, 42 U.S.C. § 12101 <u>et seq.</u> ("ADA") and analogous state laws against defendants Riverboat Delta King, Inc. ("Delta King") and the City of Sacramento arising out of the physical obstacles she allegedly encountered while visiting the Delta King.  Delta King now moves for summary adjudication regarding certain alleged barriers pursuant to Federal Rule of Civil Procedure 56 or, alternatively,

1

1   for a stay.

2   I.    <u>Factual & Procedural History</u>

3         The Delta King was a five-story vessel built over

4   eighty-five years ago in the late 1920s.  It carried passenger

5   traffic between Sacramento and San Francisco until 1940.  After

6   some wartime service with the federal government, it had become a

7   derelict vessel by the 1960s.  By the 1980s, it was submerged

8   near Rio Vista to the middle of the third deck.  In 1984, the

9   Coyne family purchased the vessel and brought it to Sacramento

10   for restoration.

11         From 1984 to 1989, the Coyne family rehabilitated the

12   Delta King, converting it from a passenger vessel to a hotel with

13   a restaurant, theatre, bar and grill, and banquet facilities.

14   During the rehabilitation, the Delta King maintained many of its

15   original characteristics, such as slanted floors and narrow door

16   widths.  It is now berthed at 1000 Front Street in Old Sacramento

17   and, while it still floats, it is no longer a sea-worthy vessel.

18         Since its original rehabilitation, patrons are able to

19   board the Delta King through one of two gangways.  The Elevator

20   Gangway leads to the second deck and incorporates a floating

21   barge with an elevator and stairs and has two configurations

22   depending on the water level of the Sacramento River.  The Aft

23   Gangway is less than twenty-five feet from the Elevator Gangway

24   and leads directly to the third deck of the Delta King.  Within

25   the Delta King, an elevator provides access to the first three

26   decks, but there is not an adequate means for disabled patrons to

27   access the fourth and fifth decks.

28

1    The Delta Bar and Grill is on the fourth deck of the

2  Delta King.  Although disabled patrons are unable to access the

3  fourth deck, the Delta King provides a cocktail seating area at

4  the base of the main staircase on the third deck where patrons

5  can order any drinks or food offered at the Delta Bar and Grill.

6  When the Delta Bar and Grill features live music about two to

7  three times per week, disabled patrons are able to hear the

8  music from the third deck.  The Delta Bar and Grill also has a

9  TV for patrons to view, but there is not a TV available in the

10  seating area on the third deck.

11    In her Complaint, plaintiff alleges claims under (1)

12  the public services provisions of the ADA, 42 U.S.C. § 12132,

13  against the city; (2) section 504 of the Rehabilitation Act of

14  1973 against the city, 29 U.S.C. § 794; (3) the public

15  accommodations provisions of the ADA against Delta King and the

16  city, 42 U.S.C. § 12182; (4) California Health and Safety Code

17  section 19955 against Delta King and the city; (5) California

18  Government Code section 4456 against the city; (6) the California

19  Disabled Persons Act ("CDPA") against Delta King and the city,

20  Cal. Civ. Code § 54 et seq.; (7) the Unruh Civil Rights Act

21  against Delta King and the city, Cal. Civ. Code § 51 et seq.; (8)

22  California Government Code section 11135 against the city; (9)

23  California Government Code section 12948 against Delta King and

24  the city; and (10) state law negligence against Delta King and

25  the city.

26    Plaintiff's Complaint details thirty-five pages of

27  barriers on the Delta King that allegedly violate the ADA and

28  analogous state disability laws.  (See Compl. Ex. 1.)  Delta

3

King's motion for summary judgment is limited to the following alleged barriers: 1) the slope of the gangways;[1] 2) vertical access to the fourth and fifth decks; 3) leveling of cambered decks; 4) removal of raised thresholds; and 5) configuration of the doors.[2]

_____

[1] Although plaintiff's Complaint and opposition to Delta King's motion for summary judgment appear to be limited to the slope of the Aft Gangway, Delta King indicated at oral argument that its motion for summary judgment addresses the slope of the Elevator and Aft Gangways.

[2] In what appears to be petty bickering between the parties, Delta King contends that the court should disregard plaintiff's opposition and supporting filings as untimely, (Delta King's Reply at 16:2-18:12 (Docket No. 80); Docket No. 80-2); plaintiff objects to new arguments in Delta King's reply brief, (Docket No. 81); plaintiff requests relief from potential default based on any untimely filings, (Docket No. 84); and Delta King objects to plaintiff's sur-reply, (Docket No. 86).  Suffice to say that each party has had the opportunity to be fully heard and the court will focus on the substance of the motion for summary judgment.  The court will also decline plaintiff's vague invitation to "consider exercising discretion to cross-grant summary judgment where appropriate." (Pl.'s Opp'n at 1:6-7 (Docket No. 74).)

Along a similar vein, Delta King filed sixty-one formulaic and conclusory objections to the statements in plaintiff's declarations.  (Docket No. 80-2.)  In the thirteen pages of objections, Delta King simply cuts and pastes various objections without a single attempt to offer any helpful analysis.  As the court has repeatedly explained, "Objections to evidence on the ground that the evidence is irrelevant, speculative, argumentative, vague and ambiguous, or constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself." Century 21 Real Estate LLC v. All Prof'l Realty, Inc., 889 F. Supp. 2d 1198, 1215 (E.D. Cal. 2012) (citing Burch v. Regents of the Univ. of Cal., 433 F. Supp. 2d 1110, 1119-20 (E. D. Cal. 2006)).  "Similarly, statements based on speculation, improper legal conclusions, personal knowledge, or argumentative statements are not *facts* and can only be considered as arguments, not as facts, on a motion for summary judgment." Id.  Assuming Delta King actually intended that the court give serious consideration to any of its rote objections and to the extent that the court relies on any of the declarations, the court overrules Delta King's objections.

1  II.  <u>Discussion</u>

2          Summary judgment is proper "if the movant shows that

3  there is no genuine dispute as to any material fact and the

4  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

5  P. 56(a).  A material fact is one that could affect the outcome

6  of the suit, and a genuine issue is one that could permit a

7  reasonable jury to enter a verdict in the non-moving party's

8  favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

9  (1986).  The party moving for summary judgment bears the initial

10 burden of establishing the absence of a genuine issue of material

11 fact and can satisfy this burden by presenting evidence that

12 negates an essential element of the non-moving party's case.

13 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

14 Alternatively, the moving party can demonstrate that the non-

15 moving party cannot produce evidence to support an essential

16 element upon which it will bear the burden of proof at trial.

17 <u>Id.</u>

18         Once the moving party meets its initial burden, the

19 burden shifts to the non-moving party to "designate 'specific

20 facts showing that there is a genuine issue for trial.'"  <u>Id.</u> at

21 324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

22 the non-moving party must "do more than simply show that there is

23 some metaphysical doubt as to the material facts."  <u>Matsushita</u>

24 <u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

25 "The mere existence of a scintilla of evidence . . . will be

26 insufficient; there must be evidence on which the jury could

27 reasonably find for the [non-moving party]."  <u>Anderson</u>, 477 U.S.

28 at 252.

