1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

                            ----oo0oo----

11

HOLLYNN D'LIL,                    CIV. NO. 2:11-2230 WBS AC
12
             Plaintiff,           MEMORANDUM AND ORDER RE: MOTION
13                                FOR ATTORNEY'S FEES AND COSTS
14      v.

RIVERBOAT DELTA KING, INC.;
15  CITY OF SACRAMENTO; OLD
    SACRAMENTO BUSINESS
16  ASSOCIATION, INC.,; and DOES
    1 through 50, Inclusive,
17
             Defendants.
18

19                          ----oo0oo----

20          Plaintiff Hollynn D'Lil, a paraplegic, brought this

21  action under the Americans with Disabilities Act, 42 U.S.C. §

22  12101 et seq. ("ADA"), and analogous state laws against

23  defendants Riverboat Delta King, Inc. ("Delta King") and the City

24  of Sacramento arising out of physical obstacles she allegedly

25  encountered while visiting the Delta King.  Plaintiff separately

26  settled all claims against both defendants, but was unable to

27  agree on attorney's fees and costs with Delta King and now

28  requests the court to determine the award.

                                  1

1   I.   Factual and Procedural History

2           Plaintiff filed this action on August 23, 2011 and

3   asserted claims for (1) the public services provisions of the

4   ADA, 42 U.S.C. § 12132, against the city; (2) section 504 of the

5   Rehabilitation Act of 1973 against the city, 29 U.S.C. § 794; (3)

6   the public accommodations provisions of the ADA against Delta

7   King and the city, 42 U.S.C. § 12182; (4) California Health and

8   Safety Code section 19955 against Delta King and the city; (5)

9   California Government Code section 4456 against the city; (6) the

10  California Disabled Persons Act ("CDPA") against Delta King and

11  the city, Cal. Civ. Code § 54 et seq.; (7) the Unruh Civil Rights

12  Act against Delta King and the city, Cal. Civ. Code § 51 et seq.;

13  (8) California Government Code section 11135 against the city;

14  (9) California Government Code section 12948 against Delta King

15  and the city; and (10) state law negligence against Delta King

16  and the city.

17          In a thirty-five-page exhibit attached to her

18  Complaint, plaintiff alleged numerous barriers that prevented her

19  from fully enjoying the Delta King.  Plaintiff and the city of

20  Sacramento reached a separate settlement in December 2014.  In

21  July 2014, Delta King moved for summary judgment limited to the

22  issues of 1) the slope of the gangways; 2) vertical access to the

23  fourth and fifth decks; 3) leveling of the cambered decks; 4)

24  removal of raised thresholds; and 5) the configuration of the

25  doors.  The court denied Delta King's motion for summary judgment

26  in its entirety.  D'Lil v. Riverboat Delta King, Inc., 59 F.

27  Supp. 3d 1001 (E.D. Cal. 2014).  That Order more fully discusses

28  the facts of this case.

2

1    As the trial date approached, the parties agreed to a

2  bifurcated trial in which the first phase would be a bench trial,

3  followed by a jury trial limited to three significant issues.

4  The primary reason for bifurcating the trial was to render the

5  case digestible for the jury and avoid having to instruct and

6  inevitably confuse the jury about the intricacies of every

7  alleged barrier and the corresponding federal and state access

8  guidelines.  The bench trial commenced on January 22, 2015, and

9  after 4 days of trial, Delta King and plaintiff reached a

10  settlement.

11    In the Consent Decree memorializing the settlement, the

12  parties agreed that plaintiff "shall be deemed to be the

13  'prevailing party.'"  (Consent Decree ¶ 24 (Docket No. 159).)  To

14  say that the parties disagree about the appropriate award of fees

15  and costs is a gross understatement.  Plaintiff seeks a minimum

16  fee award of $789,760 and costs of $218,893, for a total award of

17  $1,008,653 without even considering her requested enhancement.

18  Delta King contends plaintiff has already been overcompensated in

19  the amount of $74,294.43 and thus the court should award

20  plaintiff absolutely no fees or costs.  Together, the parties

21  submitted no less than 4,470 pages of briefing, declarations, and

22  exhibits to "aid" the court in determining the appropriate

23  award.[1]

24  _____

25    [1]    Continuing with the tradition of "what appears to be
   petty bickering," D'Lil, 59 F. Supp. 3d at 1005 n.2, Delta King

26  filed seventeen objections to Mr. Thimesch's declaration,
   primarily on the grounds that his statements are argumentative.

27  (Docket No. 188-1.)  Suffice to say, the court understands the
   difference between argument and evidence.  In Mr. Thimesch's

28  second declaration, plaintiff also raised many objections to

3

1  II.  Attorney's Fees

2          Pursuant to 42 U.S.C. § 12205, a federal court may

3  award "a reasonable attorney's fee" to the prevailing party in an

4  action under the ADA.  42 U.S.C. § 12205; see also Cal. Civ. Code

5  §§ 52(a), 55 (authorizing an award of attorney's fees to a

6  prevailing party in suits brought under California civil rights

7  statutes).  A plaintiff prevails "when actual relief on the

8  merits of his claim materially alters the legal relationship

9  between the parties by modifying the defendant's behavior in a

10  way that directly benefits the plaintiff."  Farrar v. Hobby, 506

11  U.S. 103, 111-12 (1992).  Here, defendant does not dispute that

12  plaintiff was the prevailing party and is entitled to an award of

13  reasonable attorney's fees under the Consent Decree, but argues

14  that the fees plaintiff requests are exorbitant and unreasonable.

15          The court calculates a reasonable amount of attorney's

16  fees by following a two-step process.  First, the court

17  determines the lodestar calculation--"the number of hours

18  reasonably expended on the litigation multiplied by a reasonable

19  hourly rate."  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

20  Second, the court may adjust the lodestar figure "pursuant to a

21  variety of factors."  Gonzalez v. City of Maywood, 729 F.3d 1196,

22  1209 (9th Cir. 2013) (internal quotation marks omitted); see also

23  Kerr v. Screen Guild Extras, Inc., 526 F.2d 67, 70 (9th Cir.

24  1975) (enumerating factors on which courts may rely in adjusting

25  the lodestar figure).  There is a strong presumption that the

26  _____

27  Delta King's evidence.  Because the court has not relied on any
   objectionable evidence, the parties' objections are overruled as
28  moot.

4

1  lodestar amount is reasonable.  <u>Fischer v. SJB-P.D. Inc.</u>, 214

2  F.3d 1115, 1119 n.4 (9th Cir. 2000).

3       In determining the size of an appropriate fee award,

4  the Supreme Court has emphasized that courts need not "achieve

5  auditing perfection" or "become green-eyeshade accountants."  <u>Fox</u>

6  <u>v. Vice</u>, --- U.S. ---, 131 S.Ct. 2205, 2217 (2011).  Rather,

7  because the "essential goal of shifting fees . . . is to do rough

8  justice," the court may "use estimates" or "take into account

9  [its] overall sense of a suit" to determine a reasonable

10  attorney's fee.  <u>Id.</u>  Awarded fees should be "adequate to attract

11  competent counsel," without "produc[ing] windfalls to attorneys."

12  <u>Blum v. Stenson</u>, 465 U.S. 886, 894-95 (1984).

13       A.   <u>Lodestar Calculation</u>

14            1.   <u>Hours Reasonably Expended</u>

15       Plaintiff submits an 837-page billing statement

16  itemizing the time spent by attorneys Timothy Thimesch and

17  Michelle Thimesch.  (Docket No. 174.)  Ms. Thimesch billed 38.7

18  hours, and defendant does not dispute the reasonableness of that

19  time.  Defendant hotly disputes the reasonableness of Mr.

20  Thimesch's claimed 2,032.3 hours.

21       As an initial impression and based on its familiarity

22  with this case, the court agrees that Mr. Thimesch's claimed

23  2,032.3 hours far exceed a reasonable number of hours expended on

24  this case.  The court questions not only the reasonableness of

25  this amount of time, but also whether Mr. Thimesch's records

26  accurately reflect the time he actually worked.  Unfortunately,

27  this is not the first time a court has questioned the accuracy of

28  Mr. Thimesch's representations as to the hours he worked.  In

1 another case in this district, a judge reduced Mr. Thimesch's

2 hours by 26.6 for time purportedly spent preparing a motion for

3 summary judgment after the case had settled and several

4 additional hours for attending a hearing that never occurred.

5 See Riker v. Distillery, No. Civ. 2:08-00450 MCE JFM, 2009 WL

6 4269466, at *3 (E.D. Cal. Nov. 25, 2009).[2]

7                    a.    Block Billing

8             Attorneys are often criticized for "block billing"

9 because it "makes it more difficult to determine how much time

10 was spent on particular activities." Welch v. Metro. Life Ins.