5

1    In deciding a summary judgment motion, the court must

2  view the evidence in the light most favorable to the non-moving

3  party and draw all justifiable inferences in its favor.  Id. at

4  255.  "Credibility determinations, the weighing of the evidence,

5  and the drawing of legitimate inferences from the facts are jury

6  functions, not those of a judge . . . ruling on a motion for

7  summary judgment . . . ."  Id.

8      A.   Relevant Statutes

9          1.   The ADA

10   The ADA prohibits discrimination against any individual

11  on the basis of disability in a place of public accommodation. 42

12  U.S.C. § 12182(a).  "The statute provides a 'comprehensive,'

13  'broad mandate' to eliminate discrimination against disabled

14  persons, addressing both 'outright intentional exclusion' as well

15  as the 'failure to make modifications to existing facilities and

16  practices.'"  Fortyune v. City of Lomita, --- F.3d ----, 2014 WL

17  4377467, at *2 (9th Cir. Sept. 5, 2014).  "The concept of

18  'discrimination' under the ADA does not extend only to obviously

19  exclusionary conduct--such as a sign stating that persons with

20  disabilities are unwelcome or an obstacle course leading to a

21  store's entrance."  Chapman v. Pier 1 Imports (U.S.) Inc., 631

22  F.3d 939, 945 (9th Cir. 2001).  "Rather, the ADA proscribes more

23  subtle forms of discrimination--such as difficult-to-navigate

24  restrooms and hard-to-open doors--that interfere with disabled

25  individuals' 'full and equal enjoyment' of places of public

26  accommodation."  Id. (quoting 42 U.S.C. § 12182(a)).  "[A]

27  private plaintiff can sue only for injunctive relief (i.e., for

28  removal of the barrier) under the ADA."  Oliver v. Ralphs Grocery

1  Co., 654 F.3d 903, 905 (9th Cir. 2011).

2          The ADA specifically prohibits any person who owns,

3  leases, or operates a place of public accommodation from

4  "fail[ing] to remove architectural barriers" in existing

5  facilities "where such removal is readily achievable."  42 U.S.C.

6  § 12182(b)(2)(A)(iv).  For newly constructed facilities or for

7  "alterations" made to existing facilities, the ADA requires that

8  the facilities be "readily accessible to and usable by

9  individuals with disabilities."  Id. § 12183(a)(1)-(2).

10          "Congress directed the Department of Justice . . . to

11  issue regulations that provide substantive standards applicable

12  to facilities covered under Title III."  Or. Paralyzed Veterans

13  of Am. v. Regal Cinemas, Inc., 339 F.3d 1126, 1129 (9th Cir.

14  2003).  "The[] standards lay out the technical structural

15  requirements of places of public accommodation and are applicable

16  'during the design, construction, and alteration of such

17  buildings and facilities . . . under the [ADA]."  Fortyune v. Am.

18  Multi-Cinema, Inc., 364 F.3d 1075, 1080-81 (9th Cir. 2014)

19  (quoting 28 C.F.R. pt. 36, app. A) (alterations in original).

20  The Department of Justice first adopted the 1991 ADA Standards

21  for Accessible Design, which are commonly referred to as the

22  "ADAAG," and subsequently revised those standards in 1994.  See

23  28 C.F.R. Pt. 36, app. A.  In 2010, the Department of Justice

24  adopted the 2010 Design Standards for Accessible Design ("2010

25  Design Standards").  The ADAAG was in effect for new construction

26  and alterations until March 14, 2012, and the 2010 Design

27  Standards became effective for new construction and alterations

28  on or after March 15, 2012.

1        2.   California Health & Safety Code Section 19955

2            Section 19955 of the California Health and Safety Code

3   requires that all public accommodations adhere to the provisions

4   of sections 4450 through 4461 of the California Government Code.

5   Cal. Health & Safety Code § 19955(a).  Section 4450 authorizes

6   the State Architect to develop and submit building standards to

7   ensure that all buildings and facilities are "accessible to and

8   usable by persons with disabilities."  Cal. Gov't Code § 4450.

9   Although a plaintiff can obtain injunctive relief to remedy a

10  violation of section 19955, see Cal. Civ. Code § 55, the statute

11  "does not authorize an action for damages."  Botosan v. Fitzhugh,

12  13 F. Supp. 2d 1047, 1052 (S.D. Cal. 1998) (citing Donald v. Cafe

13  Royale, Inc., 218 Cal. App. 3d 168, 183 (1st Dist. 1990)).

14              3.   Unruh Civil Rights Act

15           The Unruh Act provides, in relevant part, that every

16  person is "entitled to the full and equal accommodations,

17  advantages, privileges, or services in all business

18  establishments of every kind whatsoever" notwithstanding his or

19  her disability.  Cal. Civ. Code § 51(b).  "Whoever denies, aids

20  or incites a denial, or makes any discrimination or distinction

21  contrary to Section 51" is liable under UCRA for damages and

22  attorney's fees.  Id. § 52.  Any violation of the ADA is also a

23  violation of the Unruh Act.  Id. § 51(f).

24           In order to recover under the Unruh Act for a violation

25  of the ADA, a plaintiff need not show that he suffered

26  intentional discrimination.  Munson v. Del Taco, Inc., 46 Cal.

27  4th 661, 665 (2009).  However, "[t]o the extent [p]laintiff seeks

28  to make an Unruh Act claim separate from an ADA claim, she must

8

allege intentional discrimination." <u>Wilkins-Jones v. County of Alameda</u>, 859 F. Supp. 2d 1039, 1051 (N.D. Cal. 2012) (citations omitted); <u>Munson</u>, 46 Cal. 4th at 668 ("[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination . . . ." (citations and internal quotation marks omitted)).

### 4.   California Disabled Persons Act

The CDPA provides that "individuals with disabilities shall be entitled to full and equal access . . . to . . . places of public accommodation." Cal. Civ. Code § 54.1. The CDPA also provides a private right of action whereby individuals who are denied admission to or enjoyment of public facilities can recover damages and attorney's fees. <u>Id.</u> § 54.3.

However, "a structural impediment does not violate the [CDPA] unless the impediment also violates a structural access standard." <u>Hankins v. El Torito Rests.</u>, 63 Cal. App. 4th 510, 522 (1st Dist. 1998). The CDPA "does not impose an affirmative duty to eliminate access barriers except as required by specific building standards." <u>Californians for Disability Rights v. Mervyn's LLC</u>, 165 Cal. App. 4th 571, 587 (1st Dist. 2008) (citing <u>Marsh v. Edwards Theatres Circuit, Inc.</u>, 64 Cal. App. 3d 881 (2d Dist. 1976)). Those standards, not "the [C]DPA's general guarantee of full and equal access," determine a defendant's liability under the CPDA. <u>Id.</u>

### B.   Access Infrastructure Under the ADA and California Law

#### 1.   Ramps vs. Gangways

At the time the Delta King was restored in 1984, the California Building Code ("CBC") required that ramps providing

9

1   access to buildings or structures could not exceed a slope of 1

2   foot rise in 12 feet ("12:1"), or a grade of 8.33%. (Post Decl.

3   Ex. 29 at 94.)  Since enactment of the ADA in 1990, the parties

4   agree that all relevant standards have similarly required a 12:1

5   slope ratio for ramps.  For example, section 405.2 of the 2010

6   Design Standards provides that "[r]amp runs shall have a running

7   slope not steeper than 1:12."