11 Co., 480 F.3d 942, 948 (9th Cir. 2007). "Block billing is a

12 practice where the amount of time spent by an attorney on each

13 discrete task is not identified, but instead all hours spent

14 during the course of a day on multiple tasks are billed

15 together." Yeager v. Bowlin, No. Civ. 2:08-102 WBS JFM, 2010 WL

16 1689225, at *1 (E.D. Cal. Apr. 26, 2010). "The California State

17 Bar's Committee on Mandatory Fee Arbitration has concluded that

18 block billing 'hides accountability' and may 'increase time by

19 10% to 30%' by lumping together tasks." Id.

20             Mr. Thimesch's billings include significant block

21 billing. For example, on August 22, 2014, Mr. Thimesch billed

22 14.6 hours for work on plaintiff's opposition to defendant's

23 motion for summary judgment, describing his tasks only as

24 "working on all opposition documents simultaneously." (Docket

25 No. 174 at 479.) The following two days, Mr. Thimesch billed

26

27        [2]    Judge England ultimately vacated his decision in Riker
   after the parties settled attorney's fees on appeal. (See 2:08-
28 CV-450 MCE-JFM, Docket No. 123.)

1   another 18.1 each day with the exact cursory description.  (Id.

2   at 580.)  This pattern continued with 17.8 hours billed on August

3   25, 2014 and 19.2 hours billed on August 26, 2014 for "working on

4   all opposition documents simultaneously."  (Id. at 584-85.)

5   Billing 87.8 hours over a five-day period justified only as

6   "working on all opposition documents simultaneously" deprives the

7   court of even the slightest bit if information "to determine how

8   much time was spent on particular activities."  Welch, 480 F.3d

9   at 948.  Another example of block billing occurred during trial

10  when Mr. Thimesch billed 5 hours justified only by the

11  explanation that he "called []Karl Danz regarding trial prep."

12  (Docket No. 174 at 784.)

13          In preparing his opposition to defendant's motion for

14  summary judgment alone, Mr. Thimesch billed approximately 226

15  hours, and most of this time is billed in large blocks with very

16  little explanation.  Although the summary judgment motion raised

17  some difficult issues such that an opposition would necessitate

18  more time than in a routine ADA case, plaintiff also submitted

19  significant briefing on unnecessary issues.  The court agrees

20  with defendant that the total time expended in opposing the

21  summary judgment motion was unreasonable.  In light of the

22  extensive block billing throughout the case, the inadequate

23  explanations for the work undertaken in those entries, the

24  court's familiarity with the issues raised in the summary

25  judgment motion, and plaintiff's over-investment of time on

26

27

28

1    issues that were irrelevant to the motion for summary judgment,

2    the court will **deduct 75 hours** from Mr. Thimesch's billings.[3]

3                    b.    Parsing of Related Tasks

4              In reviewing Mr. Thimesch's 837-page billing statement,

5    which has 3,442 entries, another reason his timesheets likely

6    overstate the time he expended is readily apparent.  At the

7    opposite extreme from block billing, a vast majority of Mr.

8    Thimesch's billings divide related tasks so that time expended on

9    what truly is one task receives two or more billing entries.  For

10   example, Mr. Thimesch repeatedly billed .1 of an hour to receive

11   an email and, as a separate entry, an additional .1 of an hour to

12   respond to that email.  (See, e.g., id. at 45, 49, 58, 59, 64,

13   91, 133, 143, 158, 186, 216, 223, 789.)  As another example, Mr.

14   Thimesch billed .1 to review the court's minutes from the bench

15   trial and an additional .1 to review the court's revised minutes.

16   (See id. at 783.)  Reviewing the initial and revised minutes

17   together could not have taken 6 minutes total, but Mr. Thimesch

18   managed to bill 12 minutes for this simple task.  Because most

19   entries are divided even when a task is entirely related, the

20   average time entry for all of Mr. Thimesch's entries is .35, or

21   21 minutes.  (Second Thimesch Decl. ¶ 32 (Docket No. 197-1).)

22             While this approach may initially seem like an adequate

23   response to block billing criticisms, it is similarly subject to

24   abuse.  It is commonly understood that attorneys round up time in

25   

26        [3]    This deduction is less than 4% of Mr. Thimesch's total
     claimed time, which is a very conservative estimate compared to
27   the California State Bar's Committee on Mandatory Fee
     Arbitration's estimated 10% to 30% increase that results from
28   block billing.  Yeager v. Bowlin, 2010 WL 1689225, at *1.

1   their billing entries so that a 4-minute task would be billed at

2   .1 of an hour (6 minutes).  When every task is parsed into

3   separate billing entries, the attorney receives the benefit of

4   each minute that was not spent working, but was simply added from

5   rounding up.  Although these extra minutes may seem miniscule,

6   they can make a significant impact on the overall time billed

7   when, as in this case, the billing statement has 3,442 entries.[4]

8   If 65% of the entries received the benefit of only one extra

9   minute from rounding up, the total extra time would equal

10  approximately 37 hours.  Given the incredible number of entries

11  billed at .1 of an hour that likely received the benefit of more

12  than one minute from rounding up, the court finds that this is a

13  conservative estimate of the amount of time overstated due to

14  separating related tasks and rounding up each entry.  The court

15  will therefore **deduct 37 hours** from Mr. Thimesch's billings.

16                        c.   <u>Bench Trial</u>

17          Throughout the four days of the bench trial, the court

18  observed Mr. Thimesch spend several hours on issues that were

19  either undisputed, irrelevant, or were supposed to be relegated

20  to the second phase of trial before the jury.  The court

21  repeatedly advised Mr. Thimesch to avoid duplication and save any

22  questions relevant to the jury phase or both phases for the

23

24          [4]   The court recognizes that Mr. Thimesch did not bill
    "attorney time" in every billing entry.  The extraordinary number
25  of entries, however, makes it impractical and unreasonably
    burdensome for the court to determine how many entries actually
26  bill attorney time.  The court also recognizes that many of Mr.
    Thimesch's entries are billed in increments even lower than 6
27  minutes.  Even with these entries, the added benefit from parsing
    the entries and rounding up is undeniable.
28

1  second phase.  (See, e.g., Jan. 27, 2015 Tr. at 347:6-348:15.)

2  To exclude this wasted time during trial and in preparation for

3  it, the court will **deduct 5 hours** from Mr. Thimesch's billings.

4                    d.    Work on Lawson's Unrelated Claims

5            Mr. Thimesch also represented William Lawson, who

6  visited the Delta King and allegedly experienced barriers that

7  the plaintiff in this case did not.  Mr. Thimesch mentioned

8  joining Mr. Lawson in this case as the trial approached, but

9  never sought to do so and, if he had, would have had difficulty

10  overcoming the late filing of any motion to amend.  Although Mr.

11  Thimesch contends that the time expended with Mr. Lawson should

12  be included because plaintiff intended to call Mr. and Mrs.

13  Lawson as witnesses, the court will exclude entries that do not

14  appear from their descriptions to have any relation to trial

15  preparation.  To the contrary, they appear to be repeated

16  communications with Mr. Lawson about and research and work done

17  in contemplation and settlement of his potential case.  Most of

18  the entries even identify Mr. Lawson, not plaintiff, in the

19  client column.  Because Mr. Lawson was not a plaintiff in this

20  case, the fees attributable to his threatened lawsuit and

21  settlement cannot be assessed against defendant in this case.

22  Based on the court's independent review of the billings to

23  exclude time attributable to Mr. Lawson's potential case and

24  settlement of his claims, the court will **deduct 19.9 hours** from

25  Mr. Thimesch's billings.

26                    e.    Travel Time

27            Mr. Thimesch maintains his office in his home in Walnut

28  Creek and billed 143.9 hours for travel time from Walnut Creek to

                              10

1  Sacramento.  Judges in this district have repeatedly held that it

2  is unreasonable for attorneys who routinely try cases in this

3  district but maintain offices elsewhere for their own convenience

4  to shift their travel costs to their adversary.  See Riker, 2009

5  WL 4269466, at *3; Martinez v. Longs Drug Stores, Inc., No. Civ.

6  2:03-1843 DFL CMK, 2005 WL 3287233, at *5 (E.D. Cal. Nov. 28,

7  2005).  A primary reason for this limitation is that a fee-paying

8  client would consider any added costs of retaining an out-of-town

9  lawyer and could either negotiate a reduced cost for travel or

10  elect to hire local counsel.  Martinez, 2005 WL 3287233, at *5.

11  Although Mr. Thimesch represents that he has now decided to cease

12  his practice in this district, he has filed 40 cases in this

13  district, and the plaintiff in this case brought 9 of those

14  cases.  In light of Mr. Thimesch's history of practice in this

15  district, it is not reasonable to make defendant shoulder the

16  increased cost of his travel to Sacramento just because Mr.

17  Thimesch has chosen to live in Walnut Creek.  Defendant concedes,

18  however, that one hour per trip to Sacramento on non-trial days

19  would be reasonable because that is generally the maximum time

20  local counsel would charge for travel time and that all of Mr.