8        Delta King first contends that it was not required to

9   comply with the 12:1 slope requirement for ramps in the 1984 CBC

10  because the sloped access walkways to the Delta King are

11  gangways, not ramps, and the CBC did not regulate gangways in

12  1984.  Common sense dictates, however, that a gangway is simply a

13  type of ramp.  In fact, Delta King's copy of the Manuscript Plan

14  Set repeatedly labels its pedestrian walkways providing access as

15  "ramps."  (See M. Coyne Decl. Ex. 7 at A-2 (Docket No. 59).)

16  Delta King's citation to the Wikipedia National Dictionary's

17  definition of a "gangway" as "an articulating bridge or ramp,

18  such as from land to a dock or a ship" underscores that a gangway

19  is simply a subspecies of a ramp.  (Delta King's Mem. at 29:17-18

20  (Docket No. 54-1) (emphasis added)); see also 2010 Design

21  Standards § 106.5 (defining "ramp" as "[a] walking surface that

22  has a running slope steeper than 1:20" and "gangway" as "[a]

23  variable-sloped pedestrian walkway that links a fixed structure

24  or land with a floating structure") (emphasis added).

25       Therefore, although the sloped pedestrian walkways

26  providing access to the Delta King are gangways, they also come

27  under the broader description of a ramp.  The fact that the

28  various ADA and California regulations subsequently determined

10

1  that the unique characteristics of some gangways justified

2  exemptions from the 12:1 slope ratio for ramps does not mean that

3  gangways were not regulated as ramps prior to the exceptions.

4  The very creation of the exceptions confirms that the standard

5  12:1 ratio applied.  Accordingly, the 12:1 slope in the CBC

6  applied to Delta King's gangways when it was restored in 1984.

7  To the extent Delta King argues that its gangways do not pose

8  barriers under the ADA because they comply with the ADAAG or 2010

9  Design Standards, the 12:1 slope similarly controls.

10           2.  Compliance with the 12:1 Slope

11           To establish that the Elevator and Aft Gangways comply

12  with the 12:1 slope requirement, Delta King relies on the

13  declaration of Charles Coyne, who owns twenty percent of the

14  shares of the Delta King and served as the General Manager from

15  1991 to 2005 and 2007 to 2013.  (C. Coyne Decl. ¶ 2 (Docket No.

16  60).)  Utilizing water levels recorded by the California

17  Department of Water Resources ("DWR"), Charles used "simple

18  geometry" to calculate the slope of the Delta King's two

19  gangways.  (Id. ¶ 12.)  Specifically, the DWR recorded water

20  levels for the Sacramento River at the I Street Bridge, which is

21  about 400 yards north of the Delta King.  (Id. ¶ 11.)  Since

22  approximately January 1, 2001, the DWR has measured and recorded

23  the water levels of the Sacramento River at the I Street Bridge

24  each day and posted them on its website.  (Id.)  From 1998 to

25  January 1, 2001, only incomplete recorded measurements are

26  available.  (Id.)

27           On June 14, 2014, Charles measured the vertical

28  distance from the water level to the boardwalk, Elevator Gangway

11

1    connection point, the direct barge connection point, and the Aft

2    Gangway connection point.  (Id.)  Taking those measurements,

3    along with the water height at the I Street Bridge on June 14,

4    2014 and the length and width of each gangway, Charles represents

5    that he was able to calculate the slope of each gangway on June

6    14, 2014.  (Id.)  He indicates that he was then able to utilize

7    "simple geometry[] to determine the slop of the gangways at any

8    river height."  (Id.)  According to Charles's calculations, there

9    was only one day from January 1, 2001 to June 14, 2014 when

10   neither the Elevator Gangway nor the Aft Gangway had at least a

11   12:1 slope.  (Id.)

12          This evidence is insufficient to withstand summary

13   judgment for two reasons.  First, assuming their accuracy,

14   Charles's calculations do not establish that the Elevator and Aft

15   Gangways are compliant.  He indicates only that on every day

16   except one since January 2, 2001, at least one of the two

17   gangways was compliant.  Delta King does not argue, however, that

18   one gangway could exceed the 12:1 slope so long as the other

19   gangway offered plaintiff access with a 12:1 slope.  Plaintiff's

20   expert, Zachery Reynolds, states that the slope of the Aft

21   Gangway "taken during normal inspection at random periods all

22   indicated a slope greater than a 1:12 ratio," and "for all but

23   the smallest percent of time, the aft access slope to the Hotel

24   is on a 10% (1:10) to 16% (1:6) grade."  (Reynolds Decl. ¶ 12,

25   Exs. 202, 203 (Docket No. 69).)

26          Second, Reynolds also disputes the accuracy of

27   Charles's calculations.  Reynolds is a naval architect with

28   forty-five years of experience and has reached the "provisional

1   opinion that [Charles] has used non-reliable and inaccurate

2   data." (Id. ¶ 3.)  Reynolds explains that the DWR's water level

3   readings from the I Street Bridge are "calibrated and calculated

4   from a gage reading where the datum is 0.0 (zero)" and that such

5   measurements do not accurately reflect the water level at the

6   Delta King. (Id. ¶¶ 4-12.)  At summary judgment, the court

7   cannot weigh the reliability of Charles's method of calculating

8   the slopes of the gangways against Reynolds's opinion that the

9   calculations are inaccurate.  See Scharf v. U.S. Att'y Gen., 597

10  F.2d 1240, 1243 (9th Cir. 1979) (holding that resolution of

11  issues of fact based on conflicting expert testimony is "not the

12  court's function on summary judgment").[3]

13          Accordingly, Delta King is not entitled to summary

14  adjudication on the ground that the slopes of the Elevator and

15  Aft gangways comply with the 12:1 slope requirement.

16              3. "Recreational Boating Facilities" Exceptions

17          Next, Delta King contends that the Elevator and Aft

18  Gangways do not constitute barriers under the ADA because they

19  come within the slope exception in section 1003.1 of the 2010

20  Design Standards.  Section 1003 governs "recreational boating

21  facilities" and specifically covers the slope and other

22  requirements of "gangways."[4]  The exceptions provided for

23  ───────────────

24          [3]   Because the court does not rely on Charles's
    declaration to grant Delta King's motion for summary judgment, it
25  need not resolve plaintiff's objection to his declaration on the
    ground that he was not disclosed as an expert witness or
26  qualified as an expert.

27          [4]   Delta King also relies on section 15 of the United
    States Access Board's version of ADAAG, which addresses
28  exceptions applicable to "recreational facilities," including

                                13

1  "gangways" in the 2010 Design Standards are limited to

2  "[a]ccessible routes serving recreational boating facilities."