21  Thimesch's travel time on trial days is reasonable.  The court

22  will therefore **deduct 106.9** hours from Mr. Thimesch's hours.

23         f.   Clerical Tasks

24       As the Ninth Circuit has explained, "[i]t simply is not

25  reasonable for a lawyer to bill, at her regular hourly rate, for

26  tasks that a non-attorney employed by her could perform at a much

27  lower cost."  Davis v. City & County of San Francisco, 976 F.2d

28  1536, 1543 (9th Cir. 1992), vacated in part on denial of reh'g,

1   984 F.2d 345 (9th Cir. 1993); see also Bakewell v. Astrue, No.

2   Civ. 3:10-01525-JE, 2013 WL 638892, at *3 (D. Or. Jan.9, 2013)

3   ("[C]osts associated with clerical tasks are typically considered

4   overhead expenses reflected in an attorney's hourly billing rate,

5   and are not properly reimbursable."); accord Johnson v. Allied

6   Trailer Supply, No. Civ. 2:13-1544 WBS, 2014 WL 1334006, at *2

7   (E.D. Cal. Apr. 3, 2014) (citing Missouri v. Jenkins, 491 U.S.

8   274, 288 n.10 (1989)).

9       Mr. Thimesch generally appears to recognize that he

10  cannot seek reimbursement for clerical tasks as he often

11  indicated "clerical" or "paralegal" in many of his billing

12  entries and accounted for that time in separate columns for which

13  he does not seek reimbursement.  In reviewing his billings,

14  however, the court noticed that at least one entry designated as

15  "clerical" and involving a clerical task appears to have

16  inadvertently been billed as attorney time.  (See Docket No. 174

17  at 538.)

18      Defendant also objects to tasks, such as preparing

19  subpoenas, that should not have been billed as attorney time.

20  For example, on May 24, 2012, Mr. Thimesch described his work as

21  "drafted []a 215-page discovery package consisting of notices of

22  deposition, requests to produce, interrogatories, request for

23  admission, and 5 subpoenas; revision to final."  (Id. at 50.)  He

24  then billed 5.3 attorney hours, 1.3 paralegal hours, and .5

25  clerical hours.  (Id.)  The court agrees with defendant that the

26  calculated attorney time on these primarily routine tasks

27  overstates the true attorney time and, based on the description,

28  was comprised of more than 30 minutes of clerical time.  Mr.

                                    12

1   Thimesch also billed attorney time when he "logged and paid a
2   litigation expense" on at least seven occasions, billing 1.4 for
3   these clerical tasks.  (See id. at 51, 52, 740.)

4           Other similar entries, such as receiving a fax
5   regarding a subpoena and receiving emails to continue a
6   deposition, are also clerical tasks that should not be billed at
7   an attorney rate.  (See, e.g., id. at 56, 156, 536.)  On several
8   occasions, Mr. Thimesch also solicited advice and sample filings
9   from other attorneys.  Although this practice is not
10  questionable, his time to simply "receive[]" sample documents
11  back from other attorneys and "preserve" them to the "case
12  notebook" are clerical tasks.  (See id. at 406.)  In fact, Mr.
13  Thimesch consistently and extensively bills his time to
14  "preserve" his research and work to the "case notebook."  (See,
15  e.g., id. at 325, 391.)  The court will therefore **deduct 7 hours**
16  to account for attorney time billed for clerical tasks.

17              g.   Lack of Billing Judgment

18          "Hours that are not properly billed to one's client
19  also are not properly billed to one's adversary pursuant to
20  statutory authority."  Hensley, 461 U.S. at 434 (internal
21  quotation marks and citation omitted).  Here, the court cannot
22  fathom that, upon receiving Mr. Thimesch's billings, a fee-paying
23  client would submit payment without objection or even termination
24  of the attorney-client relationship.  A client surely would not
25  expect to pay Mr. Thimesch approximately $56 for every voicemail
26  he leaves, text message he sends, or email he receives.  Even
27  assuming it has become the standard practice to bill for these
28  tasks, attorneys must exercise billing judgment before submitting

the bill to their client, and most attorneys would exclude or
limit such offensive charges.  Not only is it clear that Mr.
Thimesch did not exercise judgment in finalizing his billings in
this case, he had no incentive to do so because he was never
going to submit the bill to his client.

The time billed for phone calls made during trial
illustrate the lack of efforts made to meaningfully review the
billing.  From the first day of trial on January 22, 2015 and
through January 26, 2015, Mr. Thimesch logged entries for twenty-
four phone calls, totaling 2.1 hours.  On one occasion, Mr.
Thimesch billed .25 of an hour to call Karl Danz when his
billings indicate that he merely "left [a] message to return call
regarding trial prep."  (Docket No. 174 at 784.)  Surely, his
voice message did not total 15 minutes and Mr. Thimesch meant to
bill less time.  This apparent clerical error underscores the
court's finding that Mr. Thimesch's lengthy billings were not
adequately reviewed.  Although this error may be readily
apparent, many errors would be less obvious and it is not
feasible for the court to review all 3,442 entries to catch even
the obvious errors.  The court has no reason to believe that Mr.
Thimesch labored to ensure the accuracy of his billings,
especially because he lacked the same incentive to do so as an
attorney submitting a bill to a client.

In light of the lack of billing judgment apparent
through the excessive entries for voicemails, text messages,
and merely receiving emails or correspondences and the court's
finding that Mr. Thimesch did not closely review his 837-page

14

1  billing to correct inadvertent errors, the court will **deduct 20**

2  **hours** from Mr. Thimesch's time.

3  h.  Extent of Plaintiff's Success

4  The Supreme Court has instructed that "the extent of a

5  plaintiff's success is a crucial factor in determining the proper

6  amount of an award of attorney's fees." Hensley, 461 U.S. at

7  440.  "Where the plaintiff has failed to prevail on a claim that

8  is distinct in all respects from his successful claims, the hours

9  spent on the unsuccessful claim should be excluded in considering

10  the amount of a reasonable fee." Id.  On the other hand, in a

11  case with claims that "involve a common core of facts or [are]

12  based on related legal theories," it is "difficult to divide the

13  hours expended on a claim-by-claim basis." Id. at 435.  In those

14  cases, "the district court should focus on the significance of

15  the overall relief obtained by the plaintiff in relation to the

16  hours reasonably expended on the litigation." Id.  In such

17  cases, "a plaintiff who has won substantial relief should not

18  have his attorney's fee reduced simply because the district court

19  did not adopt each contention raised." Id. at 440.

20  The Ninth Circuit has "applied Hensley's degree of

21  success principles to a variety of fee-shifting statutes,

22  including . . . Americans With Disability Act claims." Aguirre

23  v. Los Angeles Unified Sch. Dist., 461 F.3d 1114, 1119 (9th Cir.

24  2006).  In ADA cases such as this, a single claim may allege the

25  existence of numerous "unrelated and distinct" barriers that are

26  "premised on different sections of the ADA Accessibility

27  Guidelines to determine liability." Kalani v. Nat'l Seating &

28  Mobility, Inc., No. Civ. 2:13-00061 JAM CK, 2014 WL 3956669, at

1  *4 (E.D. Cal. Aug. 13, 2014) (internal quotation marks and

2  citation omitted).  When a plaintiff prevails only on a limited

3  number of barriers, courts have reduced the plaintiff's award of

4  attorney's fees in light of the limited success of the

5  litigation.  See, e.g., id. (reducing plaintiff's fee award by

6  90% when, of the 39 alleged barriers, plaintiff prevailed on only

7  2, defendants prevailed on 16, and 21 were mooted).  This type of

8  reduction makes sense only when the court can identify and

9  compare the total barriers at issue and the barriers successfully

10  remediated through the litigation.

11         Here, however, the parties' assessments of the barriers

12  at issue and the success plaintiff obtained through the Consent

13  Decree are best described as ships passing in the night.  Both

14  sides attempt to tally the barriers at issue at the time of trial

15  and those remediated through the Consent Decree and then quantify

16  the degree of plaintiff's success.  According to plaintiff, 54

17  barriers went to trial and the Consent Decree corrected 196

18  barriers, thus plaintiff "achieved an astounding 360% of the

19  relief that went to trial."  (Pl.'s Reply at 1:23-24.)

20  Defendant, on the other hand, contends that only 5 barriers went

21  to trial and the Consent Decree corrected 1/2 of 1 of those

22  barriers and thus calculates plaintiff's success at 10%.  (See

23  Def.'s Opp'n at 4:10-14.)  The true percentage still lies only in

24  the eyes of the beholder.[5]

25         [5]    The fact that the parties still cannot even agree as to

26  the barriers that were at issue at the time of trial only
   underscores the frustration the court experienced with this case

27  when attempting to decipher a manageable way to try this case
   before a jury.