3  2010 Design Standards, § 1003.2.  The issue is thus whether Delta

4  King can rely on the "recreational boating facilities" exceptions

5  for gangways to exempt the Elevator and Aft Gangways from

6  compliance with the 12:1 slope.[5]

7         The challenges the Delta King faces in providing

8  accessible gangways are precisely the type of challenges the

9  Department of Justice contemplated when it enacted the 2010

10  Design Standards.  In the commentary discussing the exception for

11  recreational boating facilities, the Department of Justice

12  explained,

13      Section 1003.2.1 provides a list of exceptions
14      applicable to structures such as gangways, transition
       plates, floating piers, and structures containing
15      combinations of these elements that are affected by

16  "boating facilities."  See United States Access Board ADA

17  Accessibility Guidelines § 15 (Sept. 2002), http://www.access-
    board.gov/guidelines-and-standards/buildings-and-sites/about-the-

18  ada-standards/background/adaag (last visited Sept. 24, 2014).
    Although the United States Access Board published the ADAAG in

19  1991, it did not publish Section 15 until 2002.  More

20  importantly, the Department of Justice has not adopted section 15
    and the Access Board indicates that "Section 15 has not been

21  incorporated in the Department of Justice accessibility standards
    and therefore is not enforceable." Id.  The court will therefore

22  not rely on the exceptions in section 15 of the Access Board's
    version of ADAAG.

23
       [5]    Plaintiff repeatedly argues that Delta King is no

24  longer a "boat."  Although Delta King points out how it is
    similar to a boat in many respects, it does not argue that it is

25  a "boat" or is exempt from the ADA as a "boat."  If Delta King
    were a boat, the 2010 Design Standards would not govern its

26  gangways.  See 2010 Design Standards, § 106.5 (stating, in the
    definition of "gangway," that "[g]angways that connect to vessels

27  are not addressed by this document").

28
                                14

<u>water level changes</u>.  The list of exceptions specifies alternate design requirements applicable to these structures which, <u>because of water level variables</u>, cannot comply with the slope, cross slope, and handrail requirements for fixed ramps contained in sections 403.3, 405.2, 405.3, 405.6, and 405.7 of the 2010 Standards.

28 C.F.R. pt. 36, app. B (emphasis added).

Nonetheless, while the varying levels of water on the Sacramento River cause the same challenges for the Delta King's gangways as the challenges the Department of Justice contemplated in enacting the exceptions for "recreational boating facilities," it cannot persuasively be argued that the Delta King is a "recreational boating facility."  In its analysis of the commentary received prior to adopting the exceptions for recreational boating facilities, the Department of Justice focused on facilities providing access to boats.  <u>See</u> 28 C.F.R. pt. 26, app. B ("[T]he 2010 Standards require an accessible route to all accessible boating facilities, <u>including boat slips and boarding piers at boat launch ramps</u>.") (emphasis added); <u>see also</u> 67 Fed. Reg. 56352-01, 56357 (Sept. 3, 2002) ("The Board is concerned that those involved in the design and construction of <u>boat and ferry docks</u> may not have been fully aware of the proposed rule and therefore may not have evaluated its impact on such facilities.  In addition, through the proposed rule, the Board sought information to establish access provisions for gangways based on the size of <u>vessels using floating piers</u>.") (emphasis added).[6]

_____

[6]    The only federal definition for "recreational boating facilities" appears in Coast Guard regulations addressing the transport of oil and other substances.  This definition would

1          The Department of Justice could have simply applied the

2   exceptions to "gangways."  It did not.  After broadly defining

3   the term "gangway," it unequivocally limited the slope exceptions

4   to gangways accessing recreational boating facilities.  The Ninth

5   Circuit has repeatedly instructed courts to "'construe the

6   language of the ADA broadly to advance its remedial purpose.'"

7   Fortyune v. City of Lomita, 2014 WL 4377467, at *1 (quoting Cohen

8   v. City of Culver City, 754 F.3d 690, 694 (9th Cir. 2014)); see

9   also Guerrero v. Santo Thomas, No. CVA09-027, 2010 WL 3526453, at

10  *5 (Guam Terr. Sept. 8, 2010) ("[W]hen construing remedial

11  legislation, we narrowly construe exceptions and apply them only

12  to situations which are plainly and unmistakably consistent with

13  the terms and spirit of the legislation.").  As the Ninth Circuit

14  has explained,

> Our concern for the protective purposes of remedial
> legislation . . . does not vest this court with a
> license to rewrite the statute . . . . It is for us to
> ascertain--neither to add nor to subtract, neither to
> delete nor distort.  Our compass is not to read a
> statute to reach what we perceive--or even what we
> think a reasonable person should perceive--is a
> sensible result.

20  S.E.C. v. Gemstar-TV Guide Intern., Inc., 401 F.3d 1031, 1053

21  (9th Cir. 2005) (internal quotation marks and citation omitted)

22  (first omission in original).  Accordingly, Delta King cannot

23  rely on the slope exceptions for recreational boating facilities

24  to establish that the Elevator and Aft Gangways comply with the

---

26  exclude the Delta King.  See 33 C.F.R. § 158.120 ("'Recreational
    boating facility' means a facility that is capable of providing
    wharfage or other services for 10 or more recreational vessels.
    It includes, but is not limited to, marinas, boatyards, and yacht
    clubs, but does not include a place or facility containing only
    an unattended launching ramp.") (emphasis added).

1   2010 Design Standards.

2           The same analysis excludes application of the

3   exceptions for particular gangways in the California Department

4   of Boating and Waterways' 2005 Layout and Design Guidelines for

5   Marina Berthing Facilities ("CDBW Guidelines").  The CDBW

6   Guidelines "provide technical assistance and direction in the

7   planning, design and construction of marina berthing facilities"

8   and define "marina" as "a recreational boating facility on a

9   coastal or inland waterfront that provides facilities and

10  services for the wet and/or dry storage of boats, as well as

11  embarking and disembarking of boat operators and passengers."

12  (Pl.'s Req. for Judicial Notice Ex. 219 (CDBW Guidelines) at

13  iii); see also Cal. Code Regs. tit. 14, § 6565.2 (defining

14  "[r]ecreational boat" as "any vessel manufactured or used

15  primarily for noncommercial use; or leased, rented, or chartered

16  to another for the latter's noncommercial use," but not "a vessel

17  engaged in the carrying of six or fewer passengers").

18  Accordingly, because the gangways leading to the Delta King are

19  subject to the 12:1 slope ratio and the Delta King has not

20  established as a matter of law that the Elevator and Aft

21  Gangways comply with that slope, the court will deny Delta

22  King's motion for summary adjudication with respect to its

23  access infrastructure.[7]

24  _____

25          [7]   Delta King has not moved for summary judgment on the
    ground that the Elevator and Aft Gangways comply with the ADA
26  because any modifications to remedy their slopes are not readily
    achievable.
27          In her opposition, plaintiff argues that adding the
    required handrails and extensions to the Aft Gangway are readily
28  achievable.  (Pl.'s Opp'n at 27.)  The court will not address

C.    Alterations Under the ADA

Subsection 12183(a)(2) of the ADA provides that if a facility is "altered . . . in a manner that affects or could affect the usability of the facility," the alterations must be made "in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities."  42 U.S.C. § 12183(a)(2).  In the absence of a definition of "altered" or "alterations" in the ADA, courts have looked to the definition provided in the the Department of Justice's implementing regulations.  Roberts v. Royal Atl. Corp., 542 F.3d 363, 369 (2d Cir. 2008).  The regulations define alteration as "a change to a place of public accommodation or commercial facility that affects or could affect the usability of the building or facility or any part thereof."  28 C.F.R. § 36.402(b).  Although neither the ADA nor the implementing regulations define "usability," the regulations provide the following illustrations as to what may or may not amount to an alteration:

> Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions.  Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.

Id. § 36.402(b)(1).  The Department of Justice has commented that it "remains convinced that the [ADA] requires the concept of

this proposed modification because Delta King did not seek summary adjudication on that issue.