28

16

1          With the exception of three significant issues, the

2    parties agreed the court would decide all remaining issues.  The

3    Stipulated Bifurcation Order articulated the issues for the jury

4    as:

5
          a. Whether the lack of vertical (wheelchair) access to
6             the fourth and fifth levels of the Delta King are a
              violation of law.
7
          b. Whether, after 1989, an "alteration" to the Delta
8             King occurred which triggered application of ADAAG
              or Title 24 standards.
9
          c. Whether providing (wheelchair) vertical access to
10            the fourth and fifth levels of the Delta King is
              "readily achievable."
11

12   (Stipulation and Order to Bifurcate at 2:2-10 (Docket No. 107).)

13   The parties did not itemize the issues for the bench trial

14   because, as the court understood it, the bench trial involved

15   numerous discrete barriers and a determination as to whether they

16   complied with the applicable standards.[6]  These barriers were

17   identified in plaintiff's Barrier Matrix.[7]  When the bench trial

18   _____

19        [6]    As defense counsel explained at one of the Pretrial
     Conferences and the court understood at the time of trial,
20   whether the jury found that an alteration or "triggering
     modification" had been completed affected what standards
21   controlled the alleged barriers addressed during the bench trial.
     (See Jan. 7, 2015 Tr. at 4:16-6:7.)
22
          [7]    The court recognizes that defendant mooted claims based
23   on some of the barriers in plaintiff's initial Matrix by bringing
     the barrier at issue into compliance during the early stages of
24   litigation.  The Supreme Court has rejected the "catalyst theory"
     under the ADA and a plaintiff may not recover fees when a
25   defendant voluntarily remediates barriers "without a
     corresponding alteration in the legal relationship of the
26   parties."  Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of
     Health & Human Res., 532 U.S. 598, 605 (2001).  Defendant
27   recognizes, however, that plaintiff's billings render it
     impossible to excise time spent on barriers that were mooted.
28
                                  17

1   commenced and during the four days it dragged on, neither party

2   seemed to know whether all of the barriers in the Matrix remained

3   in dispute.  Instead, plaintiff's lead witness tediously walked

4   through the Barrier Matrix like a maze that would somehow be

5   understood at the end.

6         When the parties cannot agree on a manageable breakdown

7   of the barriers at issue at the time of settlement, reducing any

8   award for limited success under on a barrier-by-barrier basis

9   does not make sense.  Moreover, one of the primary benefits of

10   the Consent Decree was relieving the parties and the court from

11   having to decipher the relevance and ultimate merits of the

12   fifty-three barriers in plaintiff's Matrix.  (See Docket No.

13   138.)  The court will not now forgo this significant benefit of

14   the Consent Decree and attempt to distill what could never be

15   articulated at trial.  Cf. Hensley, 461 U.S. at 437 ("A request

16   for attorney's fees should not result in a second major

17   litigation.").

18         Plaintiff's calculation of her success also has

19   apparent flaws.  For example, plaintiff includes 113 barriers

20   attributable to the potential related case that Mr. Thimesch

21   contemplated filing on behalf of Mr. Lawson.  Although defendant

22   may have agreed to settle Mr. Lawson's potential claims from his

23   "unrelated incident" at Delta King as part of a global settlement

24   agreement, (First Thimesch Decl. ¶ 5 (Docket No. 181)), Mr.

25   Lawson was not a plaintiff in this case and the alleged barriers

26   he encountered were thus not at issue.  Any award of fees in this

27   case cannot compensate plaintiff's counsel for time expended or

28   results obtained in relation to potential claims by an individual

1   who was not a party to this case.  Excising only the results

2   plaintiff attributes to Mr. Lawson, plaintiff's own assessment

3   quickly drops from a 360% success to a 153% success.

4          It is also not possible to assess plaintiff's success

5   at or even near 100% because there are significant barriers

6   litigated in this case that will remain unremediated or were

7   remediated only under the "readily achievable" standard.  For

8   example, two of the five barriers at issue in defendant's motion

9   for summary judgment were the "leveling of cambered decks" and

10  the "configuration of the doors."  D'Lil, 59 F. Supp. 3d at 1005.

11  Although plaintiff defeated defendant's motion as to those

12  barriers, she did not ultimately prevail in obtaining defendant's

13  agreement to level the decks or widen all of the guestroom doors.

14  Nor did plaintiff succeed on the issue of whether the Delta King

15  was altered and thereby subject to the more demanding

16  accessibility requirements.[8]  For example, while plaintiff

17  obtained vertical access to the fourth and fifth decks through a

18  "portable lift/stair crawler device," (Consent Decree ¶ 15.b),

19  she concedes that the lift does not comply with the current ADA

20  Design Standards or the California Building Code because it

21  requires assistance.

22

23  _____

24      [8]    Whether the Delta King was altered was central to the
    case because, if it was altered, the ADA mandates that the
25  altered areas comply with the newer and more demanding ADA Design
    Standards.  See generally id. at 1006 (explaining that the ADA
26  requires (1) removal of all barriers where removal is "readily
    achievable" and (2) for newly constructed or alterations to
27  existing facilities, that the construction or alteration comply
    with the Design Standards in place at the time of construction or
28  alteration).

1    At the same time, however, it is disingenuous for

2   defendant to argue, as it emphatically does, that it offered to

3   remediate all barriers under the "readily achievable" standard as

4   of February 25, 2013 and that plaintiff's fees should thus cease

5   as of that date.  In its February 25, 2013 settlement offer,

6   defendant identified the "elevator or lift access to the fourth

7   and fifth decks" and "'roll-in' showers in the two 'accessible'

8   rooms" as two of the four remaining barriers.  (Post Decl. Ex. B

9   (Docket No. 188-5) (emphasis added).)  Defendant stated, "The law

10   doesn't require these changes . . . . Removal of these five

11   barriers (at least as proposed by plaintiff) is not readily

12   achievable."  (Id.)  In the Consent Decree, plaintiff ultimately

13   obtained some form of vertical access and one roll-in shower.

14   (See Consent Decree ¶¶ 15.a, 15.b.)  The parties disputed whether

15   providing any vertical access was "readily achievable" at the

16   time of trial and, through a lift, plaintiff prevailed in

17   establishing that access was readily achievable.

18    Overall, plaintiff unquestionably retracted some of her

19   demands in order to reach a settlement with defendant.

20   Quantifying a percentage of success, however, is almost

21   impossible in light of the parties' irreconcilable views of the

22   case and the seemingly moving target as to the barriers actually

23   at issue.  As an extremely conservative estimate, and taking into

24   account deductions already made for block billing and inefficient

25   trial time, the court finds that plaintiff expended at least 25

26   hours in opposing defendant's motion for summary judgment and

27   performing site inspections and 7 hours preparing to go to trial

28   on significant issues on which she ultimately did not prevail.

20

1   The court will therefore **deduct 32** hours from Mr. Thimesch's time

2   to account for time expended on proving that the Delta King was

3   altered, that the cambered decks should be leveled, that more

4   than two doors should be reconfigured, and that two roll-in

5   showers should be provided.

6                    i.   Time Spent Preparing Plaintiff's Reply

7                Mr. Thimesch also added 50 hours to his total time to

8   account for time expended in replying to defendant's opposition

9   to this motion, which he indicates is less than the 56.3 hours he

10  actually expended.  Although Mr. Thimesch attributes this

11  duration of time to defendant's lengthy opposition, he neglects

12  to mention that his unwieldly billings and motion were what

13  prompted that length.  Nor does Mr. Thimesch's explanation that

14  he expended over 50 hours "in connection with the reply"

15  sufficiently explain how he spent that time.  Taking into account

16  all of these considerations, the court finds that 20 hours was a

17  reasonable amount of time to expend on the reply and will

18  therefore **deduct 30** hours from Mr. Thimesch's billings.

19                    j.   Off-Set of Fees Paid by the City of

20  Sacramento

21                Defendant also argues that 81.95 hours should be

22  excluded because they are attributable to time Mr. Thimesch

23  expended on separate claims against the city.  At an hourly rate

24  of $310, this would equal $25,404.50 in fees.  It is undisputed

25  that the city has already paid Mr. Thimesch $370,000 in fees as

26  part of a settlement with plaintiff.  Because the court will off-

27  set the total award by this amount, it is unnecessary to deduct

28

1   the additional 81.95 hours as they can be viewed as part of the

2   $370,000.

3               k.   Total Hours

4        With the aforementioned deductions of 332.8 hours, the

5   total time remaining is 1,699.5 hours.  The court's overall

6   impression is that this is still an extraordinary number of hours

7   and pushes the envelope of reasonableness.  Given the unique

8   issues in this case, however, the court cannot conclude that it

9   was necessarily unreasonable for Mr. Thimesch to complete the

10  investigations, research, and discovery he did.  The court

11  therefore finds it reasonable for Mr. Thimesch to be compensated

12  for **1,699.5 hours**.