18

1 'usability' to be read broadly to include any change that affects
2 the usability of the facility, not simply changes that relate
3 directly to access by individuals with disabilities."  56 Fed.
4 Reg. 35544, 35581 (July 26, 1991); accord H.R. Rep. No. 101-
5 485(III) (1990), reprinted in 1990 U.S.C.C.A.N. 445, 487
6 ("Usability should be broadly defined to include renovations
7 which affect the use of facility, and not simply changes which
8 relate directly to access.").

9       While "few courts in the Ninth Circuit have interpreted
10 'usability' when assessing if an alteration has occurred," courts
11 outside this circuit "have tended to take an expansive view of
12 alterations that affect usability."  Rodriguez v. Barrita, Inc.,
13 --- F. Supp. 2d ----, ----, 2014 WL 31739, at *13 (N.D. Cal. Jan.
14 3, 2014) (citing cases).  In Roberts, the Second Circuit
15 contrasted alterations under the ADA with new construction,
16 concluding that "alterations" seem to exclude "modifications that
17 essentially preserve the status and condition of a facility,
18 rather than rendering it materially 'new' in some sense."  542
19 F.3d at 370.  It concluded that a court could consider the
20 following non-exhaustive factors to determine whether a
21 modification amounted to an alteration:

22      1. The overall cost of the modification relative to
23      the size (physical and financial) of the facility or
         relevant part thereof.
24
25      2. The scope of the modification (including what
         portion of the facility or relevant part thereof was
         modified).
26
27      3. The reason for the modification (including whether
         the goal is maintenance or improvement, and whether it
28       is to change the purpose or function of the facility).

19

4.   Whether   the   modification   affects   only   the facility's surfaces or also structural attachments and fixtures that are part of the realty.

Id.[8]

Courts have emphasized that "Congress' discussion of 'affecting usability' focused on the 'primary function" of a facility." Kinney v. Yerusalim, 9 F.3d 1067, 1073 (3d Cir. 1993); accord Alford v. City of Cannon Beach, No. CV-00-303-HU, 2000 WL 33200554, at *6 (D. Or. Jan. 17, 2000). "Areas containing primary functions refer to those portions of a place of public accommodations where significant goods, services, facilities, privileges, advantages or accommodations are provided," such as "the path of travel [,] . . . bathrooms, telephones, and drinking fountains." H.R. Rep. No. 101-485(III), reprinted in 1990 U.S.C.C.A.N. 445, 487.   Despite Delta King's attempt to argue otherwise, it seems obvious that a hotel room and its bathroom are a primary function of a hotel.

Although Delta King recounts all work that has been performed since the initial rehabilitation, plaintiff argues only

---

[8]   The parties dispute, and the Ninth Circuit has not resolved, which party has the burden of proof on the alteration issue.   In the absence of any guidance in the ADA or implementing regulations, the Second Circuit concluded that the plaintiff has the initial burden of production on the issue and meets that burden "by identifying a modification to a facility and by making a facially plausible demonstration that the modification is an alteration under the ADA."   Id. at 371.   If the plaintiff meets this initial burden, the Second Circuit concluded that the "defendant then bears the burden of persuasion to establish that the modification is in fact not an alteration."   Id.   Here, allocation of the burden on this issue would not affect the court's conclusion.

1   that alterations occurred in 2008.  Plaintiff relies on an

2   article from May 19, 2008 in The Sacramento Bee describing a

3   "six-figure makeover":

4

5       Each of the 44 staterooms is being upgraded, with new
        furniture, bedding, HD-TVs and Wi-Fi connections . . .

6       . Other changes include new carpeting as well as new
        tables in lounges and on the scenic second-level

7       outdoor deck  .  .  .  .  The upgrades[ are] to be
        completed next month and [will] cost[] "several

8       hundred thousand dollars . . . ."

9   (Thimesch Decl. Ex. 169.)

10          According to Delta King, the hotel rooms were

11  refurbished in 2000 and some shower and bathroom floors in the

12  rooms were resurfaced in 2008.  For the remodels in 2000, the

13  "renovation" cost was approximately $700 per hotel room and

14  occurred over two years.  (C. Coyne Decl. ¶ 28.)  The room

15  renovations in 2000 included removing and replacing wallpaper,

16  painting walls, replacing worn and broken blinds, lamps, side

17  tables, and bed spreads.  (Id.)  According to Charles, "[a]ll

18  replaced furniture and fixtures served the same function and were

19  of substantially the same dimensions as the worn furniture and

20  fixtures they replaced."  (Id.)  In 2008 or 2009, Delta King

21  indicates that fiberglass sheeting was placed over the tile

22  surfaces of the showers and bathroom floors in twenty to twenty-

23  five hotel rooms.  (Id. ¶¶ 26-27; M. Coyne Dep. at 241:14-1,

24  245:5-8.)  The fiberglass sheeting was installed in an effort to

25  address a mold problem and provided a "water barrier that was

26  attractive."  (C. Coyne Decl. ¶ 27.)

27          Delta King's descriptions of the hotel room remodels in

28  2000 that cost approximately $30,800 and the installation of

21

1   fiberglass sheeting on shower and bathroom floors in 2008 vary

2   drastically from the reported "six-figure makeover" in 2008 that

3   was described in The Sacramento Bee.  Delta King objects to the

4   court taking judicial notice of the The Sacramento Bee article,

5   but does not respond to the alleged "six-figure makeover" in

6   2008.[9]  In his deposition, however, Michael Coyne testified that

7   Delta King had advertised having newly remodeled rooms in 2008.

8   (M. Coyne Dep. at 242:2-7.)  Taking all reasonable inferences in

9   favor of plaintiff, it is unlikely Delta King advertised a

10  remodel that consisted only of installing fiberglass sheeting to

11  some of its shower and bathroom floors.  A genuine dispute

12  therefore exists as to the remodeling performed in 2008.

13          With the only work Delta King identifies as having been

14  performed in 2008--the shower and bathroom floor resurfacing--

15  the court also lacks sufficient details about those improvements.

16  See H. Comm. on Educ. & Labor Rep. No. 485(II) (1990), reprinted

17  in 1990 U.S.C.C.A.N. 303, 394-95 ("Changes to floors may or may

18

19          [9]    It is doubtful that the court can properly take
    judicial notice of The Sacramento Bee article.  See Von Saher v.
20  Norton Simon Museum of Art at Pasadena, 578 F.3d 1016, 1022 (9th
    Cir. 2009) ("Courts may take judicial notice of publications
21  introduced to 'indicate what was in the public realm at the time,
    not whether the contents of those articles were in fact true.'").
22  But see Ritter v. Hughes Aircraft Co., 58 F.3d 454, 458-59 (9th
    Cir. 1995) (concluding that the district court did not err in
23  taking judicial notice of layoffs in newspaper article because,
    under Federal Rule of Evidence 201(b), the layoffs "would be
24  generally known in Southern California and [] would be capable of
    sufficiently accurate and ready determination").
25
          Nonetheless, while the court does not rely on the
26  article in denying Delta King's motion for summary adjudication
    with respect to alterations, it questions why Delta King failed
27  to respond to the alleged 2008 "six-figure makeover" reported in
    the article.
28
                                22

1  not affect accessibility or usability, depending upon the nature

2  of the change involved.").  Although Delta King explains that the

3  resurfacing provided a water barrier to remedy mold, the court

4  lacks evidence explaining the process of installing the

5  fiberglass sheeting and whether the work could have affected the

6  usability of the bathrooms and showers.