13            2.   Reasonable Hourly Rate

14       The court must multiply the reasonable hours expended

15  in this litigation by a reasonable hourly rate to calculate the

16  lodestar amount.  To determine the reasonableness of the hourly

17  rates claimed, the court looks to "the prevailing market rates in

18  the relevant community," Blum, 465 U.S. at 895, "for similar work

19  performed by attorneys of comparable skill, experience, and

20  reputation."  Chalmers v. City of Los Angeles, 796 F.2d 1205,

21  1210-11 (9th Cir. 1986).  The burden is on the party seeking fees

22  "to produce satisfactory evidence . . . that the requested rates

23  are in line with those prevailing in the community for similar

24  services by lawyers of reasonably comparable skill, experience

25  and reputation."  Blum, 465 U.S. at 895 n.11.

26            a.   Availability of Local Counsel

27       Both of plaintiff's attorneys practice primarily in the

28  Northern District and seek hourly rates of $560.  Mr. Thimesch

1    recognizes that $560 per hour exceeds the prevailing market rate

2    in the Sacramento legal community, but argues that $560 per hour

3    is the prevailing rate in the Bay Area and the court should

4    calculate plaintiff's fees under the rates in that locality.

5           In general, "the relevant community is the forum in

6    which the district court sits."  Barjon v. Dalton, 132 F.3d 496,

7    500 (9th Cir. 1997).  As a narrow exception, "rates outside the

8    forum may be used if local counsel was unavailable, either

9    because they are unwilling or unable to perform because they lack

10   the degree of experience, expertise, or specialization required

11   to handle properly the case."  Id. (internal quotation marks

12   omitted) (citing Gates v. Deukmejian, 987 F.2d 1392, 1405 (9th

13   Cir. 1992)); accord Rosales v. El Rancho Farms, No. Civ. 1:12-

14   01934 AWI JLT, 2015 WL 4460918, at *23 (E.D. Cal. July 21, 2015).

15          Describing this case as a "high-risk" section "55/303"[9]

16   case Mr. Thimesch argues that there is a "complete lack of other

17   attorneys practicing in the Eastern District handling" such

18   cases.  (Pl.'s Mem. at 6 (Docket No. 179).)  Based on his

19   "intimate[ ] familiar[ity]" with the ADA plaintiff's bar, regular

20   meetings with the same group on a semiannual basis, as well as "a

21          [9]   "Section 55" refers to section 55 of the California

22   Civil Code, (see Compl. ¶ 75), which provides for injunctive
     relief to remedy a violation of several enumerated California

23   statutes.  "Section 303" refers to section 303 of the ADA, or 42
     U.S.C. § 12183, (see Compl. ¶ 58), which, in summary, provides

24   that for newly constructed facilities or for alterations made to
     existing facilities, facilities are required to be "readily

25   accessible to and useable by individuals with disabilities," §
     12183(a)(1)-(2).  In describing this case as a "section 55/303

26   case," Mr. Thimesch attempts to distinguish the building

27   modifications he sought from more routine ADA cases that Mr.
     Thimesch describes as seeking only readily achievable

28   modifications.

                                23

1   survey [he] conducted on Pacer of Eastern District filings," Mr.

2   Thimesch "certifie[s] that there are no firms outside the bay

3   area handling Section 55/303 cases." (First Thimesch Decl. ¶

4   95.)  Mr. Thimesch further asserts that, because the Eastern

5   District is "unattractive for handling" ADA cases for numerous

6   reasons, he and his "handful of Section 55/300 [sic] colleagues"

7   have "drastically limited" their Eastern District practice. (See

8   id. ¶¶ 96-98.)

9        If Mr. Thimesch and his handful of colleagues have

10  drastically limited their ADA practice in the Eastern District,

11  then someone has stepped in to pick up the slack because there is

12  certainly no shortage of ADA cases in this district.  As to Mr.

13  Thimesch's other complaints about litigating ADA cases in this

14  district, they are unfounded and incorrect.  Mr. Thimesch

15  complains that the "atmospherics and low hourly fee rates

16  typically awarded" make this district an "exceedingly

17  unattractive market for handing [sic] cases." (Id. ¶ 96.)  He

18  further faults this district for "provid[ing] considerable

19  advantages to opponents" and for its "lack of a settlement

20  procedure." (Id.)

21       The court is unsure what advantages Mr. Thimesch thinks

22  opponents have in litigating ADA cases in this district.  To the

23  extent that Mr. Thimesch's assessment may be construed as

24  suggesting bias on the part of the judges of this court, it is

25  unwarranted and borders on offensive.  The court's general

26  experience with ADA cases in this district is that the plaintiffs

27  almost invariably prevail.  Surely the court did not give

28  defendant an advantage in this case when it denied its motion for

24

1    summary judgment in its entirety.  The Eastern District also

2    offers early mediation and settlement conferences through its

3    free Voluntary Dispute Resolution Program, see E.D. Local R. 271,

4    and recently began referring ADA cases for mandatory early

5    settlement conferences with a magistrate judge.  That Mr.

6    Thimesch is dissatisfied with this district's prevailing rate is

7    one thing, but it does not justify painting a false picture of

8    ADA litigation in the district.

9          In seeking the narrow exception providing for rates

10   outside of the district, the court would also expect Mr. Thimesch

11   to provide evidence other than his own opinion to show that there

12   was not a single local attorney qualified and available to take

13   this case.  Cf. Blum, 465 U.S. at 895 n.11 (emphasis added)

14   ("[T]he burden is on the fee applicant to produce satisfactory

15   evidence--in addition to the attorney's own affidavits--that the

16   requested rates are in line with those prevailing in the

17   community for similar services by lawyers of reasonably

18   comparable skill, experience and reputation."); Jordan v.

19   Multnomah County, 815 F.2d 1258, 1263 (9th Cir. 1987); Bd. of

20   Trs. v. Core Concrete Const., Inc., No. Civ. 11-02532, 2012 WL

21   380304, at *6 (N.D. Cal. Jan. 17, 2012).

22         For example, the Ninth Circuit affirmed the award of an

23   out-of-district fee when the fee applicant provided "numerous

24   declarations of San Francisco and Sacramento attorneys which

25   directly support their contention that Sacramento attorneys and

26   law firms with the requisite expertise and experience to handle

27   this type of complex institutional prison reform litigation were

28   unavailable."  Gates 987 F. 2d at 1405; see also L.H. v.

1  Schwarzenegger, 645 F. Supp. 2d 888, 894 (E.D. Cal. 2009)

2  (applying an out-of-district rate for a "complicated [case]

3  requiring expertise in class action litigation, civil rights

4  litigation, and youth law" because plaintiff "tendered evidence,"

5  including supporting declarations from nine other attorneys, that

6  there were no Sacramento firms with the experience, capability,

7  and willingness to undertake such a suit).

8       Similarly, in Horsford v. Board of Trustees, a state

9  appellate court found that Bay Area rates should have been

10  awarded when the plaintiff explained his seven unsuccessful

11  attempts in retaining local counsel.  132 Cal. App. 4th 359, 398

12  (2005).  To corroborate this declaration, plaintiff in that case

13  submitted declarations from several local civil rights lawyers

14  stating that they had turned down plaintiff's request to serve as

15  counsel, as well as another declaration explaining the reasons

16  for local counsel's reluctance to take a case against the

17  particular defendant.  Id.

18       In stark contrast to the evidence in those cases, Mr.

19  Thimesch submitted only his opinions as to the unavailability of

20  local counsel.  Mr. Thimesch seems to assume that this case

21  necessitated a lawyer from a suburb of Oakland because not a

22  single attorney in the local community could have handled it.

23  Sacramento is not exactly Mayberry RFD.  It is the seat of state

24  government and a major metropolitan area with a robust and

25  sophisticated bar.  That hourly rates are generally lower in

26  Sacramento than the Bay Area is more likely attributable to the

27  reduced cost of doing business in Sacramento, not the lack of

28

1   experience or expertise of the bar.[10]

2          Even if the court accepts Mr. Thimesch's representation

3   that there are no lawyers in Sacramento who currently maintain a

4   "section 55/303 practice," this does not necessitate hiring a

5   lawyer outside of the Sacramento area.  Seeking building

6   modifications under the ADA and analogous state statues may, as

7   Mr. Thimesch believes, require a harder fight than seeking only

8   "readily achievable" modifications.  It does not, however,

9   necessarily require substantially greater expertise and legal

10  acumen, especially if counsel hires a slew of experts as Mr.

11  Thimesch did.  More importantly, through the Consent Decree in

12  this case, Mr. Thimesch achieved relief more akin to what would

13  be accomplished in a routine case under the "readily achievable"

14  standard.  Plaintiff may have obtained some concessions from

15  defendant because she sought building modifications, but she did

16  not achieve the heart of the modifications she fought to impose.

17  Mr. Thimesch's value as a lawyer in this case thus did not turn

18  on his "section 55/303" expertise.  Mr. Thimesch has simply made

19  no showing that the complexities or dynamics of this case were of

20  such a level that local counsel could not or would not have

21  handled it.