7        In Kinney, the Third Circuit held that resurfacing of

8  streets affected the usability of the streets and thereby

9  constituted an alteration under the ADA.  9 F.3d at 1073-74.  The

10 Third Circuit reasoned that resurfacing "involves more than minor

11 repairs or maintenance" and, because resurfacing "helps to

12 prevent damage to vehicles and injury to people," the improvement

13 from resurfacing makes the street "more usable in a fundamental

14 way."  Id.  By analogy, mold in a bathroom is not only unsightly,

15 but could pose a health concern.  A trier of fact could find that

16 Delta King's resurfacing eliminated any health risks and made the

17 showers and bathrooms more usable for its guests.  When

18 considered in light of the mandate to interpret "usability"

19 broadly and the absence of evidence about the cost and scope of

20 the work, the court cannot find that the installation of the

21 fiberglass sheeting did not constitute an alteration as a matter

22 of law.

23        Accordingly, because a genuine issue of material fact

24 exists as to whether Delta King performed any alterations, the

25 court must deny its motion for summary adjudication on that

26 issue.[10]

27  ────────────────────

28        [10]   The court need not address whether any modifications
   are readily achievable because that standard is relevant only if

23

1    D.    California Health and Safety Code Section 19956

2          Exception for Vertical Access

3          California Health and Safety Code section 19956

4    provides:

5

6          [T]he following types of privately funded multistory
           buildings do not require accessibility by ramp or
7          elevator above and below the first floor: . . . (b)
           Any other privately funded multistoried building that
8          is not a shopping center, shopping mall, or the
           professional office of a health care provider, and
9          that is less than three stories high or less than
           3,000 square feet per story if a reasonable portion of
10         all facilities and accommodations normally sought and
           used by the public in such a building are accessible
11         to and usable by persons with disabilities.

12

13   Cal. Health & Safety Code § 19956.[11]   In its memorandum, Delta

14   King does not cite to any evidence showing that each deck is

15   less than 3,000 square feet.   Although plaintiff did not dispute

16   _____

17   the Delta King did not undergo any alterations.

18       [11]   Relying on subsection 2-105(b)(11)(B)(4) of the 1984
     version of Title 24, plaintiff argues that the exception provided
19   in section 19956 is limited to facilities that were "existing"
     when the section became operative in 1970.  Not only is this
20   severely limiting interpretation of section 19956 inconsistent
     with the plain language of the statute and cases applying the
21   section to facilities that were constructed after 1970, see,
     e.g., People ex rel. Deukmejian v. CHE, Inc., 150 Cal. App. 3d
22   123 (4th Dist. 1983), it is also based on an incorrect reading of
     the 1984 version of Title 24.  Subsection 2-105(b)(11)(B)
23   identifies the various structures governed by Title 24 and
     subsection 2-105(b)(11)(B)(4) extends application to "existing
24   privately funded public accommodations when alterations,
     structural repairs, or additions are made" to them.  The
25   subsection then refers to the section 19956 exception, indicating
     that public accommodations that come within section 19956 are not
26   required to provide vertical access when alterations, structural
     repairs, or additions are made.
27

28

1   that each deck is less than 3,000 square feet, plaintiff's

2   counsel suggested at oral argument that each deck is 10,000

3   square feet.  Nonetheless, even if the court assumes that the

4   square footage of the decks brings Delta King within section

5   19956, Delta King is excused from providing access to the fourth

6   and fifth decks only if "a reasonable portion of all facilities

7   and accommodations" offered on the fourth and fifth decks are

8   available on the first three decks.

9          When discussing application of section 19956 to a

10  restaurant, a California appellate court indicated that the

11  section "would exempt a restaurant with accessible, equivalent

12  dining areas on both the first and second floors from having to

13  provide access to tables on the second floor." People ex rel.

14  Deukmejian v. CHE, Inc., 150 Cal. App. 3d 123, 136 (4th Dist.

15  1983) (emphasis added).  Plaintiff has established a genuine

16  dispute as to whether the Delta Bar and Grill offerings on the

17  third deck provide a "reasonable portion" or are equivalent to

18  the offerings on the fourth deck.

19         A trier of fact could find that seating offered at the

20  base of a staircase does not provide the equivalent ambience,

21  experience, and scenic view as seating at the Delta Bar and

22  Grill.  Cf. Donald v. Cafe Royale, Inc., 218 Cal. App. 3d 168,

23  182 (1st Dist. 1990) (finding that a restaurant seating area for

24  disabled patrons in a separate "lower level lounge area" did not

25  provide equal access to the "two raised tiers of the main dining

26  area").  Disabled patrons also learned of the available seating

27  only after inquiring whether they could order a drink from the

28  inaccessible Delta Bar and Grill.  (See M. Coyne Dep. at 168:18-

169:5.)  A trier of fact could also find that being able to hear

a live band playing on a higher deck is not equivalent to being

able to watch the band and partake in the live music experience.

These findings would be consistent with the opinion of

plaintiff's expert, Peter Blanck, Ph.D., that the alternate

seating and ability to hear the live music does not offer an

equivalent accommodation and is stigmatizing for disabled

patrons.  (See Thimesch Decl. Ex. 200, ¶¶ 15, 23-26.)  It is also

undisputed that a TV is available for patrons at the Delta Bar

and Grill, but not for patrons in the separate seating on the

third deck.

          Accordingly, because a rational trier of fact could

find that the first three decks do not provide a reasonable

portion of the offerings on the fourth and fifth decks, the

court will deny Delta King's motion for summary judgment on the

ground that section 19956 exempts it from having to provide

vertical access to the fourth and fifth decks.

          E.   Historic Exemptions During Restoration

          Originally enacted in 1975, the purpose of the

California Historical Building Code ("CHBC") is to

> provide alternative regulations and standards for the
> rehabilitation, preservation, restoration (including
> related reconstruction), or relocation of qualified
> historical buildings or structures . . . so as to
> preserve their original or restored architectural
> elements and features, to encourage energy
> conservation and a cost-effective approach to
> preservation, and to provide for the safety of the
> building occupants.

Cal. Health & Safety Code § 18951; see also Cal. Health & Safety

Code § 18953 ("It is the intent of this part to provide means for

the preservation of the historical value of qualified historical

1    buildings or structures and, concurrently, . . . to provide

2    reasonable availability to and usability by, the disabled.").

3          It is undisputed that the Delta King is a qualified

4    historical structure under the CHBC because it has been

5    designated as a historical site and is included on the National

6    Register of Historical Places. <u>See</u> Cal. Health & Safety Code §

7    18955 (providing that qualified historical buildings or

8    structures include those that have been "deemed of importance to

9    the history, architecture, or culture of an area by an

10   appropriate local or state governmental jurisdiction," including

11   "historical buildings or structures on existing or future

12   national, state or local historical registers or official

13   inventories"); (Post Decl. ¶ 3, Exs. 19, 20).