22          Mr. Thimesch also indicates that most counsel are

23  reluctant to pursue building modifications under section 55

24  _____

25          [10]   A higher cost of doing business in the Bay Area likely
    stems from the increased cost of maintaining an office there.
26  Mr. Thimesch, however, does not appear to have any increased cost
    of doing business in Walnut Creek because it seems he maintains
27  his office in his residence without any support staff.  His
    overhead therefore is likely less, not more, than the typical
28  lawyer maintaining an office in Sacramento.

1  because the mandatory award of fees for the "prevailing party"

2  applies regardless of which party prevails.  See Jankey v. Song

3  Koo Lee, 55 Cal. 4th 1038, 1047 (2012) (contrasting the mandatory

4  award of fees "to all prevailing parties, including prevailing

5  defendants" under section 55 with the ADA's discretionary award

6  of fees for prevailing defendants only if the claims were

7  frivolous).  Although at oral argument Mr. Thimesch suggested he

8  bore this risk, the court assumes that any award of fees if

9  defendant had prevailed would have been against Mr. Thimesch's

10  client, not him.  Regardless of who would bear responsibility for

11  an award of fees, Mr. Thimesch has not shown that local counsel

12  would have been unwilling to represent plaintiff in this case

13  because of that risk.

14          In light of the lack of evidence before the court and

15  the court's own familiarity with local counsel and the expertise

16  necessary to litigate this case, the court is not persuaded that

17  there was not a single qualified local counsel or counsel from a

18  nearby community that charges rates consistent with those in

19  Sacramento who would have been willing and able to handle this

20  case.  Accord Lema v. Comfort Inn Merced, No. Civ. 1:10-00362

21  SMS, 2014 WL 1577042, at *5 (E.D. Cal. Apr. 17, 2014) (awarding

22  Mr. Thimesch a rate based on the prevailing rates in the Eastern

23  District); see also Knox v. Chiang, No. Civ. 2:05-02198 MCE CKD,

24  2013 WL 2434606, at *6 (E.D. Cal. June 5, 2013) (concluding that

25  an affidavit from another attorney opining it is "doubtful that

26  any (perhaps one or two) local Sacramento attorneys would be

27  willing to take on and pursue such a case . . . does not

28  demonstrate that local counsel was unavailable").  Accordingly,

28

1   Mr. Thimesch should be awarded attorney's fees at the prevailing

2   market rate in Sacramento.

3               b.   Prevailing Rate in Sacramento

4               The court must now determine the reasonable rate in

5   Sacramento for similar work performed by attorneys of comparable

6   skill, experience, and reputation.  Chalmers, 796 F.2d at 1210-

7   11.  "The hourly rate for successful civil rights attorneys is to

8   be calculated by considering certain factors, including the

9   novelty and difficulty of the issues, the skill required to try

10  the case, whether or not the fee is contingent, the experience

11  held by counsel and fee awards in similar cases."  Moreno v. City

12  of Sacramento, 534 F.3d 1106, 1114 (9th Cir. 2008).

13              1.   Timothy Thimesch

14              Mr. Thimesch has 25 years of experience and has handled

15  section "55/303 cases" since 1994.  (First Thimesch Decl. ¶¶ 91,

16  99.)  He founded his own practice in 2000 and has successfully

17  litigated cases achieving building modifications to provide

18  disabled access to numerous institutions such as banks, hotels,

19  recreational facilities, and theaters.  (See id. ¶ 106.)

20              In Sacramento, judges have recently determined that the

21  current prevailing rate for experienced attorneys handling

22  routine disability access cases is $300.  See Loskot v. Annie's

23  Panda Garden, No. Civ. 2:13-00213 JAM JEM, 2015 WL 2235521, at *2

24  (E.D. Cal. May 12, 2015) (awarding an hourly rate of $300 to an

25  attorney with 38 years of experience in an ADA case that was "not

26  complicated");[11] Johnson, 2014 WL 1334006, at *6 (finding an

27  ─────────────────

28       [11]   The court in Loskot indicated that it had considered
attorney Thomas E. Frankovich's experience and reputation in

1    hourly rate of $300 to be reasonable for attorneys with twenty

2    and twenty-nine years of experience in a routine disability

3    access case).

4           Mr. Thimesch's experience is consistent with attorneys

5    awarded $300, which is the higher end of the prevailing rate for

6    routine ADA cases.  From the court's general experience with ADA

7    attorneys awarded $300 per hour, Mr. Thimesch handled this case

8    at an equal or even better level.  This case was also more

9    complicated and necessitated more research than a routine ADA

10   case.  See, e.g., Moreno, 534 F.3d at 1114 (explaining that the

11   complexity of a case is relevant in determining the prevailing

12   hourly rate).  Neither plaintiff nor defendant have provided any

13   evidence or cited authority discussing the prevailing market rate

14   in Sacramento for an experienced attorney handing a non-routine

15   ADA case.  Defense counsel in this case charged defendant only

16   $250 per hour, which is significantly less than recent awards to

17   attorneys with similar experience in routine ADA cases.[12]

18          In Sacramento, "[a] rate of $400 is generally reserved

19   _____

20   finding his reasonable hourly rate, but the opinion does not
     indicate Mr. Frankovich's years of experience.  The California

21   State Bar website indicates that Mr. Frankovich was admitted to
     the practice of law in June 1977 and thus had 38 years of

22   experience at the time of the Loskot decision.

23          [12]  Defendant cites cases such as Riker, along with
     declarations of Charles Coyne and Laurence Berman, to argue that

24   the reasonable rate for an experienced ADA attorney in the
     Eastern District is $250.  2009 WL 4269466, at *2.  Although this

25   rate is the hourly fee defense counsel charged in this case, the
     court must consider rates awarded in the last two years.  See

26   Bell v. Clackamas County, 341 F.3d 858, 869 (9th Cir. 2003)
     (holding that the district court abused its discretion by relying

27   on market rates that were in effect more than two years before

28   the time the attorney worked).

1   for complicated civil rights cases litigated by attorneys with

2   thirty or more years of experience." Loskot, 2015 WL 2235521, at

3   *6 (internal quotation marks and citations omitted); see also,

4   e.g., Deocampo v. Potts, No. Civ. 2:06-1283 WBS CMK, 2014 WL

5   788429, at *9 (E.D. Cal. Feb. 25, 2014) (awarding $400 hourly

6   rate to attorney with "thirty-five years of legal experience" and

7   "record of high-profile representations in civil rights

8   matters"); Lehr v. City of Sacramento, No. Civ. 2:07-1565 MCE

9   GGH, 2013 WL 1326546, at *4 (E.D. Cal. Apr. 2, 2013) (awarding

10  $400 per hour to a "highly qualified civil rights attorney with

11  over 40 years of relevant litigation experience" in a complex

12  class action).  Although civil rights practice is a broader

13  category than disability access practice, reasonable hourly rates

14  in civil rights cases are instructive in determining the

15  reasonable hourly rate for ADA cases.  See, e.g., Luna v. Hoa

16  Trung Vo, No. Civ. 1:08:1962 AWI SMS, 2011 WL 2078004, at *4

17  (E.D. Cal. May 25, 2011) (using rate set in a prior "fully

18  contested civil rights" case as a reference point for determining

19  the applicable rate for an ADA case).

20       Here, while this case was not a routine ADA case and

21  arguably merits slightly more than $300, Mr. Thimesch did not

22  present himself to be a highly experienced trial lawyer.  For

23  example, Mr. Thimesch repeatedly tried to use defendant's

24  statement of undisputed facts that was submitted in support of

25  its motion for summary judgment as evidence at trial.  (See Jan.

26  22, 2015 Tr. at 61:17-65:5.)  The court also had to explain to

27  Mr. Thimesch why motions in limine would be unnecessary during a

28  bench trial.  (See Jan. 7, 2015 Tr. at 11:7-16.)

1          While the court does not dispute that Mr. Thimesch has

2     garnered significant ADA expertise in his twenty-five years of

3     practice, at times he also seemed to struggle with the issues in

4     this case.  He did not appear to come into this case with a

5     strong understanding of the more complex issues that were unique

6     to this case.  Even in his area of expertise, Mr. Thimesch's

7     billings show that he relied heavily on experts to determine the

8     applicable federal and state access requirements.  These

9     observations are similar to a recent assessment of Mr. Thimesch

10    by another judge in this district: "Despite Mr. Thimesch's

11    enthusiastic account of his qualifications, the Court has

12    observed nothing in his presentation and management of this case

13    that would rank him above or below the median fee."  Lema, 2014

14    WL 1577042, at *5.  In that case, which was in Fresno, the court

15    awarded Mr. Thimesch $300 per hour.  Id.[13]

16          Mr. Thimesch also argues that a higher rate than the

17    prevailing rate for routine ADA cases is merited because he

18    sought building modifications and did not rely on the easier

19    "readily achievable" standard.  Mr. Thimesch has not shown,

20    however, that greater expertise is necessary to seek building

21    modifications.  As previously explained, most of the remediations

22    plaintiff achieved are akin to those achieved under the readily

23    achievable standard and thus any expertise gained from trying

24    building modification cases did not significantly enhance

25

26         [13]    Since Mr. Thimesch states in his declaration that, with
      the exception of a few non-disability access cases, he practices
27    exclusively in section "55/303" cases, (see First Thimesch Decl.
      ¶ 100), the court assumes Lema was also a section "55/303" access
28    case that is comparable to the present case.