14         At the time the Delta King was restored, section 8-1304

15   of the 1979 California Historical Building Code exempted "strict

16   compliance" with the requirements for access and permitted

17   "alternative provisions for access" in order to preserve the

18   historical fabric of a structure if the following conditions were

19   satisfied:

20         (a) such alternative provisions shall be applied only
           on an item-by-item or case-by-case basis. (see Table
21         8-13-1)

22
           (b) the alternative standards are applied according to
23         the priorities outlined in Table 13-2 whereby the
           alternative providing the most access is listed first.
24

25         (c) the official charged with enforcement of the
           standards shall provide written documentation stating
26         the reasons for the application of the alternative
           standards. Such statement should include the opinion
27         and/or comments of a representative local group of
           disabled people and shall be available to the public
28         on request.

                                   27

1    (Thimesch Decl. Ex. 123 (1979 California State Historical

2    Building Code, Title 24 Building Standards, Part 8, as reprinted

3    in 1985).)   If the alternative standards under section 8-1304

4    would destroy the historical fabric or aspects, section 8-1306

5    provided for an "exemption from the literal requirements for full

6    and equal access" under the following conditions:

7        (a)  such exemption is considered only on an item by
8        item or case by case basis.

9        (b)  interpretive exhibits and/or equal services of the
         exempted  significant  historical  aspects  are  provided
10       for  the  public  in  a  location  fully  accessible  to  and
         useable  by  the  disabled,  including  people  with  hearing
11       and sight impairment.

12       (c)  services  must  be  provided  in  an  accessible
         location  equal  to  those  provided  in  the  exempted
13       location.

14
         (d)  the  official  charged  with  enforcement  of  the
15       standards  shall  provide  written  documentation  stating
         the  reasons  for  the  consequent  exemption.    Such
16       statement shall include the opinion and/or comments of
         a  representative  local  group  of  disabled  people  and
17       shall be available to the public on request.

18   (Id. Ex. 123.)

19

20       Section 2-7101(b) of Title 24 of the 1984 California

21   Building Code provided, "In existing buildings, when the

22   enforcing agency determines that compliance with any regulation

23   under this section would create an unreasonable hardship, an

24   exception shall be granted when equivalent facilitation is

25   provided." (Post Decl. Ex. 29 at 25.) Section 2-422(c) of the

26   1984 California Building Code indicated that an "unreasonable

27   hardship" exists when compliance with the standard would make the

28   project "unfeasible" based on:

1        1. The cost of providing access.

2        2. The cost of all construction contemplated.

3        3. The impact of the proposed improvements on
         financial feasibility of the project.
4

5        4. The nature of the accessibility which would be
         gained or lost.
6

7        5. The nature of the use of the facility under
         construction and its availability to handicapped
8        persons.

9   (Id. Ex. 29 at 19.)  It further required that "[t]he details of

10  any finding of unreasonable hardship shall be recorded and

11  entered in the files of the enforcing agency."  (Id.)

12        Lastly, Health and Safety Code section 19957, which was

13  effective as of July 1, 1970, provided,

14
         In cases of practical difficulty, unnecessary
15       hardship, or extreme differences, a building
         department responsible for the enforcement of this
16       part may grant exceptions from the literal
         requirements of the standards and specifications
17       required by this part or permit the use of other
         methods or materials, but only when it is clearly
18       evident that equivalent facilitation and protection
         are thereby secured.
19

20        Delta King contends that the Sacramento Building

21  Department applied the relevant accessibility requirements to the

22  extent feasible and, when the requirements compromised the

23  historic fabric of the Delta King, the Building Department

24  utilized the CHBC and granted exceptions.  The City, Building

25  Department, and Delta King are unable to locate the approved

26  building plans and other correspondence related to the

27  restoration and any granted exceptions.  (See Post. Decl. Ex. 27

28  (Klock-Johnson Dep.); M. Coyne Decl. ¶ 11.)  Delta King therefore

                                    29

1   seeks to prove the existence of the requisite approvals and

2   exceptions--and thereby compliance with the state accessibility

3   standards--through individuals involved in the restoration and

4   Delta King's purported copy of the Manuscript Plan Set.

5           Solon Wisham, Jr., was the assistant Sacramento city

6   manager from 1981 to 1991 and "served as a liaison between the

7   developers of the Delta King and the City of Sacramento."

8   (Wisham Decl. ¶ 5.)  He indicates that the goal "was to find a

9   way to preserve as much of the original appearance and design of

10  the vessel as possible in a way consistent with then-existing

11  standards as a hotel and public accommodation."  (Id. ¶ 7.)

12  Wisham specifically explains,

13

14      Numerous ideas were discussed and ultimately the City,
        acting through its building department, exercised its
15      discretion to determine what aspects of the California
        Building Code, inclusive of the Historic Building
16      Code, would be applied to the vessel. . . .  The
        decisions about access to the vessel, the number of
17      ramps, the use of an exterior elevator on a floating
        elevator barge, decisions about what decks within the
18      vessel would be rendered accessible to disabled person
        by use of an internally installed elevator, the
19      decision to retain inherent maritime features such as
        coamings, door thresholds, and cambered docks all were
20      compromises made by the City while balancing the
        objective of preserving the existing historical
21      fabric, maintaining the character and silhouette of
        the vessel, with the intended operation of the vessel
22      as a functioning hotel largely accessible to disabled
        persons.
23

24

25  (Id. ¶ 8.)

26          Tim Sullivan was the chief building inspector for the

27  Building Department from 1984 to 1996.  (Sullivan Decl. ¶ 2.)

28

                                30

1   Sullivan similarly recounts how the project required balancing

2   preserving the historic characteristics of the Delta King against

3   transforming it and providing accessibility to disabled persons.

4   (Id. ¶ 5.)  He specifically explains:

5
6       The tilt or camber of decks was considered, as were
        general path of travel and access to the various
7       features within the vessel.  Although I have no
        particular recollection of the discussion, . . . I
8       understand and believe that [an] equivalent
        facilitation determination was made by the Building
9       Department based upon the decision that cocktail
        seating and drinks would be available to disabled
10      patrons (and others) on the third floor and that that
        was equivalent to the view, ambiance, and facility
11      service made available on the fourth floor cocktail
        area.
12

13  (Id. ¶ 8.)

14          Edmund and Michael Coyne recount a similar process.

15  (See E. Coyne Decl. ¶¶ 12, 16; M. Coyne Decl. ¶¶ 7-9.)  Edmund

16  recalls that the Sacramento Building Department made the

17  following determinations and exemptions: 1) vertical access to

18  the fourth and fifth decks was not required because equivalent

19  facilities were provided on the first three decks; 2) the

20  leveling of the original camber and tilt of many decks was not

21  required; 3) the original openings, including windows, portholes,

22  exterior door thresholds and coamings, need not be altered; and

23  4) the original stairways and exterior doorways need not be

24  altered.  (E. Coyne Decl. ¶ 16.)

25          Although all of the Building Department's records were

26  lost or destroyed, Michael, who was "present during most of the

27  construction," was able to locate his copy of the Building

28  Department's Manuscript Plan Set.  (M. Coyne Decl. ¶¶ 1, 5, 12.)

1    Michael indicates that his set did not include the Building

2    Department's notations, but he had "transcribe[d] all the hand

3    written notes and details from the Building Department's Approved

4    Plan Set" on the Delta King's copy.  (Id. ¶ 12.)   Notwithstanding

5    the difficulty of reading the transcriptions on the copy before

6    the court, it is questionable whether Michael's copy is a

7    complete copy of the final approved plan.  For example, green

8    handwritten notations state "TO BE UPDATED" on page A-6 and "This

9    page needs to be updated" on page A-7.  (See M. Coyne Decl. Ex. 7

10   at A-6, A-7.)