1  plaintiff's recovery in this case.  Any increased work

2  necessitated by a case seeking building modifications is also

3  compensated through the greater number of hours expended on the

4  case.

5       With all of these considerations in mind, the court

6  finds the prevailing market rate in Sacramento for this case may

7  slightly exceed the higher end of a routine ADA case because this

8  case raised unique issues.  At the same time, however, Mr.

9  Thimesch neither displayed an expertise requiring a significantly

10 higher rate than $300 nor showed that his expertise substantially

11 increased plaintiff's success in this case.  The court therefore

12 finds that a reasonable fee for Mr. Thimesch in this non-routine

13 ADA case is $310 per hour.

14               2.   Michelle Thimesch

15      Plaintiff likewise requests a rate of $560 per hour for

16 Ms. Thimesch.  Ms. Thimesch has over 25 years of transactional

17 experience, including experience related to tax transfers and tax

18 investment vehicles.  (See Michelle Thimesch Decl. ¶ 1 (Docket

19 No. 173).)  For this case, Ms. Thimesch conducted transactional

20 research related to preservation easements and appeared at three

21 mediations in 2015.  (See id. ¶¶ 2-3.)

22      Ms. Thimesch has not submitted any evidence identifying

23 the prevailing market rate in Sacramento for a transactional

24 attorney of similar skill and experience.  Nor has she explained

25 whether she maintains her own practice or works as an associate

26 for Mr. Thimesch.  See Johnson, 2014 WL 1334006, at *6

27 (discussing whether an attorney is a partner or associate when

28 determining the reasonable rate).  Plaintiff has failed to

1   satisfy her burden of showing that her requested hourly rate is

2   in line with those prevailing in the community, and this could be

3   fatal to her fee request.  See Schultz v. Ichimoto, No. Civ.

4   1:08-526 OWW SMS, 2010 WL 3504781, at *8 (E.D. Cal. Sept. 7,

5   2010) ("If the prevailing party fails to meet this standard, the

6   fee request is reduced or excluded altogether.").  The court

7   nonetheless will award Ms. Thimesch $275 per hour in light of her

8   duration of experience and the limited role she served in this

9   case.

10        Accordingly, the lodestar in this case is $537,487.50,

11  calculated as follows:

12      Timothy Thimesch     1699.5    x    $310    =    $ 526,845.00

13      Michele Thimesch      38.7     x    $275    =    $  10,642.50

14      **TOTAL ATTORNEY'S FEES**                    **=    $ 537,487.50**

15        Over half a million dollars in attorney's fees for a

16  case that necessitated opposing one motion for summary judgment,

17  several site inspections, and a four-day bench trial is generous

18  to say the least.  Without doubt, it is "adequate to attract

19  competent counsel."  Blum, 465 U.S. at 894-95.  Although the

20  court questions whether the awarded fee gives Mr. Thimesch a

21  "windfall[]," id., there is a "strong presumption that the

22  lodestar amount is reasonable," Fischer, 214 F.3d at 1119 n.4,

23  and the court will therefore adhere to it.

24      B.   Costs

25        Federal Rule of Civil Procedure 54(d)(1) and Local Rule

26  292(f) govern the taxation of costs to losing parties, subject to

27  limits set under 28 U.S.C. § 1920.  See 28 U.S.C. § 1920

28  (enumerating taxable costs).  While costs taxable under § 1920

and Local Rule 292(f) are more limited, the ADA authorizes a court to award "reasonable . . . litigation expenses[] and costs" to a prevailing party.  42 U.S.C. § 12205; accord Lovell v. Chandler, 303 F.3d 1039, 1058 (9th Cir. 2002).  "The Ninth Circuit has stated that out-of-pocket expenses, although not normally taxable as costs, may be recovered as part of an attorney's fee award . . . if they represent costs normally charged to the client." Pac. W. Cable Co. v. City of Sacramento, 693 F. Supp. 865, 874 (E.D. Cal. 1988); see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 624 n.1 (2001) (noting that the award of litigation expenses and costs in § 12205 was modeled after § 1988 and the Court has "interpreted these fee-shifting provisions consistently across statutes").  For example, "because the term 'litigation expenses' normally encompasses expert witness fees, [the Ninth Circuit has held] that the statutory provision provides direct authority for the award of expert witness fees."  Lovell, 303 F.3d at 1058.

Here, plaintiff seeks litigation expenses and costs in the amount of $218,890.  Although defendant does not dispute that plaintiff is entitled to recover reasonable litigation expenses and costs as the prevailing party, it disputes the reasonableness of plaintiff's requested costs and litigation expenses.  The court finds that Mr. Thimesch has adequately justified his costs for trial exhibits, service, court costs, Westlaw charges, and deposition costs.  (See Second Thimesch Decl. ¶¶ 87-88, 90-94.)

1.   Meals

With the exception of meals during trial, defendant

35

objects to numerous expenses for meals consumed during the course
of Mr. Thimesch's work on this case.  Although some attorneys may
charge clients for meals under certain circumstances and with the
client's consent, the court agrees that it is unreasonable to
assess the cost of these meals against the losing party.
Regardless of whether he was working on this case or not, Mr.
Thimesch and his experts would have to eat and his meals did not
advance plaintiff's case in any way.  The court will therefore
**deduct $1,184.83** from Mr. Thimesch's taxable expenses.  (See
Berman Decl. ¶ 52 (itemizing the meals expensed) (Docket No. 188-
2).)

     2.  <u>Hotel Expenses</u>

     Mr. Thimesch seeks reimbursement for numerous hotel
expenses.  Defendant does not object to expenses for Mr.
Thimesch's hotel stay during trial.  When rooms at the Delta King
were booked in order to complete inspections, the court also
finds these expenses reasonable because defendant has not
indicated that it would have provided plaintiff with unrestricted
access to guest rooms for similar durations without charge.  (See
Second Thimesch Decl. ¶¶ 89.c, 89.d, 89.f, 89.g.)

     On August 1, 2012, Mr. Thimesch argues it was
reasonable for him and Karl Danz (one of plaintiff's many
experts) to stay in a hotel overnight because they concluded a
pre-mediation conference that day and had a settlement conference
the next day.  Mr. Thimesch's billings, however, reflect that the
pre-mediation conference concluded at 5:30 p.m. and the
settlement conference did not commence until the afternoon on the
following day.  (See Docket No. 174 at 78-79.)  Although Mr.

36

1  Thimesch might have determined that an overnight stay was

2  preferable for him, it was neither necessary nor a reasonable

3  litigation expense.  Mr. Thimesch's lives approximately 70 miles

4  from the Delta King and this courthouse.  This is no greater

5  distance than many people commute every day.  Because the court

6  has already determined that Mr. Thimesch should not be reimbursed

7  for travel from Walnut Creek, overnight stays for Mr. Thimesch's

8  convenience and to avoid fees for travel time are not reasonably

9  taxed against defendant.  The court will therefore **deduct**

10  **$1,304.73** for hotel expenses for Mr. Thimesch's or his expert's

11  convenience.  (See Second Thimesch Decl. ¶¶ 89.a, 89.e; Pl.'s Ex.

12  325 at 4-5, 39, 223, 287.)

13      3.  <u>Expert Witness Fees</u>

14          a.  <u>Mr. Attwood</u>

15      Barry Attwood, plaintiff's lead expert who testified

16  for most of the bench trial, indicates that his expenses and fees

17  for this case were $86,002.56.  (Docket No. 325 at 470.)  Mr.

18  Attwood's trial testimony was central to plaintiff's case, and

19  Mr. Thimesch has adequately explained the necessity of his

20  attendance at various events throughout the litigation.  The

21  court agrees with defendant, however, that the time he billed in

22  assisting Mr. Thimesch prepare the opposition for summary

23  judgment and draft jury instructions is more akin to work one

24  would expect a lawyer to perform and, assuming it was appropriate

25  work for an expert like Mr. Attwood, the amount of hours billed

26  were excessive when considered in light of the hours Mr. Thimesch

27  billed for the same work.  The reasonableness of the time

28  expended is also difficult to assess because, although Mr.

Attwood's bill is similar to that of an attorney, he has
significant entries that are block billed without adequate
descriptions.  Through Mr. Attwood's trial testimony, the court
found that he was knowledgeable about the intricacies of the ADA,
but despite his expenditure of almost 100 hours preparing his
Matrix and reports, the Matrix had numerous errors.  In light of
all of these considerations, the court will **deduct $10,000** from
Mr. Thimesch's expenses.