11           While Delta King will ultimately have to rely on this

12   copy and the faded recollections of the individuals involved in

13   restoration of the Delta King to establish the grant of any

14   exceptions, the copy and the individuals' deposition testimony[12]

15   and declarations are insufficient to establish the absence of a

16   genuine issue of material fact that the proper procedures were

17   followed and particular accessibility exemptions were granted.

18   _____

19   [12]    Based on their deposition testimony, plaintiff objects
     to the court's consideration of the declarations of Wisham,
20   Sullivan, and Ed Coyne on the ground that they are sham
     affidavits.  Because the court ultimately does not rely on the
21   affidavits to grant Delta King's motion for summary judgment, it
     need not resolve whether there is a clear and unambiguous
22   difference between their deposition testimony and declarations.
     See Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir.
23   2009) (providing that a court can strike an affidavit as a sham
     only if the court makes "a factual determination that the
24   contradiction was actually a 'sham'" and that "the inconsistency
     between a party's deposition testimony and subsequent affidavit
25   [is] clear and unambiguous").  Assessing these individuals'
     credibility and the reliability of their memories is precisely
26   the type of inquiry that should be resolved by the trier of fact,
     not by the court at summary judgment.  See id. ("[A] court's role
27   in deciding a summary judgment motion is not to make credibility
     determinations . . . .").

28

1    As to the procedures followed, prerequisites for an

2   exemption under section 8-1306 of the 1979 Historical Building

3   Code were that "written documentation [memorialized] the reasons

4   for the consequent exemption," including "the opinion and/or

5   comments [of] a representative local group of disabled people and

6   shall be available to the public on request."  (Thimesch Decl.

7   Ex. 123.)  None of evidence before the court suggests that the

8   Building Department worked with or solicited input from a

9   representative local group of disabled people.  Sullivan

10  described the procedure for granting "handicap hardship

11  exceptions" as follows:

12        With a review of the plans, a determination of what
          would be required to gain full compliance, how that
13        could affect the structure probably from a historical
          standpoint, review of the accommodations that were
14        offered on an accessible level, a decision then would
          be made to what was a reasonable accommodation or not.
15

16  (Sullivan Dep. at 75:7-15.)  He does not recall consulting with

17  any disabled advocacy groups, the Mobility Compliance Section of

18  the Department of Rehabilitation, or the State Department of

19  Rehabilitation during the restoration.   (Id. at 115:12-116:6.)

20  The lack of evidence showing compliance with the requirements of

21  sections 8-1304 and 8-1306 raises a genuine dispute as to whether

22  those sections were in fact utilized to grant any exceptions.

23        There also remains a dispute about whether the

24  rationale for granting certain alleged exemptions was based on

25  preserving the historic fabric of the Delta King or simply

26  because the Delta King was considered a vessel, not a building or

27  structure.  When explaining the approval process, Wisham

28  recollects,

> [T]he City, acting through its building department, exercised its discretion to determine what aspects of the California Building Code, inclusive of the Historic Building Code, would be applied to the vessel. Specifically, I recall decisions by the City that portions of the applicable building code could not possibly apply to this particular project. To begin with, the Delta King has a hull and floats, therefore, provisions of the building code that did not consider hulls, decks and floatation, did not apply.

(Wisham Decl. ¶ 8.)  It is unclear what "provisions of the building code" were determined inapplicable simply because the Delta King has a hull and floats, not because the Building Department completed the requisite balancing between preserving its historic fabric and providing accessibility.  During his deposition, Wisham also testified that he was unaware of any "exceptions . . . that were granted formally by the building department" for the lack of access to the fourth deck or for the gangways.  (Wisham Dep. at 66:10-67:24.)

Accordingly, because genuine disputes of fact remain as to whether the Building Department granted particular accessibility exemptions, the court will deny Delta King's motion for summary judgment based any such exemptions.

F.   <u>Motion for a Stay</u>

In the event the court does not summarily adjudicate the alleged Building Department exemptions, Delta King requests that the court stay the action so it can re-apply for the appropriate exemptions from the Building Department.  In a letter dated September 17, 1992, the California Attorney General advised local building officials that retroactive hardship exceptions may be granted.  (Delta King's Req. for Judicial Notice Ex. A, app. 1

34

1   at 1.)  The Attorney General specifically explained, "A hardship

2   exception may be granted post-construction where the owner

3   establishes that under the facts that existed at the time the

4   relevant building plans were approved, an exception would have

5   been granted."  (Id.)

6        "The District Court has broad discretion to stay

7   proceedings as an incident to its power to control its own

8   docket."  Clinton v. Jones, 520 U.S. 681, 706 (1997); accord

9   CMAX, Inc. v. Hall, 300 F.2d 265, 268 (9th Cir. 1962) ("A

10  district court has inherent power to control the disposition of

11  the causes on its docket in a manner which will promote economy

12  of time and effort for itself, for counsel, and for litigants.").

13  The Ninth Circuit has held that a court may stay a case pending

14  resolution of administrative proceedings:

15       "A trial court may, with propriety, find it is
         efficient for its own docket and the fairest course
16       for the parties to enter a stay of an action before
         it, pending resolution of independent proceedings
17       which bear upon the case.  This rule applies whether
         the separate proceedings are judicial, administrative,
18       or arbitral in character, and does not require that
         the issues in such proceedings are necessarily
19       controlling of the action before the court."
20

21  Lockyer v. Mirant Corp., 398 F.3d 1098, 1111 (9th Cir. 2005)

22  (quoting Leyva v. Certified Grocers of Cal., Ltd., 593 F.2d 857,

23  863-64 (9th Cir. 1979)).  When determining whether to grant a

24  stay, a court must weigh the competing interests, including "the

25  possible damage which may result from the granting of a stay, the

26  hardship or inequity which a party may suffer in being required

27  to go forward, and the orderly course of justice measured in

28  terms of the simplifying or complicating of issues, proof, and

1   questions of law which could be expected to result from a stay."

2   CMAX, Inc., 300 F.2d at 268.

3        Despite Delta King's request for a stay so that it can

4   apply for retroactive exemptions, it fails to explain why it has

5   not already initiated such proceedings with the Sacramento

6   Building Department.  Plaintiff filed this lawsuit over three

7   years ago and the trial is set for December 9, 2014.  Now, less

8   than three months before trial, Delta King requests a stay to

9   accomplish what it could have pursued over the past three years.

10  Furthermore, any exemptions Delta King may receive from the

11  Sacramento Building Department will not affect plaintiff's ADA

12  claims.  Congress and the state of California have unequivocally

13  expressed their desire to eliminate discrimination against

14  disabled individuals, and this court will not delay plaintiff's

15  attempt to bring that goal to fruition.

16       IT IS THEREFORE ORDERED THAT Delta King's motion for

17  summary judgment or, alternatively, for a stay be, and the same

18  hereby is, DENIED.

19  Dated:  September 25, 2014

20

21  WILLIAM B. SHUBB
    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28