The court also questions the reasonableness of
requiring defendant to pay Mr. Attwood's flat fee of $3,500 for
expert testimony at trial when he has already billed for every
minute he spent preparing for trial and the court did not hold
full trial days.  The first day of trial lasted less than five
hours and the second and third days lasted less than three hours
each.  On the two days when Mr. Attwood testified for less than
three hours, his normal rate of $250 per hour sky-rocketed to
over $1,166 per hour when calculated in light of his $3,500 flat
fee.  Because Mr. Attwood seeks to bill similar to an attorney,
with entries for every phone call and email, it is reasonable for
his fee for trial testimony to be taxed against defendant at his
hourly rate of $250, not an exorbitant flat fee.  Moreover,
because the court's own calendar dictated the limited trial days,
defendant should not be punished for Mr. Attwood having to
testify over the course of several days.  The court will
therefore **deduct $7,750** from Mr. Thimesch's expenses to account
for Mr. Attwood's unreasonable trial testimony fees.

b.  <u>Mr. Danz</u>

Plaintiff also hired Karl Danz, a contractor, as an

1   expert witness and incurred $30,797.27 in fees for his services.

2   Although defendant complains that Mr. Danz duplicated Mr.

3   Attwood's efforts, plaintiff has sufficiently explained how Mr.

4   Attwood's primary purpose was to identify barriers under the ADA

5   and Mr. Danz's primary purpose was to propose modifications and

6   determine the costs of those modifications.  Although the parties

7   settled before Mr. Danz testified, this distinction is consistent

8   with the representations Mr. Thimesch made at trial regarding Mr.

9   Danz's anticipated testimony.  While defendant also objects to

10  the travel time for Mr. Attwood and Mr. Danz, defendant's own

11  expert was not located in Sacramento and defendant has not

12  identified experts with similar experience in Sacramento.  The

13  court therefore will not deduct Mr. Danz's fee.

14          c.   Mr. Cole

15          Plaintiff's next expert was David Cole, an independent

16  marine consultant.  The court agrees with defendant that this

17  expert was unnecessary and unreasonable because, by October 2012,

18  defendant had unequivocally admitted that the authority of the

19  United States Coast Guard and other maritime regulations had

20  ceased "before or during 1984-1989" when the Delta King was

21  restored to a hotel.  (Post Decl. Ex. G at 3 (Docket No. 188-6).)

22  Plaintiff needlessly pressed forward on this issue at summary

23  judgment as well.  See D'Lil, 59 F. Supp. 3d at 1010 n.5

24  ("Plaintiff repeatedly argues that Delta King is no longer a

25  'boat.'  Although Delta King points out how it is similar to a

26  boat in many respects, it does not argue that it is a 'boat' or

27  is exempt from the ADA as a 'boat.'").  The court will therefore

28  **deduct $1,000** from Mr. Thimesch's expenses because it was not

1    reasonable to hire a marine consultant.

2              d.   Mr. Reynolds

3         Although defendant similarly objects to plaintiff's

4    marine architect as unnecessary, his testimony focused on the

5    access infrastructure and aided plaintiff in prevailing at

6    summary judgment.  See id. at 1009.  The court therefore finds

7    that plaintiff was reasonable in seeking his expertise.

8              e.   Mr. Lerner

9         Next plaintiff seeks reimbursement for services by

10   Arnie Lerner.  From the redacted consulting services agreement

11   plaintiff submitted, the court cannot decipher what services Mr.

12   Lerner actually provided.  (See Pl.'s Ex. 325 at 76-77.)  Mr.

13   Lerner, who was not listed as a potential witness for trial in

14   the Final Pretrial Order, seems to have replicated any services

15   provided by Mr. Attwood and Mr. Danz.  Because plaintiff never

16   intended to call Mr. Lerner as an expert at trial and his

17   services appear duplicative of experts plaintiff had already

18   hired, the court will **deduct Mr. Lerner's fee of $1,500** from Mr.

19   Thimesch's expenses.

20             f.   Dr. Blanck

21        Plaintiff's next expert was Dr. Peter Blanck who

22   addressed "what equality means to persons with disabilities."

23   (Second Thimesch Decl. ¶ 123.)  Although Dr. Blanck's testimony

24   and purpose likely overlapped with Mr. Attwood, plaintiff

25   emphasizes that it was necessary to have an expert on this issue

26   who was a "believable witness that the jury could relate to."

27   (Id.)  While Dr. Blanck's report was not necessary to plaintiff's

28   success at summary judgment, the court did reference it in its

1  decision.  See D'Lil, 59 F. Supp. 3d at 1015 ("A trier of fact

2  could also find that being able to hear a live band playing on a

3  higher deck is not equivalent to being able to watch the band and

4  partake in the live music experience.  These findings would be

5  consistent with the opinion of plaintiff's expert, Peter Blanck,

6  Ph.D., that the alternate seating and ability to hear the live

7  music does not offer an equivalent accommodation and is

8  stigmatizing for disabled patrons.").  Overall, the court

9  understands Mr. Thimesch's desire to have a witness the jury

10  could relate to on these less than tangible issues, but agrees

11  with defendant that the work likely duplicated that of Mr.

12  Attwood.  The court also agrees with defendant that it was

13  unreasonable for Dr. Blanck to expend 10 hours at $500 per hour

14  preparing for his 1-hour deposition.  In light of the unnecessary

15  duplication and excessive time spent preparing for his

16  deposition, the court will **deduct $3,500** from Mr. Blanck's

17  $10,000 fee.

18          g. Mr. Finklea and Mr. Ebert

19          Mr. Thimesch justifies expenses for Dan Finklea and

20  Scott Ebert on the grounds that he has a "long history with

21  [them] in assisting at inspections and in investigations" and

22  "utilization of their skills when possible reduced the higher

23  fees I would have faced if I had instead involved Atwood and

24  Danz."  (First Thimesch Decl. ¶ 142.)  For the inspection on July

25  16, 2013, however, Mr. Attwood and Mr. Thimesch also attended the

26  inspection, (see Docket No. 174 at 506; Pl.'s Ex. 325 at 463),

27  thus Mr. Finklea's attendance was unnecessary.  The court will

28  therefore **deduct $1,350.50** for Mr. Finklea's charges for that

1   inspection.

2         Mr. Ebert works for Ebert Enterprises, Inc., which does

3   business as My PC Partners.  His bills indicate only that he

4   served as a "technician" for the inspections and provided "legal

5   and tech assistive services."  (Pl.'s Ex. 325 at 472.)  The court

6   is at a loss in determining what expertise or services he offered

7   to the case.  Although Mr. Thimesch now says Mr. Ebert was not

8   going to testify at trial, Mr. Thimesch identified him as witness

9   in the Final Pretrial Order.  (See Docket No. 108 at 9.)  Mr.

10  Thimesch now explains that Mr. Ebert served as a legal assistant

11  at trial, but Mr. Thimesch has not sought to recover his fees by

12  showing his reasonable number of hours and reasonable fee.  Even

13  if the court treated Mr. Ebert as a legal assistant, the cursory

14  description in the bill for a block billed total of 52.5 hours

15  could not pass muster under the lodestar analysis.  The court

16  will therefore deduct his **fees of $7,537.50** from Mr. Thimesch's

17  requested expenses.

18        Similarly, because Mr. Ebert has not adequately

19  accounted for his time as either an expert witness or legal

20  assistant and his contribution to the case remains unclear, the

21  court will **deduct the $664.59** expensed for his hotel room during

22  trial.  (Pl.'s Ex. 325 at 405, 411.)

23  III. <u>Total Award</u>

24        With deductions for unreasonable litigation expenses

25  and costs of $35,792.15, the total litigation expenses and costs

26  the court will tax against defendant is $183,097.90.  The total

27  award of attorney's fees and costs together is $720,585.40, to

28  which the $370,000 in fees and costs paid by the city must be

1  off-set, for a total award of $350,585.40.

2      The hearing on this motion was set for August 24, 2015

3  at 2:00 p.m.  Although both defense counsel and defendant's

4  representative appeared for the hearing, plaintiff did not appear

5  because of his calendaring error.  To provide plaintiff with the

6  opportunity for oral argument, the court reset the hearing for

7  the following day.  Mr. Thimesch agreed at oral argument that his

8  award of fees should be reduced to compensate defendant for

9  appearing at the originally scheduled hearing.  The court will

10  therefore **deduct $750** (3 hours at defense counsel's hourly rate

11  of $250) to account for the two attorneys and one representative

12  who attended the hearing on behalf of defendant.

13      IT IS THEREFORE ORDERED that plaintiff's motion for

14  attorney's fees be, and the same hereby is, GRANTED in part.

15  Defendant is directed to pay $349,835.40 in attorney's fees,

16  litigation expenses, and costs to Mr. Thimesch.

17  Dated:  August 28, 2015

18  _____

19  WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28